# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

NOV 14 2019 AM10:23
FILED-USDC-CT-NEW HAVEN

| | |
|---|---|
| Superb Score, LLC and | CIVIL ACTION |
| Ramon Moreno-Cuevas | |
| *Pro se Plaintiffs* | 3:19 cv 1803 (KAD) |
| | |
| v. | |
| | |
| Town Sports International (TSI) DBA | |
| New York Sports Club (NYSC), | |
| Starwood Retail Partners / Starwood Corp., | |
| Laura Hoover, Director NYSC | |
| Robyn Rifkin, Property Manager | |
| Timothy Carlson, Director Starwood | |
| Brisvely Garcia, Gen. Manager NYSC | |
| Tania Hussain, Fin. Manager NYSC | |
| Jane Doe 1 | |
| John Doe 1 | |
| Jane Doe 2 | |
| John Dow 2 | |
| Jane Doe 3 | |
| John Dow 3 | |
| Jane Dow 4 | |
| *Defendants* | |

## JURISDICTION

The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 1962, 15 U.S.C. § 45, 15 U.S.C. § 1692, 28 U.S.C. § 1332 and 28 U.S.C. § 1367, as supplemental jurisdiction.

## STATUTES INVOLVED

Statutes involved. Federal, 18 U.S.C. §§ 1343, 1344, 1512, 1513, 1951, and 1961-1968. State, C.G.S. §§ 42-110, 52-564, §53a -119, 53a-128, and 53a-183.

## RIGHT TO RELIEF AND JURY TRIAL DEMAND

The Plaintiffs are entitled to relief, as stems from the laws and facts averred in the 16 counts and four remedies stated below. The Plaintiffs' prayers for relief includes a constructive trust, treble damages, punitive damages, and disgorgement of profits. The Plaintiffs demand a jury trial, pursuant to FRCP Rules 5 (d) and 38 (b)

## INTRODUCTION

1. Plaintiff Superb Score LLC is a sole proprietorship, owned by Ramon Moreno-Cuevas and organized under Connecticut's laws, that teaches standardized tests. When "Plaintiff" is in singular refers to Ramon Moreno-Cuevas only.

2. Defendants Town Sports International (TSI) DBA New York Sports Clubs (NYSC) is an LLC organized under the laws New York. Plaintiffs' papers refer to Defendants in plural. The Plaintiffs and the Defendants signed a sublease by which TSI / NYSC subleased a space to Superb Score, in exchange for $750.00 to be deducted from Plaintiff's card. A check offered was not accepted. Pl.'s Aff. ¶¶ 16 and 41. Defs. Laura Hoover, Brisvely Garcia, and Tanya Hussain are officers of TSI / NYSC.

3. Defs. Starwood Retail Partners / Starwood Corporation are TSI / NYSC's Landlord, and managers of Blue Back Square. They are organized under the state of Illinois. Defs. Timothy Carlson and Robin Rifkin are officers of Starwood Retail Partners.

4. NYSC signed the sublease with Superb Score on February 15, 2018, and agreed that Superb Score would move early into the premises, but would start classes on March 1, 2018. TSI / NYSC would charge Pl.'s card on or before March 1, 2018, and would continue to charge it throughout the tenancy, unless another card substituted it.

## STATEMENT OF THE CASE

5. Plaintiffs needed a space to open their business in West Hartford. When Plaintiff proposed the transaction to TSI / NYSC's manager, she offered a space different from the one proposed by Plaintiff, but that Plaintiff accepted as an initial solution.

6. To sign the sublease, TSI / NYSC's manager in West Hartford, Brisvely Garcia, asked for and received a $2,000,000.00, third-party, liability insurance policy with NYSC / TSI as co-beneficiary. Exhibit #2. They gave a key to Plaintiffs that had to be especially made because, according to TSI / NYSC's manager, TSI / NYSC never received that key, and the Landlord, Starwood Retail Partner / Starwood Corp., did not have the original key to that entrance. Starwood authorized their exclusive locksmith to make the key. Exhibit #7.

7. Before signing it, TSI / NYSC's manager had the sublease proposal for about 15 days without making a decision. And before that, there was a one-month-waiting period, just to decide to have Plaintiffs write a draft lease-proposal. TSI / NYSC's manager told Plaintiffs several times that she was waiting for an email from her Director authorizing her to sign the lease. As lots of emails can be written in 15 days, Plaintiff

thought it was simply a "delayed−no," and started looking for an office elsewhere. Pl.'s Aff. ¶¶ 9-10; Exhibit #10.

8. The first place Plaintiff went to looking for rental was Starwood Retail Partners / Starwood Corporation. Tim Carlson took Plaintiff to see a place on Raymond Rd., one block from New York Sports Clubs. At the prospective rental office, Carlson produced a surprising statement both by its spontaneity and by its content: "I see you a lot," he said. "How come I see you that much?" I hesitated for some seconds, thinking "'how could he see me a lot, if I am sitting down all day long at the library doing my computer programming research or writing programs?' I don't go outside except to eat or get a coffee, and I'd never seen him before." Besides, between employees of the different companies from around, high school students who converge at the center of town, library patrons, and visitors, thousands of people pass through Blue Back Square every day. Without accepting or rejecting what he said, I gave him a neutral explanation of what I was doing for him to brew his own answer. Pl.'s Aff. ¶ 11.

9. Another important exchange was Carlson's offering of free parking spaces in the garage, "attached to the rent negotiation." As I know that not always free stuffs are free, I said: "At the beginning that won't be necessary because as part of the research I am doing, my parking is validated by the library." Since then, the parking garage that serves the library started to put restrictions on long-hour-parking library patrons. Pl.'s Aff. ¶ 11.

10. Once we finished seeing the space they were offering, there was no need to go to the monitoring center. But he took me there, where they receive the images of

cameras placed across West Hartford Center. To go to their monitoring center, we had to pass the library, where I was returning, and walk two additional blocks. He did not give me any other information or document to justify the extra walk. That made me conclude on the fly that Carlson wanted to protect his informant with the phrase "I see you a lot," as if he had learned about me through the monitoring center. He seemed to have details about my education because, without my asking, he volunteered that he had worked at Choate, "the exclusive high school," as he described it. By pure coincidence Brisvely Garcia, the NYSC's manager, who is never at the front desk during the week, was at the front desk with two other people when Carlson and I walked by, in our way out, and when I returned to that building at the end of the tour to use the facilities, an hour later. Pl.'s Aff. ¶ 12.

11. It is difficult to know how much Carlson and Garcia communicate with each other, but after that day, Carlson did not answer my emails for seeing other spaces for rent and Garcia kicked in resuming the negotiations that culminated quickly in signing the sublease in one or two days. Pl.'s Aff. ¶ 13.

THE BREACH OF CONTRACT

12. If Superb Score was going to rent spaces in some other NYSC's locations (for the project I am attaching), I had better prop up her confidence, showing how solid the project was. So, I quickly told her not to worry about the number of students that would initially register, and that we would make enough money soon from a product that did not depend on the registration in West Hartford. As part of the negotiation, I got three small lockers where I would place formal clothes and coats to change after working out and save travelling time. Pl.'s Aff. ¶ 19.

13. On Sunday, February 18, 2018 at about 9:45 p.m. during the moving weekend, after all the furniture and equipment were inside the office, Daniel Persa, officer #2306 of Secure-America, a security guard company that renders services to Blue Back Square, came to me while I was leaving the building and said: "The owner of the building told me to escort you out of the building." I turned around from my way out and said: "Follow me. Let me show you something: 'See this key?' 'And this door?' Then, with the key, I opened the door accessing the office I just rented, and told him, 'The owner couldn't have told you what you just said because I am renting here, and he knows it.' Then he said, "I'll go back to him. I have to find out," and he went away. This conversation lasted no more than one minute or two. Pl.'s Aff. ¶ 20-2.

14. On Monday, February 19, 2018 before 1:00 p.m., while fully moved in, Garcia came to the separation between Superb Score's office and the day care, without coming in, as if afraid of something, and said that the Landlord had received several complaints about me: "One was that you had an altercation with one of the janitors; the other, that you have been trespassing into the garages (this can be confirmed by Brooke—a woman who works for the parking garage—and the other is that you are homeless," lowering her voice to a secretive whisper when uttering 'you are homeless'. "And for that, they are going to charge an additional fee." Pl.'s Aff. ¶ 20-2.

15. Plaintiff responded: "I haven't had any altercation with anybody. I had a brief conversation with one of the security guards..." "...Ah, it was with the security guard…," she interrupted giggling. "If they sent him to create an altercation," I continued, "it didn't work because we only had a brief conversation." (On Wednesday the 21st, security guard Persa, came back to apologize for the

'confusion'). "For the second one, how can anybody trespass into garages that are open to the public? If you park your car there without paying or validating, they give you a ticket. That's all, and my parking ticket is validated for the whole day by the library. Now, being homeless doesn't authorize them to charge an additional fee. If I am homeless, they should help me put my office together so that I can produce money not to be homeless. In any case, here is my address." When I gave her my address, I noticed her surprise by the dry swallowing and the slack jaw that made her mouth shape into an 'o'. Then I added, "Briz, those people have been harassing me since I came to the library. They even sent other patrons to spy what I was doing. That's why they are circulating those gossips," I said trying to overcome any bad info that came to her ears. "I don't care what other people are doing to you…" she said. "But it could have been to you…," I interjected. "I don't care. This is about business…" she said. "It could have been to your son," I said, looking for a vein to inject some sensibility. This time she hesitated a little bit, but finally said: "Business is business…" Later that day I sent her an email adding to the conversation, modifying concepts, and to review the contract later on. Exhibit #11; Pl.'s Aff. ¶ 22.

16. The next day the story changed: Garcia claimed that Superb Score had to pay an additional amount on the rent because TSI / NYSC did not have the right to sublet, and Starwood did not know about the transaction, and to authorize it asked for an extra pay that TSI / NYSC was simply passing to Superb Score. Plaintiffs responded that Plaintiffs could not pay one penny more than what the final agreement had been. Pl.'s Aff. ¶ 23. Exhibit #11.

17. As Plaintiffs had made expenses, detailed on page 5 of the small claim's complaint attached, and were expecting to teach a class that would produce some money, Plaintiffs tried to mend the situation by insisting on a contract review in six months. If it was fair to increase the rent, he could do that. But Defendants wanted to impose their will here and now. Pl.'s Aff. ¶ 24.

18. On the 23rd, Plaintiff went to his car and found a business card from police officer Cardone with a note on the back to call him ASAP. Plaintiff called him and he came to the office where Plaintiff showed him around and presented the lease. He said everything looked Ok, but he would get back to me because "this is West Hartford. Things here are never straightforward." The next day he called Plaintiff and said: You're not going to like what I'll tell you, but remember, I'm just the messenger, not the message: Your lease is going to be rescinded, you are forbidden to be in that building after business hours and in two or three buildings near the center where I have never been. Now, listen well to this part, he said: "If you are found there, you're gonna be arrested." Less than two minutes later Brisvely Garcia called and said that she just sent me an email rescinding the lease. No specific date to move out was given in her email breaching the contract. Exhibit #5 Pl.'s Aff. ¶ 25.

19. I thought that maybe somebody could talk to these people and make them reason. They had nothing to gain with what they were doing, and they could lose an income for a room they were not even using. The Chief of Police, Tracey Gove worked out more or less at the same hours I did. At the first opportunity I left a note where he could see it: "Chief, I need to talk to you for a couple of minutes." The following day he said, "Ramon. You are Ramon. You know that I am not working with them

anymore. I retired. Anything you have to solve, you have to solve it with them," he said in an unassuming manner. A down to earth man. "No, Chief. There's nothing to solve with them. I'm renting an office here, and after I moved in these people want to increase the rent. I just want somebody with a persuasive voice to see if they can reason…" before I finished he gave me the answer: "That is a lawyer," he said. "That's precisely what I don't want. Get to the point of lawyers. Maybe you can talk to them, mediate," I said, trying to convince him. "That's what lawyers do, mediate. Nice try, Ramon, but I can't get into that." He had the right answer, but I couldn't spend the money to do the business with lawyerly stuff to solve an artificial conflict that at the end might not be solved if TSI / NYSC didn't want to solve it. I appreciated the fact that the Chief was so approachable and unassuming, and that he gave me the right answer to the situation, even if I did not want to go that way. Pl.'s Aff. ¶ 26.

20. After that conversation, Plaintiff opened his thoughts to the alternative of a legal action. It wasn't worthy to work with such an irresponsible landlord, but I could not bear the costs of moving in, moving out, and the promotion expenses for the class interrupted by what they have done. Therefore, we sued to recuperate part of the expenses before moving. The day before the marshal delivered the papers I went to the front desk at the Club and told the staff member there that I wanted to pay for my lockers, and asked him to charge it from the credit card. "You're all set," he said. Pl.'s Aff. ¶ 27.

   THE LOCKOUT

21. New York Sports Clubs / TSI consistency of style in making people agree with them was fully in display when they received the marshal's papers on March 6, 2018. When Plaintiff walked in that evening, Garcia with one or two body guards was

"coincidentally" walking to the lockers in the rear, where my clothes were: "Get your f***ing clothes out of my lockers before I throw them into the dumpster," was her greeting statement as she saw me. "Hey, I paid for those lockers," I said. With no more words, she signaled to one of the guys who displayed his workouts in a tight, sleeveless T-shirt, and carried hedge shears as soldiers bear their rifles during arms inspection. By the size of their shears, it appeared the mission was to cut the suspension cables of the George Washington Bridge, not simple padlocks. "Hold it. I paid Julian for those lockers," I said. "There's no record of those payments," she replied. "We stopped renting lockers yesterday," and repeated the signal to the guy who had stopped the shear half-way towards the lockers. "Ok. Ok," I said. "Let me look for the padlocks combinations." As my car was in a garage two blocks away, I placed the clothes in the office with the rest of the office chattel. Pl.'s Aff. ¶ 28.

### CUTTING PLAINTIFFS ACCESS TO HIS FURNITURE AND EQUIPMENT

22. To try to get to an understanding, Plaintiffs proposed a meeting that included some other employees. Maybe they would get her to reason about an attitude that would only cause them to lose an income for a space difficult to use by the club or to rent to somebody else. In reaction to that, she said that "my Director will send you an email." When Plaintiff went the next day, the lock to the office door had been changed. On March 8, Plaintiff went to the Small Claims Court and filled out a lockout form, after which they asked me to go to the police and report the lock out. TSI / NYSC told the Police that the lease had been rescinded, therefore, the police did not do anything to solve the situation. Pl.'s Aff. ¶ 29; Exhibit #13.

23. In response to Superb Score's claim for its losses, TSI / NYSC responded detaining Plaintiffs' working equipment, furniture, and clothes, by changing the lock to access the office. On March 8, Plaintiffs received a phone call from "my (her) Director," whose office is in Massachusetts. She repeated the content of the call in an email stating that I could not go to the facilities as a renter or as a member, that my membership to the club was canceled "starting this moment." If Plaintiffs wanted to get "your belongings," Ramon Moreno had to call Laura Hoover (director and signer of the email) to set an appointment with her, but he "could not talk to any TSI / NYSC's employees." Exhibit #12. Despite all this, I continued to follow the court's procedures and indications.

NO APPEARANCE, NO ANSWER

24. The Small Claims Court set Defendants' appearance and answer for no later than March 28, 2018. Defendants did not file an answer or an appearance on that date. On May 11, Defendants filed an invalid appearance, but did not answer the claim. Not a single sentence was filed contradicting Plaintiffs' statements. Although they received Plaintiff's notification changing the company's address to Plaintiff's personal address, Defendants decided to send their notification to their own address, and admitted that Plaintiffs would probably not receive the notification. Although our address was correctly written on the appearance form, Exhibit #16, the court sent letters to a different town and to an inexistent zip code in that town, West Hartford. Exhibit #17. When Defendants filed their appearance, Plaintiffs had corrected the address the court recorded wrong, Exhibits #16 and #18, which they never tried. In violation of the Court Rules, Defendants wrote Plaintiff to their own

address, admitting it would not be received. Defendants never sent a notification to any of Plaintiffs' recorded addresses, wrong or right. Because of the lack of notification, Plaintiffs found out about Defendants' filing the invalid appearance around 30 days later. On June 13, 2018, Plaintiffs answered Defendants, objecting to the appearance for insufficiency of notification, among other grounds, and notified Defendants as the Rules indicate should be done. Exhibit #22.

THE SMALL CLAIMS COURT's CONDUCT

25. On or about March 28, the court set a hearing for June 20, 2018, almost 3 months after the answer date, despite the Rules stating otherwise. No other document was filed by Defendants. As it was strange that Defendants acted as if they were giving up, Plaintiff realized that they might have a surprise plan. So, Plaintiff took several measures, including bringing a witness. I asked my friend Georgetta Levesque to come to court. Levesque's Aff. ¶ 2.

26. On June 20, 2018, at about 9:45 Brisvely Garcia, who had not filed the appearance, and is a non-lawyer, passed by the table Plaintiff was sitting at. Plaintiff called Georgetta, who sat several seats away and explained who Garcia was. "But she is going toward the judges' chambers. Only employees and judges or lawyers are allowed in there, unless a judge calls somebody," she observed. "I know. That's strange. It might be the surprise they are preparing." Court room C was supposed to open at 10:00 a.m., but it did not open until 10:40 or so, when Garcia came out of the backrooms. Levesque's Aff. ¶ 3; Pl.'s Aff ¶ 36.

27. When Courtroom "C" finally opened and everybody was let in, instead of one, two persons entered. It was odd to see two persons trying to fit in the space for one

magistrate. Mag. Edward Mcananey introduced himself and the other person as a "magistrate", who sat somewhat behind and to the right as seen from the public, but it is difficult to keep in memory a "magistrate" who did not have any apparent role in the proceedings. The first thing Mag. Mcananey did after introducing the other person was to "organize the cases": "To save some time in the proceedings," said Mag. Mcananey, "I'm going to organize the cases in one-party and two-parties." With that organization, Mag. Mcananey gave entrance to NYSC in the two-party list, then left the case for the end, when there was no additional witness to testify of what happened there. I felt happy I asked Georgetta to come to court. Pl.'s Aff. ¶ 36.

28. Then, Mag. Mcananey proceeded to repeat a litany that had only one target: "If anybody wants to get an agreement, step out and then come back in for the court to rule on the agreement." This litany was repeated case after case, including those in which there was only a single party. When Superb Score's case was finally announced by the Magistrate, and only five people stayed in the room, he repeated the same litany, but this time raising his eyes to Plaintiff, said: "If *you* don't get an agreement *now*, one of *you* will be very unhappy," emphasizing *you* as he hardened his eyes over Plaintiff. The tension going through Mag. Mcananey's mind was visible at the jawbone joint, where he contracted his muscles intermittently.  He looked at Garcia and asked her "Do you have an offer?" In the four hours there, Mag. Mcananey had not asked that question to any of the parties in controversy. "Yes," she said. "Go outside, and come back in," he added, exhaling audibly. "If you had an offer," Plaintiff said, "why did you waste four hours here to make it now?" She did not answer that question. It was not in the backroom screenplay. Pl.'s Aff. ¶ 39;

THE TRIAL

29. There was no trial. Mag. Mcananey started by asking her a question as if she were the Plaintiff, and turned her answer into an accusation against Plaintiff, as if the Plaintiff were the respondent, from which he had to defend himself: "So, you were at the facilities for about 15 days without paying rent?" he started saying after her answer. "I did pay rent, Your Honor. They just didn't charge it. They had controlled over my credit card," I said. "But the case is that you were there for about 15 days, right?" he insisted. "And the case is that you did not pay rent, correct?" To which I said, "No, Your Honor. I haven't been there for about 15 days. I am still there. And, like the case you had before, two cases before this, one of the parties gave a check to the other in January. The other party did not deposit the check until November. The first party paid, but the second did not deposit. Like the first party, I am not responsible for their lack of charge. It's not my responsibility to force them to charge…"  "I didn't say that you are responsible for their charge," he said. Silence from me. Then he asked Garcia, "Let's say that we impose the payment of the 15 days that they were in the premises, how would you charge that?" he said. "By credit card," she said. "What happens if he offers a check?" he continued. "Our system doesn't accept checks." Pl.'s Aff. ¶ 41.

30. The questions and answers with the Defendant went on for a few minutes, after which I said: "Your Honor, I want to say something about being there for about 15 days…" "I don't need to hear it. I know what you are going to say. You are going to say that everything that she said is not true," he cut me to conclude. "No, Your

Honor. What I was going to say is that you have in your hands a document that proves that what she said is not true." Mag. Mcananey got the document I have passed him a few minutes before. "But this is only about cancelling your membership," he said. "If you continue reading, you will see that they forbade me to go to the facilities, you will see that they were the one who kidnapped my furniture and equipment. I am there because they forced me to," I said. Exhibit #12; Pl.'s Aff. ¶ 41.

31. "Ok. You will hear from me soon," he said to finish with the matter. Plaintiffs heard from him pretty soon. A few days after, by email, I got the Decision Memo from Mag. Mcananey. It was not against the Plaintiff, but against the Connecticut Justice System and all its rules and regulations. Exhibit #23.

32. The ruling violates the U.S. Constitution by giving to the Defendants property that was not in dispute, without the court having jurisdiction to do so, and without a trial about that property. Apparently it gave me a chance to pick up my property within 45 days, but that chance is only apparent, not real. Magistrate Mcananey did not lift the ban not to talk to NYSC's employees, that he was aware of because I asked him to read the email that contains that ban, and did not lift the ban to go to NYSC, as illegally imposed by the West Hartford police to intimidate Plaintiff to accept additional charges in the lease. The ruling could have perfectly worked as the set up for an arrest to have Garcia's threat executed and NYSC solve this case by charging me with a criminal offense, by converting Plaintiff into a criminal.

## ARGUMENT

33. These pleadings present to the Court 16 counts, including two larcenies and two breaches of contract, and three remedies encompassing the counts. Two additional remedies may be presented in a supplementary pleading. The counts include federal and state offenses. The state offenses are presented as pending jurisdiction.

    **A.** TSI / NYSC, STARWOOD RETAIL PARTNERS / STARWOOD CORP., AND THEIR AGENTS, SHOULD BE FOUND LIABLE OF CIVIL RICO AND CONSPIRACY BECAUSE DEFENDANTS FORMED AN ENTERPRISE THAT CONSPIRED AND VIOLATED U.S.C. 18 §§ 1343, 1344, 1512, 1513, 1951, AND 1961-1968, PROVISIONS CONTROLLING PREDICATE ACTS IN A CIVIL RICO ACTION.

34. Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents, Timothy Carlson, Robin Rifkin, Laura Hoover, Brisvely Garcia, and Tanya Hussain should be found liable of Racketeer Influenced and Corrupt Organizations (RICO) because Defendants "participate" in an "enterprise" that engages in a "pattern" of "racketeering activity." TSI / NYSC and Starwood Retail Partners / Starwood Corporation are located in several states and affect interstate commerce. In executing their scheme to deprive Plaintiffs of money and other property, TSI / NYSC violated U.S.C. 18 §§ 1343, 1344, 1512, 1513, 1951, and 1961-1968, which provisions control predicate acts in a Civil RICO action, as the Supreme Court defined it in Sedima and the Second Circuit in Moss v. Stanley Morgan. In executing their "pattern" of "racketeering activity," Defendants conspired to injure Plaintiffs in both their business and their property. Therefore, a recovery is appropriate, as per the RICO Statute. Sedima, SP RL v. Imrex Co., 473 US 479 - Supreme Court 1985; Moss v. Morgan Stanley Inc., 719 F. 2d 5 - Court of Appeals, 2nd Circuit 1983.

35. A person who affects interstate or international commerce, "participates" in an "enterprise" that engages in a "pattern" of "racketeering activity," and in doing so injures another person in business or property in violation of the RICO statute 18 U.S.C § 1962, is liable of racketeering and subject to treble damages and expenses, should the plaintiff properly allege the elements of the offense and show the injuries suffered. These elements are: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests, maintains an interest, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. Sedima, SP RL v. Imrex Co., 473 US 479 - Supreme Court 1985; Moss v. Morgan Stanley Inc., 719 F. 2d 5 – Ct. of App., 2nd Cir. 1983, relying on 18 U.S.C. §§ 1961-68 and Bays v. Hunter Savings Association, 539 F. Supp. 1020, 1023 (S.D. Ohio 1982).

36. A defendant who has commissioned two or more predicate acts in violation of U.S.C. 18 § 1343, has violated 18 U.S.C § 1961(1) because § 1343 is one of the codes controlling the array of predicate acts leading to a violation of 18 U.S.C § 1961(1). A violation of section 1343 is also a violation to section 1962 because violations to the former are part of the underlying predicate acts described as prohibited activities by the latter, that a person affecting interstate or international commerce cannot commit in a "pattern" of "racketeering activity" less risking being classified as a racketeer.

37. In relevant part, U.S.C. 18 § 1343 states that

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire [...]

> communication in interstate […] commerce, any writings, signs,
> signals, pictures, or sounds for the purpose of executing such
> scheme or artifice, shall be fined under this title or imprisoned not
> more than 20 years, or both. […]

38. In <u>Carpenter v. United States</u>, in which the defendants, a Wall Street Journal's
    columnist and his co-conspirators, tried to reduce their violations of § 1343 and other
    statutes to "a violation of workplace rules and did not amount to fraudulent activity
    that is proscribed by the [wire] fraud statute." The Court replied that the defendants
    "miss the point…" "[Section] 1343 reach[es] any scheme to deprive another of
    money or property by means of false or fraudulent pretenses, representations, or
    promises." <u>Carpenter v. United States</u>, 484 US 19 - Supreme Court 1987 at 26-7.

39. And in relevant part U.S.C. 18 § 1962 (d), states that

> (d) It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a), (b), or (c) of this section.

40. Likewise, violations to U.S.C. 18 § 1344, 1512, 1513, 1951 in a "pattern" of
    "racketeering activity" by persons or companies that affect interstate or international
    commerce are subject to U.S.C. 18 § 1962 (2) of the Act that sanctions the
    Prohibited Activities stated by the Code. Section 1344 states that "(2) to obtain any
    of the moneys, funds, credits, assets, securities, or other property owned by, or
    under the custody or control of, a financial institution, by means of false or fraudulent
    pretenses, representations, or promises; shall be fined not more than $1,000,000 or
    imprisoned not more than 30 years, or both." As U.S.C. 18 § 1344 (1) mentions that
    the violation entails to "defraud a financial institution," the defendant in <u>Loughrin v.
    US</u>, 134 S. Ct. 2384 - Supreme Court 2014, admitted all the violations committed,
    but said that he did not attempt to deceive a bank, which is an element of the

offense, therefore, he did not violate the statute because that element of the offense

is missing in the prosecution allegations. As Defendants in this case may try to use

that argument to avoid responsibility, here is what the Court said in Loughrin:

> According to Loughrin, we should read the bank fraud statute in the
> same way [that we read § 1341 in other cases].
> But the two statutes, as an initial matter, have notable textual
> differences. The mail fraud law contains two phrases strung
> together in a single, unbroken sentence. By contrast, § 1344's two
> clauses have separate numbers, line breaks before, between, and
> after them, and equivalent indentation — thus placing the clauses
> visually on an equal footing and indicating that they have separate
> meanings. Id. at 2391.

No need to say it, the Court affirmed the Tenth Circuit in Loughrin.

41.  And yet, in Neder v. United States, 527 US 1 - Supreme Court 1999, the Court

reversed the case to the court of appeals because the defendant asked that the jury

be instructed on materiality. The district court denied such instruction, saying the

statute does not mention materiality anywhere, and the jury found the defendant

guilty. The court of appeals affirmed, and the defendant averred that materiality

should be incorporated into the statute interpretation, therefore, should have gone to

the jury as an element. In its opinion in Neder, the Court stated that the Government

did not dispute that at the time the mail fraud statute was enacted, in 1872, and later

when Congress enacted the wire fraud and bank fraud statues, "actionable 'fraud'

had a well-settled meaning at common law." Neither the Government dispute that

the "well-settle meaning of 'fraud' required a misrepresentation or concealment of

material fact." And, therefore, "the common law could not have conceived of 'fraud'

without proof of materiality." Id. at 22. Based on that, and on the district court's

failure to properly instruct the jury, the Court reversed.

42. In relevant part, U.S.C. 18 § 1512 states that

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;
> (2) cause or induce any person to—
> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
> (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> (D) be absent from an official proceeding to which such person has been summoned by legal process;

43. In US v. Diaz, the defendants alleged that although they had beaten up another defendant, wrongfully thinking that he was an informant against the Latin King, they were just trying to prevent the beaten-up defendant from going to the local authorities, not the federal authorities. To that contention, the prosecution responded, and the court adopted, that to determine whether the defendants in their violations had a "federal jurisdictional nexus," that the starting point must be the language of the statute itself. "Section 1512(b)(3) makes it unlawful to use physical force 'with intent to ... hinder, delay or prevent the communication to a law enforcement officer ... of the United States of information relating to the commission or possible commission of a Federal offense.' Subsection (a)(4) of 18 U.S.C. § 1515 defines a 'law enforcement officer' as 'an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government.' Section 1512(f) notes that 'no state of mind [of the defendant] need be proved with respect to the circumstance ... that the law enforcement officer is an

officer or employee of the Federal Government or a person authorized to act for or

on behalf of the Federal Government.'" US v. Diaz, 176 F. 3d 52 - Court of Appeals,

2nd Circuit 1999.

44. Likewise, U.S.C. 18 § 1513, in relevant part, states:

> (e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.
> (f) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

45. Defendant John Lea, in US v. Lea, 360 F. 3d 401 - Court of Appeals, 2nd Circuit

2004, knew of a witness who testified against one of his friends in a trial. At some

point, Lea attacked the witness in retaliation. Lea was trialed and found guilty by the

jury. The defendant posted bail and the district court approved it, but the prosecution

assured his incarceration and appealed the verdict. The Second Circuit reversed the

district court and said in its opinion that the "district court's ruling was clearly

erroneous."

> Assuming, *arguendo,* that the court reasonably concluded that Lea posed no risk of flight or danger to anyone, and thus satisfied the requirements of § 3143(a)(1), it plainly erred in finding that Lea's case presented "exceptional circumstances." […] the circumstances in this case do not approach being "exceptional." There is nothing "exceptional" about going to school, being employed, or being a first-time offender, either separately or in combination.
> US v. Lea, 360 F. 3d 401 - Court of Appeals, 2nd Circuit 2004.

46. In relevant part U.S.C. 18 § 1951 states:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
(b) As used in this section—
(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

47. In US v. Ivanov, 175 F. Supp. 2d 367 - Dist. Court, D. Connecticut 2001,

defendant Ivanov, while in Russia, "hacked" into OIB's computer system and

obtained its "root" password, then threatened OIB with the destruction of its

computer systems and demanded approximately $10,000 for his assistance in

making those systems secure. From Russia, Ivanov gained access to the Lightrealm

computer network to communicate with OIB. Ivanov was indicted and "Count Seven

charges that the defendant obstructed, delayed and affected commerce, and

attempted to obstruct, delay and affect commerce, by means of extortion by

attempting to obtain property from OIB with OIB's consent, inducing such consent by

means of threats to damage OIB and its business unless OIB paid the defendant

money and hired the defendant as a security consultant, in violation of 18 U.S.C. § 1951(a)."

48. Based on the facts of <u>Ivanov</u>, this District Court concluded that "the Hobbs Act encompasses not only all extortionate interference with interstate commerce by means of conduct occurring within the United States, but also all such conduct which, although it occurs outside the United States, affects commerce within the borders of the United States." Therefore, even if Defendants were abroad their acts make them liable.

49. In a RICO claim, a plaintiff does not have to allege a separate "RICO-type injury," in the form of a "racketeering injury," or a "competitive injury" for the court to find a defendant liable of a RICO offense. The Supreme Court ruled in <u>Sedima</u> that because a "racketeering activity" consists of just a predicate act violating § 1961(1), it is not necessary to allege "a 'racketeering injury' separate from the harm" that the "predicate acts" have caused. The Court ruled on the "racketeering injury" because when <u>Sedima</u> was introduced in the federal court system through the Eastern District of New York, the district court dismissed the RICO component of the complaint finding that the plaintiff had not alleged a "RICO-type injury" in the form of a "racketeering injury," or a "competitive injury." For a "racketeering injury" to occur, "something more or different than [the] injury that would result from the predicate acts must be shown" by the plaintiff. And to demonstrate that a "competitive injury" has occurred, the plaintiff has to show that "an enterprise that has gained an unfair market advantage through the infusion of funds from racketeering activity" has been

the cause of plaintiff's injury. SEDIMA SPRL v. Imrex Co., Inc., 574 F. Supp. 963 -
Dist. Court, ED New York 1983, at 965.

50. The Supreme Court disagreed with that construction of § 1962 of the statute, among
other reasons, because neither the district court nor the appellate court that affirmed
the judgment stated what was the test to show a "RICO-type injury." The Court
reversed. Sedima, SP RL v. Imrex Co., 473 US 479 - Supreme Court 1985 at 495.

51. The claim in Sedima stemmed from a joint-venture agreement between Sedima and
defendant Imrex Co. Imrex would purchase electronic components in the United
States that Sedima was to provide to a European firm. The two companies were to
split the operation's profits. After selling about $8.5 million in products, the plaintiff
somehow realized that Imrex was inflating the bills by presenting non-existent
expenses and so "cheating Sedima out of a portion of its proceeds [by overbilling
about $175,000]." SEDIMA, SPRL v. Imrex Co., Inc., 741 F. 2d 482 - Court of
Appeals, 2nd Circuit 1984 at 484. The action filed included unjust enrichment,
conversion, breach of contract, breach of fiduciary duty, and constructive trust, and
"asserted RICO claims under § 1964(c) against Imrex and two of its officers, and
conspiracy to violate 1962(c)." The plaintiff sought treble damages and attorney's
fees.

52. In adjudging the case, the district court adopted the formality of the Second Circuit's
opinion in Moss, by stating that (1) RICO claims do not need the allegation that
defendant is affiliated with "organized crime" for the claim to be successful, and (2)
the racketeering enterprise does not depend on any economic significance apart
from the pattern of "racketeering activity." 574 F. Supp. 965, 1983. But despite that,

the district court dismissed the RICO component of the claim. SEDIMA SPRL v. Imrex Co., Inc., 574 F. Supp. 963 - Dist. Court, ED New York 1983, at 963. The plaintiff appealed to the Second Circuit. The majority of the panel confirmed the district court's decision to dismiss Sedima's RICO claim SEDIMA, SPRL v. Imrex Co., Inc., 741 F. 2d 482 - Court of Appeals, 2nd Circuit 1984 at 492.

53. But the Supreme Court reversed the case and the concepts expressed in it, and found, instead, that a "racketeering activity" is the commission of two or more "predicate acts" in violation of § 1961(1). And that § 1964 (c) "authorizes a private suit by '[a]ny person injured in his business or property by reason of a violation of § 1962.'" This section, in turn, makes it unlawful for "'any person'–not just mobsters— to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity." The Court concluded that "[t]here is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement."

54. However, in alleging an injury, the plaintiff has to prove that the injury alleged has a proximate cause in defendant's violative actions. So, in Holmes v. Securities Investor Protection Corporation, the Court denied Securities Investor Protection Corporation standing to sue Robert G. Holmes on a RICO basis "because the alleged conspiracy to manipulate [securities] did not proximately cause the injury claimed, SIPC's allegations and the record before us fail to make out a right to sue petitioner under § 1964(c)." Concurring in the judgment, Scalia J. wrote an opinion that provides an alternative reason to support the judgment:

55. In his concurring opinion Justice Scalia says that the "ultimate question here is statutory standing: whether the so-called nexus [...] between the harm of which this plaintiff complains and the defendant's so-called predicate acts is of the sort that will support an action under civil RICO. [...] One of the usual elements of statutory standing is proximate causality. [...] Yet another element of statutory standing is compliance with what I shall call the 'zone-of-interests' test, which seeks to determine whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefited by the provision at issue." Holmes v. Securities Investor Protection Corporation, 503 US 258 - Supreme Court 1992. (Intern'l quotes and notes omitted).

56. As a Second Circuit's judge, Sotomayor J. wrote in her opinion in Lerner v. Fleet Bank, NA, in which the RICO elements were compressed to a set of three: "The RICO statute grants standing to '[a]ny person injured in his business or property by reason of a violation of section 1962 ....' 18 U.S.C. § 1964(c). To demonstrate standing, a plaintiff must plead, at a minimum, '(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.' [...] This third requirement is satisfied if the defendant's injurious conduct is both the factual and the proximate cause of the injury alleged. Holmes, 503 U.S. at 268, 112 S. Ct. 1311." Lerner v. Fleet Bank, NA, 318 F. 3d 113 - Court of Appeals, 2nd Circuit 2003.

57. Then Judge Sotomayor added:

> While the zone-of-interests test may indeed be relevant to determining statutory standing, it is unclear precisely how this test would apply under the complex structure of the RICO statute. A RICO violation encompasses not only a violation of § 1962, but also

violations of the underlying statutes that constitute the array of predicate acts. [...] The district court relied upon its determination that plaintiffs did not fall within the zone of interests of the reporting regulations for this system in dismissing plaintiffs' RICO claim for lack of standing. <u>Lerner</u>, 146 F.Supp.2d at 231. Whether a plaintiff must fall within the zone of interests of both RICO and the underlying statutes and regulations in order to pursue a RICO action is a question we have not yet answered.

Both the Supreme Court in <u>Holmes</u> and this Circuit in <u>Powers v. British Vita</u>, P.L.C., 57 F.3d 176, 188 (2d Cir.1995), have been squarely confronted with the issue, and both courts have found it wiser to resolve those cases on grounds of proximate causality.

Then, the zone-of-interest is not an additional test requirement for a RICO claim.

### A PRIMA FACIE CASE FOR A RICO CLAIM

58. To form a prima facie case that Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents, "participate" in an "enterprise" that engage in "racketeering activity," and violated U.S.C. 18 §§ 1343, 1344, 1512, 1513, 1951, and 1961-1968 against Plaintiffs, Plaintiffs have to show that a reasonable jury could consider the evidence attached and other expected, and properly plead each element of the violation, which are:

59. First, to show that the Defendants have violated the "criminal RICO" statute 18 U.S.C. § 1962, the Plaintiffs has to show compliance with the requirement of alleging the constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invest in, or maintain an interest in, or participate in (6) an "enterprise," (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. 18 § 1962(a)-(c). To satisfy this burden, Plaintiffs must also show that Plaintiffs were "injured in [their] business or property by reason of the violation of section 1962." 18 U.S.C. §

1964(c). The Plaintiffs meet and surpass this standard, or the shorter version set out by Justice Sotomayor in ¶ 56, as shown below.

60. A company that forms a "pattern" of "racketeering activity," and directly or indirectly participates in an "enterprise" that affects interstate or international commerce, having or not nexus to organized crime, that injures in property or business another company or person due to these activities, is subject to a RICO claim. Defendants, TSI / NYSC, formed an "enterprise" in which their three main officers in West Hartford and Massachusetts, Laura Hoover, Brisvely Garcia, and Tania Hussain, "knowingly" participate and conduct a "pattern" of "racketeering activity." Pls.' Compl. ¶¶ 161-80 and 198-206. The enterprise "pattern" of "racketeering activity" is structured in a way similar to the one shown in Neufeld v. Cigna Health and Life Insurance Company. Pls.' Compl. ¶¶ 161-80. In this case the violation is committed by requesting the members of TSI / NYSC to pay their monthly fee only by credit card, Pl.'s Aff. ¶ 41, and then using this credit card number to feed it to the "enterprise." As this credit card can be charged at any time, the "enterprise" overcharges and when those members claim their money back the officers of the "enterprise" refuse returning the money, adopt a threatening attitude, and state that only if "my Director approves, the money will be credited, in violation of U.S.C. 18 §§ 1343, 1344, 1512." Pls.' Compl. ¶ 238; Pl.'s Aff. ¶¶ 7-8; Neufeld v. Cigna Health and Life Insurance Company, WL 4158377 (D. Conn. Aug. 30, 2018).

61. To attract new customers, the "enterprise", TSI / NYSC, runs promotions from time to time promising to give a discount off the normal fees, but after registration, the enterprise not only does not honor the promise but also levies charges undisclosed

in the promotion, that the members have no other choice, but to absorb. With this scheme, Plaintiff was overcharged $138.21 in 2.5 months. The projection of that pattern of overcharging to a whole year is $663.41. Pls.' Compl. ¶¶ 198-205.

62.  Plaintiff notified TSI / NYSC's officers, but as seen in in Pl.'s Aff. ¶¶ 7-8, the officer in charge of finance not only refused to return the money, but referred Plaintiff to a higher up officer, just to get the money credited. Using this "pattern" of "racketeering activity", Defendants have potentially swindled a large amount of money from the public. Only the final evidence, after Discovery, will tell the exact amount, or whether they only swindled Plaintiff for being him. *See* calculations Pls.' Compl. ¶¶ 198-205.

63. The appropriation of money with false promises occurred when TSI / NYSC promised two months free of charge, but after Plaintiff registered, TSI /NYSC did not comply with the offer, and instead, imposed several inappropriate charges that form a "pattern" of "racketeering activity" and constitute fraud. Exhibit #4 pp 1-6; U.S.C. 18 § 1962(a)-(c); Neufeld v. Cigna Health and Life Insurance Company, WL 4158377 (D. Conn. Aug. 30, 2018); Zito v. United Technologies Corporation, Not Reported in Fed. Supp. (2016) WL 2946157 Civil No. 3:15-cv-744 (AWT); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); Negron v. Cigna Health and Life Ins., 300 F. Supp. 3d 341 - Dist. Court, D. Connecticut 2018. Devitt v. Manulik, 176 Conn. 657, 662–63,410 A.2d 465 (1979).

64. Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents, Timothy Carlson, Laura Hoover, Brisvely Garcia, and Tania Hussain, violated the U.S.C 18 §§ 1343, 1344, 1512, 1513, and 1951, which are part of the

"substantive RICO statute," as defined in 18 U.S.C. § 1961(1), each of which violations constitutes a violation of 18 U.S.C. § 1962.

> 1. Defendants Violated U.S.C. 18 § 1343 by Obtaining Money and Property by False Pretenses and Then Transmitting the Money Through the Wire, Affecting Interstate Commerce.

65. Plaintiffs show with the attached evidence, Exhibit #4, and demonstrates in details in **Points D, E, F, L** and **M** of these pleadings, that in their activities, (1) Defendants (2) "commissioned" (and additionally attempted to "commission") more than two "predicate acts" of fraud between December 20, 2017 and April 2, 2018. When the first predicate act commissioned by TSI / NYSC occurred, Plaintiff complained at the Clubs about the charge on his credit card, and asked to have the money returned. Defendant Tanya Hussain answered that the money would not be returned. As Defendants executed the predicate acts in more than two occasions, (3) constituting a "pattern" (4) of "racketeering activity." Defendants fit the requirements for liability described in the RICO Act. Pl.'s Compl. ¶¶ 34 and 58-9.

66. TSI / NYSC uses part of the money they collect through this "racketeering activity" in paying their employees, creating new club locations, acquiring other clubs, and giving bonus and commissions to the managers in charge of executing the fraud, they "conduct an 'enterprise' through a pattern of racketeering activities." Therefore, the Defendants (5) "directly or indirectly invest in, maintain an interest in, and participate in" (6) the "enterprise." In executing such activity, Defendants (7) used false pretenses to deceive Plaintiffs into the scheme, in violation of 18 U.S.C § 1962, for which the Defendants are subject to a RICO claim.

67. Specifically, Defendants transferred money from Plaintiffs' bank account to Defendants' bank account using the wire and crossing state lines, so affecting

interstate commerce. The offense committed by Defendants in the violation of U.S.C. 18 § 1343 stems from using the wires in transferring the overcharges they took from Plaintiff credit card. The violation of U.S.C. 18 § 1343 applies to "[w]hoever, having devised," but also to those "*intending to devise* any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." (Emphasis added). Their "intending to devise" a scheme to deprive Plaintiffs of liquid property (money) disguised as a penalty to the rent was not successful because Plaintiffs rebuffed the extortion, but by what § 1343 states, they are liable of a second offense in a "pattern" of "racketeering activity," as the intended rent money was also to be collected through the wire, transferring money from bank account to bank account.

68. Starwood Retail Partners / Starwood Corp. and agents conspired with TSI / NYSC and their agents to violate U.S.C. 18 § 1962 (a)-(c) sending their security guard to provoke and then to stage an altercation with Plaintiff and put Plaintiff under duress to soften Plaintiffs to accept the rent increase disguised as a penalty for the "altercation." That conspiracy extended to sending the police, that Garcia and the other minor players could not summon at will, but Starwood, as managers of Blue Back Square, have some leverage on, as shown in the affidavit. Pl.'s Aff. ¶ 25.

69. Given that the conspiracy to commit fraud between the two groups of Defendants had as objective to deprive Plaintiff of the monthly rent-increase money, which means more than two predicate acts of the same kind, both groups of Defendants violated U.S.C. 18 § 1962 (d), that states

> (d) It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a), (b), or (c) of this section.

70. Thus, even if Plaintiffs were to concede that Starwood Retail Partners / Starwood Corp. did not directly deprive Plaintiffs of any of their money or property, and that they might have entered late in the conspiracy, they are equally responsible and liable for the execution of the "pattern" of "racketeering activity." They acquired all the information necessary to reject the conspiracy, but, instead, they willingly participated in it. By the Supreme Court's decision in <u>Carpenter</u>, there is precedent that these violations of U.S.C. 18 § 1343 are actionable against Defendants. <u>Carpenter v. United States</u>, 484 US 19 - Supreme Court 1987 at 26-7.

71. Therefore, for the reasons exposed above, Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents should be found liable of violating U.S.C. 18 § 1343, and consequently violating U.S.C. 18 § 1961(1) and 18 § 1962.

72. Defendants also violated section 1344.

2. <u>Defendants Violated U.S.C. 18 § 1344 by Appropriating Money that Was Under the Custody and Control of a Financial Institution.</u>

73. The evidence attached and the detailed argument in **Points D** and **E** of these pleadings show that TSI / NYSC executed a "pattern" of "racketeering activity" "to obtain […] moneys […] under the custody or control of, a financial institution, by means of false or fraudulent pretenses…," when the Clubs fraudulently overcharged Plaintiff's credit card several times while he was a member, and even after his membership ceased. Because that money was "under the custody or control of, a financial institution," and crossed state lines, affecting interstate commerce, that appropriation violated U.S.C. 18 § 1344.

74. As the "attempts to execute" a fraudulent scheme in a "pattern" of "racketeering activity" carries the same penalties as the actual execution, Defendants are liable of a second count for the violation of U.S.C. 18 § 1344 because they additionally attempted to execute the scheme to increasing the rent. The moneys that they attempted to (but could not) appropriate by false pretenses were equally under the custody of a financial institution, and would have equally crossed state lines and affected interstate commerce should they have been successful in their attempt to commit that other fraud. And yet, in Neder v. United States, 527 US 1 - Supreme Court 1999, the Court reversed the case to the court of appeals because the defendant asked that the jury be instructed on materiality.

75. As shown in details in ¶¶ 165-74 of this pleadings, Starwood Retail Partners / Starwood Corporation participated fully with TSI / NYSC in the conspiracy and the attempts to appropriate those moneys by supplying the materiality of a security guard, instrumental in trying to increase the rent and that resulted in Plaintiffs losing their property used as tools for their livelihood. This is part of the material injury inflicted on the Plaintiffs, for which these pleadings also satisfy the element of materiality found by the Court in Neder. Therefore, Starwood and agents are equally culpable of the formation and execution of the "pattern" of "racketeering activity" that TSI / NYSC employed to attempt to appropriate the rent-increase funds. By the Supreme Court's decision in Loughrin and its confirmation of the Tenth Circuit, there is precedent that these violations of U.S.C. 18 § 1344 are actionable against Defendants. Loughrin v. US, 134 S. Ct. 2384 - Supreme Court 2014. Id. at 2391.

76. Therefore, for the reasons exposed above, Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents should be found liable of violating U.S.C. 18 § 1344 (2), and consequently violating U.S.C. 18 § 1961(1) and 18 § 1962.

3. Defendants Violated U.S.C. 18 § 1512 by Obstructing Plaintiffs' Proceedings in Federal Court Using Intimidation and Causing Delays in the Process.

77. When realizing that Defendants would not forego their greed, Plaintiffs decided to recover their moving in-and-out expenses, and prepared for a federal court claim for the damages Defendants caused beyond the costs sustained to that point. Plaintiffs notified that proceedings in the Small Claim Pleadings. See Small Claims Pleadings, page 5. But Defendants took badly this perfectly civilized stance, and Garcia, at the first opportunity threatened: "I thought you were going to go intact…but you didn't go… Hah?" Pl.'s Aff. ¶¶ 20-2. Besides that, Hoover sent an email cancelling Plaintiff's membership in the Clubs and forbidding to talk to any of the employees. In so doing, Defendants were obstructing Plaintiffs from finding out information necessary to initiate these federal proceedings. Exhibit #12.

78. Moreover, the police, without any incident that justified it, or any procedure that legalized it, banned Plaintiff from going to the building and half-a-dozen other places in town, and announced the lease "rescission." As Plaintiffs' property was in that building, it is not difficult to conclude that the reason to include the other forbidden places was to cover up the purpose of parting Plaintiffs with their property and with it the possibility of getting the data for federal court proceedings. Pl.'s Aff. ¶ 25.

79. This "intimidation," "threats," and obstruction of Plaintiff work in the federal procedure were designed to "influence, delay, [and] prevent" [Plaintiff's] legal action by obstructing the small claim proceedings Plaintiffs were engaged in and the federal case Plaintiffs were preparing, as announced in the small claims pleadings. By the Second Circuit Court of Appeal's decision in US v. Diaz and the provisions of § 1512 because a proceeding in federal court is handled by federal employees and the code says, that "whoever knowingly uses intimidation, threatens […] with the intent to— (1) influence, delay, or prevent the testimony of any person in an official proceeding;" […] "Shall be fined under this title or imprisoned not more than 20 years, or both." Garcia was upset because her name was mentioned in the small claim: "Look how my name is all over the place," and used her getting offended to threaten Plaintiff with no going "intact." Pl.'s Aff. ¶ 28. Id. at 2391. US v. Diaz, 176 F. 3d 52 - Court of Appeals, 2nd Circuit 1999. Defendants' conduct fit what the Circuit Court said in Diaz and what is inscribed in statute § 1512.

80. As shown in Pl.'s Aff. ¶ 21 and Pls.' Compl. ¶ 14, Starwood Retail Partners / Starwood Corporation and their agent, Carlson, fully participated in the intimidation by sending the security guard to "escort you out of the building," as Mr. Persa said, and the police to announce the "rescission" of the lease. Pl's Aff. ¶¶ 20 and 25. Besides that, this might have been authorized by Robyn Rifkin, who is the business manager. A counter-argument that Carlson, Rifkin, and Starwood may use is that there is no proof in the pleadings that either of the two persons was sent by anybody at Starwood. However, the prohibitions the police were implementing are beyond TSI / NYSC's scope of interest, power, and control. Conversations with Garcia

indicate that she may not even have known, at that moment, where those places were. Besides that, TSI / NYSC did not have control over those places to know whether Plaintiff subsequently went there or not. Starwood has the camera system to notify the police and manage those places. When Hoover wrote her email to Plaintiff, she confined herself to places and things NYSC had control over. Therefore, the pattern of behavior reveals who was behind those measures. Those obstructions from Starwood violated U.S.C. 18 § 1512. Exhibit #12

81. Therefore, for the reasons exposed above, Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents should be found liable of violating U.S.C. 18 § 1512, and consequently violating U.S.C. 18 § 1961(1) and 18 § 1962.

82. Defendants violated U.S.C. 18 § 1513.

4.  Defendants Violated U.S.C. 18 § 1513 by Interfering with the [Plaintiff's] Lawful Employment or Livelihood.

83. As defendant Garcia expressed after Plaintiffs sent the small claims papers, they thought that after the contract violation Plaintiff was "going to go intact…" but he did not go. In account of that, Garcia threatened to cut the padlocks on Plaintiff's lockers and throw his clothes into the dumpster. That is a retaliation for the proceedings Plaintiffs decided to conduct in small claims court, and for the proceedings in federal court, announced in that claim. On banning Plaintiff from going to the building where his property was, talking to the employees that have access to the property, and going to public places in town where other persons go, Defendants were also retaliating against Plaintiff for his lawful action at the small claims court and "[interfering] with the lawful employment or livelihood of [Plaintiff]." They were stealing Plaintiff's working tools and form of livelihood: books, computers, programs

in the computers, office furniture, bookcases, faxes, copiers, writing boards, teaching clothes, shoes, crates, etc., used in teaching standardized tests by Plaintiff. In US v. Lea, the defendant John Lea attacked a witness in retaliation for testifying against one of his friends. Lea was trialed and found guilty by the jury. Like in Lea, Garcia retaliated against Plaintiff for simply claiming his expenses of moving-in-and-out, and threatened further retaliatory measures for following the law.

84. May the Court notice that in this violation of U.S.C. 18 § 1513, TSI / NYSC were the visible actors, but without the assistance of Starwood Retail Partners / Starwood Corporation, and particularly, Tim Carlson, the retaliatory incident and other measures would not have been possible, as Garcia would not have felt emboldened to do it and would not have displayed the forces in town that made possible retaliatory measures, for TSI does not have the essential connections to do so. Starwood and Carlson and Rifkin are equally responsible and liable for this violation.

85. Therefore, for the reasons exposed, Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and agents should be found liable of violating U.S.C. 18 § 1513, and consequently violating U.S.C. 18 § 1961(1) and 18 § 1962.

86. Defendants violated U.S.C. 18 § 1951.

5. Defendants Violated U.S.C. 18 § 1951 by Threatening to Employ Physical Violence, and Affecting Interstate Commerce by Stealing Plaintiffs' Working Tools.

87. When Plaintiff asked for his money back, after the inappropriate charges on his credit card in the first month as a member of TSI / NYSC, the presence of three or four persons at the front desk in the appointment TSI / NYSC planned, was simply to intimidate Plaintiff. A police officer who announced the "rescission" of the lease,

without the police being a partner in the business between the parties, was an act of intimidation. Having a security guard sent to provoke an altercation was an act of intimidation. It was an act of intimidation to ambush Plaintiff after he sent the small claims paperwork, and force him to take his clothes out of lockers he has rented under the threat of throwing them in the dumpster. Likewise, stealing Plaintiffs' working tools is a violation of U.S.C. 18 § 1951.

88. For the reasons exposed, Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and agents should be found liable of violating U.S.C. 18 § 1951, and consequently violating U.S.C. 18 § 1961(1) and 18 § 1962.

## CONCLUSION

89. The facts and laws have shown that Defendants violated U.S.C. 18 § 1343, U.S.C. 18 § 1344, U.S.C. 18 § 1512, U.S.C. 18 § 1513, and U.S.C. 18 § 1951, by obtaining money and property by false pretenses and using the wire to process the money; by appropriating money that was under the custody and control of a financial institution; by obstructing Plaintiffs' proceedings in federal court using intimidation and causing delays in this federal process, interfering with Plaintiffs' lawful employment and livelihood; and, threatening to employ physical violence and to arrest Plaintiff, if Plaintiff did not accept the impossible conditions of their transactions.

90. The codes describing the kinds of violations Defendants have commissioned are instances of violations to U.S.C. 18 § 1961(1), or, "the underlying statutes that constitute the array of predicate acts" to U.S.C. 18 § 1962. The Act names in *seriatim* the violations in § 1961(1), and then refers to them in general terms, as

Prohibited Activities, in § 1962. Therefore, the violations of U.S.C. 18 § 1962 have to be shown by instances of violations to U.S.C. 18 § 1961(1). So we have done.

91. Along the way, Plaintiffs have proffered that Defendants injured Plaintiffs in their business and their property, stated how appropriating Plaintiffs' property have also injured Plaintiff in his livelihood because Defendants have stolen his working tools. Plaintiffs have satisfied the two natural consequences that violating the elements of the Act implies, as the Supreme Court uncovered in <u>Holmes</u>, and the Second Circuit addressed in <u>Lerner v. Fleet Bank, NA</u>: Plaintiffs not only belong to the class of persons the Law was enacted to protect, but also because Defendants' "injurious conduct is both the factual and the proximate cause of the injury," the immediate and only cause of injury by their knowingly, willful, and purposeful predicate acts.

92. Given that the calculations of Plaintiffs' injuries may shunt off the reader's train of thought, Plaintiffs present those calculations at the end of the pleadings.

93. For the reasons and evidence presented above, Defendants should be found liable of Racketeer Influence and Corrupt Organizations (RICO), be subject to the penalties of the Act, and make them comply with the remedies to cure the injuries inflicted on Plaintiffs in their property and in their business.

**B.** THE DEFENDANTS, TSI / NYSC AND STARWOOD RETAIL PARTNERS / STARWOOD CORP., SHOULD BE FOUND LIABLE OF VIOLATING 15 U.S.C. § 45 AND CUTPA BECAUSE DEFENDANTS ENGAGED IN UNFAIR AND DECEPTIVE PRACTICES, AS DEFINED BY 15 U.S.C. § 45, AND C.G.S § 42-110 et seq., PRACTICES PROHIBITED IN CONNECTICUT AND THE USA

94. The Defendants, TSI / NYSC and Starwood Retail Partners / Starwood Corporation, and their agents, should be found liable of violating 15 U.S.C. 45, and therefore, of CUPTA violation, because Defendants engaged in "unfair and deceptive practices," as defined by 15 U.S.C. § 45, and violated CUPTA, C.G.S. § 42-110 et seq., that defines unfair and deceptive practices, prohibited in Connecticut.

95. A "person" whose activities include "trade" and "commerce," and who engages in "unfair trade practices" and "deceptive acts," as defined by the Federal Trade Commission Act, Section 5 and 15 U.S.C. 45 (a) (1), and as "trade" and "commerce" are defined in C.G.S § 42-110a, is liable of CUPTA violation, as CUPTA violation is defined in C.G.S § 42-110 et seq.

96. To determine when a commercial practice is unfair, the plaintiff should examine: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons]...." Ulbrich v. Groth, 78 A. 3d 76 – Conn. Supreme Court 2013, relying on Harris v. Bradley Memorial Hospital & Health Center, 296 Conn. 315, 350-51, 994 A.2d 153 (2010).

97. The Connecticut General Statutes adopts the Federal Trade Commission's definition of unfair and deceptive practices and forbids using those practices and acts against consumers. C.G.S. § 42-110b. In that section the code states that "(a) [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The legislature states that it is its intent "that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a) (1) of the Federal Trade Commission Act (15 USC 45(a) (1)), as from time to time amended."

98. In relevant part, the Connecticut General Statutes states that

> (3) "Person" means a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, and any other legal entity;
>
> (4) "Trade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.
> C.G.S § 42-110a.

99. The Federal Trade Commission Act defines unfair and deceptive practices as follows:

> An act or practice is unfair where it
> • causes or is likely to cause substantial injury to consumers;
> • cannot be reasonably avoided by consumers; and
> • is not outweighed by countervailing benefits to consumers or to competition.
> Public policy, as established by statute, regulation, or judicial decisions may be considered with all other evidence in determining whether an act or practice is unfair.
> An act or practice is deceptive where
> • a representation, omission, or practice misleads or is likely to mislead the consumer;

• a consumer's interpretation of the representation, omission, or
practice is considered reasonable under the circumstances; and
• the misleading representation, omission, or practice is material.
Federal Trade Commission Act § 5, Unfair and Deceptive
Practices.

100. Allegations of fact in a CUPTA claim identical to those asserted by a breach of

contract claim can work as the underlying facts for both claims. In its opinion in

Ulbrich, the Conn. S. Ct. found that in a previous ruling, that court had determined

that "the economic loss doctrine barred the plaintiffs' CUTPA claim [in Flagg Energy

Development Corp.]  because, like the plaintiffs' negligence claims, the claim

'depend[ed] upon allegations of fact that are identical to those asserted in their

[breach of contract] claims.'" But the court solved the discrepancy by concluding that

"we must overrule our decision in Flagg Energy Development Corp. to the extent

that it held that the economic loss doctrine bars CUTPA claims arising from the

breach of a contract for the sale of goods subject to the UCC." Consequently, the

law now states that a plaintiff can sue for CUPTA and breach of contract claims from

facts that are identical and counts that stem from the same set of facts. Ulbrich v.

Groth at 100.

101. "[A] simple breach of contract, even if intentional, does not amount to a violation of

CUTPA. A plaintiff must show substantial aggravating circumstances to recover

under the Act." Bruce v. Home Depot, USA, Inc., 308 F. Supp. 2d 72 - Dist. Court, D.

Connecticut 2004, relying on Rizzo Const. Pool Co. v. Riefler, No. 391537, 2003 WL

22962196, at 13 (Conn.Super.Ct. Dec.3, 2003); Raffone v. Home Depot U.S.A., Inc.,

No. CV020465471, at 1 (Conn.Super.Ct. June 23, 2003); Lunn v. Hussey, No.

CV010085525, 2003 WL 716298, at 2 (Conn.Super.Ct. Feb.11, 2003).

102. Based on that finding, the Defendant alleged in Bruce v. Home Depot, USA, Inc.
that "(a) Plaintiff has not pled substantial aggravating factors attending the breach of
contract, which would constitute an actual deceptive act or practice; and (b) Plaintiff
has failed to allege any ascertainable economic loss as a result of any alleged
violation of public policy embodied in the Connecticut Creditors' Collection Practices
Act." Id. at 77.

103. However, ruling on a motion to dismiss the CUTPA count based on those
allegations, this Court stated that "Plaintiff has alleged that Defendant knew or
should have known from the inception of the transaction that it lacked the capacity to
provide the promised kitchen components at the contract price and, in fact, that its
vendors did not even manufacture such components. […] These facts, she alleges,
set forth substantial aggravating circumstances of Defendant's breach of contract to
constitute an actionable violation of CUTPA." Based on these allegations presented
by the plaintiff, this Court stated that it "agrees and finds that these allegations
sufficiently set forth a fact pattern upon which a jury could find that the Defendant's
acts were offensive to public policy in violation of CUTPA." Id. at 78.

### A PRIMA FACIE CASE FOR 15 U.S.C. 45 AND CUPTA VIOLATIONS

104. To form a prima facie case that Defendants violated CUPTA, Plaintiffs only have to
show that (1) Defendants' activities include "trade" and "commerce"; (2) they
engaged in "unfair trade practices" and "deceptive acts" in violation of 15 U.S.C. 45
(a) (1); and, (3) they violated CUPTA, as CUPTA violation is defined in C.G.S § 42-
110 et seq. The Plaintiffs meet and surpass this standard, as shown below:

105. In the case in point, both TSI / NYSC and Starwood Retail Partners / Starwood

Corporation center their activities in "trade" and "commerce," as these activities are

defined in C.G.S § 42-110a. Defendants have violated CUPTA because they

engaged in "unfair trade practices" and "deceptive acts," as these practices and acts

are defined by the Federal the Trade Commission. Therefore, they are liable of

CUPTA violation.

106. Defendants conspired to convert, and converted, Plaintiffs' property to assure that,

if Plaintiffs resisted the planned rent increase, Defendants would use the property as

leverage to force the rent increase. Legally, Defendants could not ask for a rent

increase because the lease had already been signed, and equitably, it would be

hard to justify asking for a third rent increase after two increases from its original

price. So, Defendants decided to achieve their purposes illegally and inequitably. ¶¶

298-317. Along the way in the pursuit of that purpose, Defendants

    1.  TSI / NYSC, Starwood Retail Partners / Starwood
       Corporation and Their Agents Formed a Combination to Act
       in Furtherance of their Unlawful Goals.

Paragraphs 299-312 show "the manifestations" that a combination was formed.

Defendants also

    2.  Conspired to Commit Unlawful Acts by Unlawful Means.

Defendants committed unlawful acts by unlawful means. ¶¶ 313-14.

Defendants committed the third element necessary to show conspiracy.

    3.  Committed Acts Pursuant to the Conspiracy and in
       Furtherance of the Scheme Goals.

The conspiracy acted in furtherance of their goals. ¶¶ 315-16.

4.  Defendants' Acts Resulted in Damages to the Plaintiff.

Paragraph 317 shows how the acts of this conspiracy in furtherance of their goals

caused damages to the Plaintiffs in their business and their property.

107. These acts are unlawful and "show substantial aggravating circumstances" to

serve as basis for a CUPTA violation. Bruce v. Home Depot, USA, Inc., 308 F. Supp.

2d 72 - Dist. Court, D. Connecticut 2004, relying on Rizzo Const. Pool Co. v. Riefler,

No. 391537, 2003 WL 22962196, at 13 (Conn.Super.Ct. Dec.3, 2003); Raffone v.

Home Depot U.S.A., Inc., No. CV020465471, at 1 (Conn.Super.Ct. June 23, 2003);

Lunn v. Hussey, No. CV010085525, 2003 WL 716298, at 2 (Conn.Super.Ct. Feb.11,

2003). The acts caused "ascertainable economic loss as a result" of Defendants'

conspiracy and actions in furtherance of that conspiracy because Plaintiffs lost

money and tangible property. Those "ascertainable economic losses" include

Plaintiff's loss of his livelihood when losing the tools with which Plaintiff exercised his

work and business.

108. Furthermore, Defendants also damaged Plaintiff's reputation as a professional and

as a businessperson. Besides that, the practice of conspiring to deprive another

person of his property and money "(1) offends public policy as it has been

established by statutes, the common law, [and] otherwise—in other words, it is

within [the full shadow] of […] common law, statutory, [and] other established

concept[s] of unfairness; (2) […] it is immoral, unethical, oppressive, [and]

unscrupulous; (3) […] it causes substantial injury to consumers, [competitors or

other business persons]..." Ulbrich v. Groth, 78 A. 3d 76 – Conn. Supreme Court

2013, relying on Harris v. Bradley Memorial Hospital & Health Center, 296 Conn. 315, 350-51, 994 A.2d 153 (2010).

109. Another set of "unfair trade practices" and "deceptive acts" that "offends public policy" and the sense of fairness in human beings is that of maneuvering to commit fraud, especially if that fraud has the Plaintiff participate in the deception as a "credulous" victim, induced to act by the Defendants.

110. The details of this additional basis for a CUTPA action are explained in ¶¶ 160-80 of these pleadings, where it is demonstrated that Defendants

1. Made False Representations as Statements of Fact.

Paragraphs 160-64 show that Defendants made false statements as statements of fact, the first element of fraud.

2. Knew Representations Were False at the Time They Were Uttered.

111. Paragraphs 165-74 show that the Defendants were aware that the statements were false at the time they uttered them.

Likewise, it is shown that Defendants

3. Uttered the False Statements to Induce Plaintiffs to Act Towards Defendants' Rent Increase.

112. Paragraphs 175-79 demonstrate that the Defendants uttered those statements to induce plaintiffs to act towards Defendants' rent increase plans.

And finally, it is also shown that Defendants induced Plaintiffs and

4. Plaintiffs Relied on the Defendants' Statements, Acting Accordingly, to Plaintiffs' Injury.

113. Paragraph 180 shows how this inducement and actions caused injuries to Plaintiffs
in their business and their property.

114. Yet another set of "unfair trade practices" and "deceptive acts" that "offends public
policy" and represents an additional act of fraud. The details of this additional basis
for a CUTPA action are stated in ¶¶ 197-214, where it is shown that Defendants

    1. Developed a Fraudulent Built-in Billing Passageway Through Which
They Overcharged.

115. Paragraphs 198-208 show that Defendants developed a fraudulent built-in
passageway through which they overcharged customers, or at least Plaintiff.

116. Furthermore, Defendants'

    2. Built-in Billing Passageway Required "Managers to Charge Customers
Excessive and Unlawful Payments that Are Never Returned."

117. Paragraphs 209-12 show that Defendants' managers were instructed to charge
excessive and unlawful payments that were never returned.

118. In addition, Defendants'

    3. Created Mechanisms to Camouflage the Fraudulent Built-in Billing
Device to Shield it from Plain Viewers.

119. Defendants' activities violating CUPTA and 15 U.S.C. 45 were camouflaged to
shield them from plain viewers. ¶ 213-214.

120. For the reasons and evidence presented above and in succeeding Points,
Defendants should be found liable of violating 15 U.S.C. 45, and therefore, of

CUPTA violation, and be subject to the penalties of the Act, and comply with the remedies to cure the injuries inflicted on Plaintiffs.

## CONCLUSION

121. The facts and the laws of this issue show that Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corporation and their agents formed a combination to act in furtherance of their unlawful goals. Those facts and laws, also indicate that the Defendants conspired to commit unlawful acts by unlawful means. Then, they committed the acts themselves, pursuant to the conspiracy and in furtherance of the scheme goals. These Defendants' acts resulted in damages to the Plaintiff. Besides that, Defendants Developed a Fraudulent Built-in Billing Passageway Through Which They Overcharged. The conspiracy required the "managers to charge customers excessive and unlawful payments that are never returned." In addition, Defendants created mechanisms to camouflage the fraudulent built-in billing device to shield it from plain viewers.

122. For the reasons and evidence presented above, Defendants should be found liable of violating 15 U.S.C. § 45, and C.G.S § 42-110 et seq., and be subject to the penalties stipulated in those federal and state statutes, then make them comply with the remedies to cure the injuries inflicted on Plaintiffs in their property and in their business.

C. THE DEFENDANTS, TSI / NYSC AND THEIR AGENTS, SHOULD BE FOUND LIABLE OF VIOLATION OF 15 U.S.C. § 1692 BECAUSE DEFENDANTS VIOLATED SEVERAL PROVISIONS OF THE FDCP ACT, INCLUDING § 1692j, THAT REGULATES VIOLATIONS TO THE ACT BY A NON-DEBT COLLECTOR, AS DEFINED BY CONGRESS.

123. Defendants, TSI / NYSC and their agents, should be found liable of the violation of 15 U.S.C. § 1692 because Defendants violated several of the provisions of the Act, including 15 U.S.C. § 1692j, that regulates and penalizes violations to the Code by a non-debt collector, following Congress' definition of debt collector. Only one violation to the Code is required to recover in a civil action against a debt collector or against a person who has become subject to the Code because of violation to that provision.

124. In the Fair Debt Collection Practices Act, the United States Congress defines:

> A "debt collector" is any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. […] [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692 (f) (6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

125. By this definition, TSI / NYSC, does not fall into the category of "debt collector," except when it comes to Section 1692j, which explains and regulates the violations to that section by persons who are not debt collectors:

> (a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter.

126. That is, a person who is not a "debt collector" will be penalized as if the person were one, if that person violates the provisions of 15 U.S. Code § 1692j, just quoted. Alternatively, the violation of Section 1692j makes a person subject to the penalties a debt collector is subject to.

127. Some of the violations that call for a debt collector's sanctions are enumerated in 15 U.S. Code § 1692e. The provisions sanction "false and misleading representation," whether it is of "(A) the character, amount, or legal status of any debt; or"

128. "(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action."

129. Likewise, a debt collector can be sanctioned for "(5) [t]he threat to take any action that cannot legally be taken or that is not intended to be taken."

130. In addition, a debt collector cannot incur in "(7) [t]he false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer." And cannot either use the power of "(8) [c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."

131. In fact, the Conn. D. Court found against lawyer James C. Gaynor, of Ohio, who

collected debts for at least two businesses, and, in the course of that work, allegedly

made some misrepresentations in violation of 15 U.S. Code § 1692e, trying to collect

a debt allegedly owed by Elizabeth Rosa, from Connecticut. Rosa sued in federal

court for misrepresentation.

132. The case started when Rosa received a letter dated May 18, 1988, that had the

printed signature and name of attorney Gaynor. The letter had the following

contents:

> Re: First Interstate Bankcard Balance: $2436.61
>
> The above account has been referred for collection in full and information
> obtained will be used for that purpose.
>
> Unless you dispute the validity of any portion of this claim within 30 days
> after receipt of this notice, we will assume it to be valid. If you notify us
> within that time, we will secure evidence of the debt, and mail it to you.
> We will also furnish you with the creditor's address.
>
> Otherwise, we may be forced to proceed with a lawsuit. After judgment,
> any remedy may be filed against you that is available to attorneys in your
> area. This may include garnishment, levy on real or personal property, or
> calling you into court for a debtor's examination. This is your final letter.
>
> Rosa v. Gaynor, 784 F. Supp. 1 - Dist. Court, D. Connecticut 1989.

133. Rosa's claim in the Conn. District Court alleged "that the letter violated the Fair

Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 et seq., because it (1)

threatened to take legal action defendant could not or did not intend to take, (2)

misrepresented its source, and (3) was generally unfair and deceptive." Id. at 2.

134. The Court found that "FDCPA forbids a debt collector from using 'any false,

deceptive, or misleading representation or means in connection with the collection of

any debt.' 15 U.S.C. § 1692e. In order to recover, plaintiff need only show one

violation." And added that the "Court of Appeals noted [for] more than fifty years that

consumer protection laws are not 'made for the protection of experts, but for the

public—the vast multitude which includes the ignorant, the unthinking, and the

credulous,' Charles of the Ritz Dist. Corp. v. FTC, 143 F.2d 676, 679 (2d Cir.1944)."

Id. at 3.

135. The Court also expressed that while "our Court of Appeals has not addressed this

question directly, one of its recent decisions suggests a willingness to afford broad

protection under the FDCPA. In Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d

22 (2d Cir.1989), the Court of Appeals reversed a district court finding that no

violation had occurred; in the letter at issue there, no explicit reference is made to

attorneys or court proceedings, but '[t]he clear import of the language, taken as a

whole, is that some type of legal action has already been or is about to be

initiated....'" Id. at 4.6

136. The Court finally observed that:

> The misrepresentation about the immediacy of litigation goes
> beyond defendant's not being licensed to practice in Connecticut
> and not yet being authorized to file suit. I find the list of possible
> remedies particularly intimidating, and particularly extraneous for
> any purpose other than bullying plaintiff. Cf. Floersheim v. F.T.C.,
> 411 F.2d 874, 877 (9th Cir.1969), cert. denied, 396 U.S. 1002, 90
> S.Ct. 551, 24 L.Ed.2d 494 (1970). Faced with such a list of dire
> consequences, an unsophisticated debtor cannot help but feel
> unduly threatened. While the qualifying phrases "after judgment"
> and "available to attorneys in your area," make these possible
> consequences technically true, they do nothing to make their
> enumeration less intimidating or to create a more accurate

impression upon a layman. "[A] statement which is literally true may, nonetheless, be unlawfully deceptive." Bailey Employment Sys. v. Hahn, 545 F.Supp. 62, 67 (D.Conn. 1982) (Daly, J.), aff'd, 723 F.2d 895 (2d Cir.1983).

## A PRIMA FACIE CASE FOR A 15 U.S.C. § 1692 VIOLATION

137. To form a prima facie case that Defendants, although not being a debt collector, violated 15 U.S.C. § 1692, Plaintiffs only have to show that (1) Defendants violated 15 U.S.C. § 1692j; (2) and that they made a single violation of other provision of 15 U.S.C. § 1692.

138. In the case in point, TSI / NYSC are not debt collectors as defined by Congress in the Fair Debt Collection Practice Act. However, they have violated 15 U.S. Code 1692j, which makes them subject to the Act, just as any debt collector. They violated § 1692j by sending Plaintiff a form they use to request from their customers another credit card number when that customer's credit card cannot be charged and the customer owes money to the Clubs. Exhibits #14 and #15. They also use that form when the customer has a long-term agreement with the Clubs and decided unilaterally to get out of the agreement. By sending that form to Plaintiff, knowing that his membership was wrongfully terminated by Defendants, and threatening that if Plaintiff did not comply with the request, they would send his name to a collection agency. This violation made Defendants subject to the Act. See U.S. Code 15 § 1692j; Exhibit #14 and #15 with the form sent.

139. Besides sending the attached form to Plaintiff, Defendants, TSI / NYSC followed with a phone call demanding a new card. They also "(1) …threat[ened] [the] use of violence or other criminal means to harm the physical person, reputation, or property of [plaintiff]:" When Plaintiff resorted to a small claim to recover his moving in-and-

out expenses of Defendants' premises, Defendants said: "I thought you were going to go *intact*…but you didn't go…Hah?" Likewise, Defendants threatened the use of violence against Plaintiff's property when, after receiving the small claim's complaint, defendant Garcia told Plaintiff: "Get your f***ing clothes out of my lockers before I throw them into the dumpster," although the lockers where the clothes were had been rented by Plaintiff. As far as Plaintiff knows, Garcia is one of the few persons who can violate two provisions of a federal code with just one sentence because the threat also stands as a violation to the code: "(2) the use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." However, in fairness to defendant Garcia, I do not know if it is equitable to penalize somebody for using the only language that person knows. If that is so, Garcia could be penalized every time she opens her mouth to speak.

140. In spite that only one violation to this Code is necessary to find liability, Defendants decided to commit multiple ones to show their violative conduct *vis-a-vis* the Code:

141. Defendants also violated 15 U.S. Code § 1692e (2) (A) that forbids

> (2) The false representation of—
>    (A) the character, amount, or legal status of any debt;

142. Defendants wanted Plaintiff's new credit card number to continue charging the card despite Defendants wrongfully terminating Plaintiff's membership. They were not only deceiving about the "character, amount, or legal status of [a] debt," but inventing a debt. That false representation violates not only this Code but several codes that we will see along the pleadings.

143. Another way in which Defendants violated 15 U.S. Code § 1692e was by using:

> (4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

144. When Garcia went to Plaintiffs' on February 19, 2018, and told Plaintiffs that they had to pay an additional fee for the reasons detailed in **Point D** of these pleadings and Pl.'s Aff. ¶¶ 16-17, she knew that no fee was due to pay. However, they unartfully invented one that had the character of a debt because the parties had already signed the contract. To force Plaintiffs to pay, they used the "implication that nonpayment of that [fee would] result in the arrest [and] imprisonment of [Plaintiff]." This was asserted by sending officer Cardone from the West Hartford Police Department to announce the breach of the contract using the label "rescission" to refer to the action. At the same time, Cardone told Plaintiff that if he was seen in any of half-a-dozen public places in town he would be arrested. Cardone did not say: "You don't have a debt, but they invented one and I'm here to enforce its payments, and if you don't pay it, the police are going to arrest you."

145. He certainly did not say that. However, the people who sent officer Cardone (Carlson, Rifkin, and Garcia) cannot allege that they did not intend to have Plaintiffs reach that conclusion on Plaintiffs' mind.

146. Let us put the example of a person who knows that certain chemicals are innocuous separately, but they become poisonous when mixed in a cocktail. If the first person knows the chemical reaction, and despite that, decides to make a second person drink the chemicals one after another, the first person cannot allege

that the result is not his fault, but the second person's because she mixed the chemicals in her stomach. The defense is invalid as the results were foreseeable.

147. Likewise, Defendants cannot pretend that right after Defendants asked Plaintiff for a rent increase, Defendants sent a police officer to announce the "rescission" of the lease. The police officer said, "Ah, by the way, you are going to be arrested if you go to any of these places," and the recipient of the message is not going to conclude: "If I don't accept the rent increase, I'm going to be arrested and put in prison." That is using a police officer for extorting a person into paying an inexistent debt. That is actually a criminal act.

148. Although no more violations are needed to find liability, Defendants also violated 15 U.S. Code § 1692e

> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
> (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.
>  (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

## CONCLUSION

149. The facts and the laws of this issue show that Defendants, TSI / NYSC, have violated § 1692j and several other codes of FDCPA for which, and in view of the reasons and evidence presented above and for the injuries caused to Plaintiffs in their property and in their business, Defendants should be found liable of violation of 15 U.S. Code § 1692 and therefore subject to the penalties stipulated in that Code, as we ask in the last two Points of these pleadings.

D. DEFENDANTS, TSI / NYSC, STARWOOD RETAIL PARTNERS / STARWOOD CORP., AND AGENTS, SHOULD BE FOUND LIABLE OF CONTRACT FRAUD BECAUSE, AFTER ENCOURAGING SUPERB SCORE TO MOVE INTO THEIR SUBLET PREMISES, INTENTIONALLY BREACHED THE LEASE TO PUT SUPERB SCORE UNDER DURESS AND DEMAND A HIGHER RENT. THE MANEUVERS WERE SUPERVISED BY TSI / NYSC's DIRECTOR.

150. A person who in the course of forming a contract or business agreement with a second person, knowingly uses false information, conceals detrimental information, or makes reckless misrepresentation about the business, in disregard to the truth, aimed at inducing the second person to act in a certain way that advances the inducer's business ends, causing injury to the second person, is liable for fraud and subject to "disgorgement of profits, treble and punitive damages, and injunctive relief" for the damages caused to the second person. Maturo v. Gerard, 196 A.2d 494, 584 (Conn. S.Ct. 1985); Aldi v. Wells Fargo Bank, NA, Not Reported in F.Supp.3d (Conn. D. Ct. 2015) WL 3650297; Neufeld v. Cigna Health and Life Insurance Company, WL 4158377 (D. Conn. Aug. 30, 2018). If the first person commits these acts through an agent who promotes the scheme in disregard for the truth, the agent is also liable for fraud and for treble the damages caused to plaintiff. Maturo v. Gerard; Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. Partnership, 309 Conn. 342 (2013) 71 A.3d 480.

151. The Connecticut Supreme Court has stated that fraud is difficult to define because it can be executed in many different ways, but the court has also stated that fraud is basically a "deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the [deceiver's] end designed." Billington v. Billington, 220 A.2d. 212, 594 (Conn. S. Ct. 1991).

152. For more than a century, the Conn. S. Ct. has sustained the position that:

> [I]f a [person] by [a] promise induces another to change [another's]
> situation and is then permitted to deny the validity of the promise,
> [that person] is thus perpetrating a fraud, and injuring another by a
> false promise. The law will not permit this, but will hold [the person]
> to the fulfillment of [the person's] undertaking.
> Finlay v. Swirsky, 103 Conn. 624 (1925) 131 A. 420, relying on Rice
> v. Almy, 32 Conn. 297, 304 (1864).

153. **"Person**: means a human being, and, where appropriate, a public or private corporation, a limited liability company, an unincorporated association, a partnership, a government or a governmental instrumentality." Conn. Gen. Stat. §53a-183.

154. A court in Connecticut evaluates an action for fraud by testing the presence of the four elements that capture the description of fraudulent conduct: (1) a party makes a false representation as a statement of fact; (2) the party making the false representation knows that the statement is untrue at the time the party utters it; (3) the statement was made with the intent of inducing a second party to act in a certain way that advances the end design of the first party; and (4) the second party relies on the statement to act accordingly, to that party's injury. Billington v. Billington; Maturo v. Gerard; Aldi v. Wells Fargo Bank, NA; Tatum v. Oberg, 650 F.Supp.2d 185, 191 (Conn. D. Ct. 2009).

155. In Maturo v. Gerard, the court found that an agent for the defendant, who promoted with pompous language investing in the defendant's businesses [Dolce's businesses], was held liable for fraud. At trial, Henry Gerard, the agent, adduced that he did not know the businesses did not exist, that he was only in charge of recruiting investors. The Connecticut Supreme Court found him liable for reckless misrepresentation and fraud; his wife, who frequently accompanied him in tours

promoting investments, was also held liable, and their family house was attached to pay the victims of the scheme.

156. In Coppola v. Hoffman, the court sustained a similar position (the "officer [of a business] could be held individually liable [...] for [the] tort of negligent misrepresentation even if [the plaintiff] had [an] alternate remedy under [the] contract"). Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. Partnership; see also Kilduff v. Adams, Inc., 219 Conn. 314 - Conn: Supreme Court 1991; Scribner v. O'Brien, Inc., 169 Conn. 389 - Conn: Supreme Court 1975.

157. The policy behind holding liable a business entity's participating officers for the fraud these officers help the business entity to commit, follows logically from the fact that a business entity cannot by itself commit fraud. The business entity needs a human to execute the core act of a fraud (deception), for the fraud to occur.

a) However, Not All Allegations of Fraud Are Fraud: Sturm v. Harb Development, LLC, 298 Conn. 124 (2010) 2 A.3d 859 ("knowledge of falsity is an essential element of a cause of action for fraudulent misrepresentation, and the plaintiffs failed to allege this required element, [therefore] the trial court properly struck [this] count." Madsen v. Gates, 85 Conn. App. 383, 398 (2004) 857 A.2d 412. ("The failure to include a necessary allegation in a complaint precludes a recovery by the plaintiff under that complaint....").

b) And Fraud Has to Be Pled with Particularity: Plaintiffs pleading *fraud* are subject to "the heightened requirements of Fed. R. Civ. P. 9(b)." Rule 9(b) requires that a plaintiff claiming *fraud* state the claim with particularity. Tatum v. Oberg, 650 F. Supp. 2d 185 - Dist. Court, D. Connecticut 2009. This means that the plaintiff's

complaint must (1) detail the statements or omissions the other party produced that are fraudulent, (2) identify the speaker producing those statements or omissions, (3) state when and where the statements or omissions were uttered or omitted, and (4) explain why the statements or omissions were fraudulent. Id. at 191; Robert Pressman v. Ana Purcell, Conn. D. Ct., Civil Case No. 3:17-CV-1918 (JCH). WL 6069099 (2018). See Fed. R. Civ. P. 9(b). When some of the elements of fraud are not alleged with "sufficient precision," the requirement of particularity is not satisfied. Tatum at 191; Rombach v. Chang, 355 F.3d 164, 175 (2004) U.S. Ct. App. 2d. Circuit. ("plaintiffs do not identify any materially false statements in the registration statement that were false or misleading when made. Plaintiffs, rather, simply allege generally that the registration statement 'failed to disclose that the [secondary] offering was necessitated by pressure from the Company's lenders and its deteriorating cash position.'").

c) Additionally, Plaintiff Must Comply with the Statute of Frauds: "Connecticut's statute of frauds provides that no civil action may be maintained upon any agreement for the sale of real property or any interest in or concerning real property unless the agreement is made in writing. Conn. Gen. Stat. § 52–550(a)(4)". Aldi v. Wells Fargo Bank, NA, Not Reported in F.Supp.3d (Conn. D. Ct. 2015) WL 3650297.

d) But Fraud in the Inducement Occurs Before Signing the Contract: If the previous points show some possible counter-arguments against plaintiffs, the Conn. S. Ct. has also adopted a concept that makes it harder for fraud defendants to avoid liability when those defendants have induced others to act towards their end

game and have caused injuries to those persons. The court has stated that "fraud in the inducement by definition occurs prior to the formation of the contract itself," and that fraud "was perpetrated by [the defendant] before a contract between the two parties came into existence." Ulbrich v. Groth, 310 Conn. at 406 (2013) 78 A.3d at 98, therefore, showing of fraud is not on the contract, but in the inducement.

158. The Conn. District Court explains why it is important for the delivery of justice to be specific in claiming fraud: "The purpose[s] of the specificity requirements [are]: (1) to ensure that a complaint provides a defendant with fair notice of plaintiff's claim; (2) to safeguard a defendant's reputation from improvident charges; and (3) to protect defendant from a strike suit." Negron v. Cigna Health and Life Ins., 300 F. Supp. 3d 341 - Dist. Court, D. Connecticut 2018 relying on O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991).

A PRIMA FACIE CASE FOR FRAUD IN THE INDUCEMENT

159. To form a prima facie case that Defendants committed common law fraud or fraud in the inducement or contract fraud, the Plaintiffs have to show that a reasonable jury could consider the evidence attached and other expected, and plead with particularity each element of the violation, which are:

160. (1) a party makes a false representation as a statement of fact; (2) the party making the false representation knows that the statement is false at the time the party utters it; (3) the statement was made with the intent of inducing a second party to act in a certain way that advances the end design of the first party; and, (4) the second party relies on the statement to act accordingly, to that party's injury, as the

following details reveal. <u>Maturo v. Gerard</u>; <u>Aldi v. Wells Fargo Bank, NA</u>; <u>Neufeld v. Cigna Health and Life Ins.</u>; <u>Negron v. Cigna Health and Life Ins</u>. The Plaintiffs meet and surpass this standard, as shown below:

1. <u>The Evidence Attached and Other Expected Show that Defendants Made False Representations as Statements of Fact.</u>

161. During the contract negotiations, TSI / NYSC and Superb Score talked of a rent of $500.00 for the space; then the Defendants asked for an increase that took the rent up to $600.00. Finally, in the lease-agreement the rent was signed as $750.00 a month. Before signing Plaintiff, Ramon Moreno, asked TSI / NYSC's manager Brisvely Garcia, "wouldn't it be fair to keep the rent at $600.00 a month, as we said before?" To which Garcia replied:

162. "Six hundred dollars? No way. You know how much money my Director wanted to charge? One thousand. I was the one who convinced her to leave it for $750.00. And we have to sign today because I'm not here tomorrow, and I'm going to Massachusetts next week." (Massachusetts is where "my (her) Director" has her seat.) So, Plaintiff signed the lease for the $750.00. The rent would be paid in the manner Plaintiff's membership in the NYSC was paid, as a monthly charge from Plaintiff's credit card. Pl.'s Aff. ¶¶ 15-16. Exhibits #1 and #4.

163. In signing the lease, Defendants produced four materially false statements as statements of fact: The Defendants

164. (a) stated that the rent was going to be $750.00 and signed it, though they knew they intended to ask for more; (b) said several times that they had the right to sublet the space, including at the time of signing the lease and in the lease itself, but

refused to attach their lease with Starwood to the one being signed with Plaintiffs, and knew that they would change that statement; (c) omitted that they were going to try a rent increase, and (d) omitted that they were going to ask Plaintiffs to move out to put Plaintiffs under duress. Pl.'s Aff. ¶¶ 15-16. Exhibits #1 and #12.

2. The Evidence Attached and Other Expected Show Defendants Knew the Representations Were False at the Time They Were Uttered.

165. What happened the night of February 18, 2018 is evidence that TSI / NYSC knew that statements, (1)(a), (1)(b), (1)(c), and (1)(d) were false and that Starwood Retail Partners / Starwood Corporation and their agents were conspiring with TSI / NYSC and their agents to help the latter increase the rent disguised as a fee to the Landlord: The Landlord sent Daniel Persa, officer #2306 of Secure-America, a security guard company that renders services to the Landlord at 65 Memorial Dr. Mr. Persa went to Plaintiff at about 9:45 pm., while Plaintiff was leaving the building after finishing moving in, and said:

166. "The owner of the building told me to escort you out of the building." Plaintiff turned around from his way out and said: "'Follow me. Let me show you something: See this key? And this door?' Then, with the key received from TSI / NYSC, Plaintiff opened the door to the office Plaintiff just moved into, and told him, 'The owner couldn't have told you what you just said because I am renting here, and he knows that.'" This conversation lasted no more than one minute or two. Pl.'s Aff. ¶ 20. Exhibits #1 and #7.

167. On Monday, February 19, 2018, only hours after the conversation with the security
     guard, TSI / NYSC's manager Garcia came to Plaintiff's office at 1:00 pm. or earlier,
     and said:

168. "'The Landlord has received several complaints about you: One was that you had
     an altercation with one of the janitors; the other, that you have been trespassing into
     the garages, and the other is that you are homeless,'" lowering her voice to a
     secretive whisper when uttering "you are homeless"— 'and Brooke, the woman who
     works for the garage, is willing to confirm it,'. 'And for that, they are going to charge
     an additional fee.'" Pl.'s Aff. ¶ 21. Exhibits #1, #5, and #7.

169. To Garcia's statements Plaintiff responded: "I haven't had any altercation with
     anybody. I had a brief conversation with one of the security guards..." "...Ah, it was
     with the security guard...," she interrupted giggling. "If they sent him to provoke an
     altercation," Plaintiff continued, "it didn't work because we only had a brief
     conversation." (On Wednesday, Mr. Persa came back to apologize for the
     'confusion'). "For the second one, how can anybody trespass into garages that are
     open to the public? If you park there without validating, you get a ticket. The ticket is
     for overstaying your time at the meter, not for trespass. My parking ticket is validated
     for the whole day by the library. Now, if I am homeless, they should help me put my
     office together so that I can produce money not to be homeless. In any case, here is
     my address. You can go there." When Plaintiff gave Garcia his address, he noticed
     her surprise by the dry swallowing and the slack jaw that shaped her mouth in an 'o.'
     Later, I sent an email modifying the conversation. Pl.'s Aff. ¶ 22; Exhibit #11 (a-d).

170. To evaluate as falsehood Defendants' statements, the Court may notice that managers in the real estate business are not first responders, who work Sunday night and holiday Monday of the President's Day weekend. In fact, Starwood Retail Partners' office was closed from Friday evening to Tuesday morning, as we will prove during trial, if defendants Starwood do not admit it.

171. First, the security guard working Sunday night would not have risked his job by bothering a manager with a call that could wait. If he needed to inform something urgent, he would have called his supervisor at Secure-America, who is the person who hires and fires him. And if he worked the night shift the next day, he would not have started working before 3:00 p.m. Therefore, he would not have time to officially convey the report carrying the conversation with Plaintiff to the office until that time, and the office was closed on Monday, anyway. Garcia approached Plaintiff to inform him about "the complaints received" at about 1:00 p.m. or earlier. At that time, Defendants did not have occasion to have received information about "the altercation," which the security guard had not had time to convey to Carlson, unless the whole scenario was set up ahead of time and he had permission to call Carlson on Sunday at almost 10:00 p.m., as all the evidence points out was the case.

172. If TSI / NYSC were interested in solving the three obstacles the Landlord had posed to them for subletting the premises, they would have first, submitted Plaintiff's address to be confirmed, and would have asked the Landlord why they are taking as sacred the words of somebody who is not an expert in homelessness and making an immediate decision based on an unconfirmed version, especially when that data is irrelevant to impose a fee on TSI / NYSC. Second, once they had the address

submitted, they would have investigated whether it was true or not. But, instead, when they saw that those excuses were too weak, they changed them. They changed them so quickly that, in doing so, TSI / NYSC and their manager signed two mutually-exclusive statements: The second paragraph in the lease plainly states that TSI / NYSC have the right to sublet. Exhibit #1. The statement in the email in which Garcia "rescinds" the lease says: "Due to restrictions paragraphed in the lease with TSI and Starwood…" Exhibit #5. This statement suggests that they do not have the right to lease. Plaintiffs please ask the Court to notice that the writer is dancing around the meaning without saying what she (or he) needs to say to justify the "rescission," but cannot say it because it contradicts the signed lease.

173. This set of facts shows that Defendants knew they were (2)(a) producing a false statement when they signed the lease and stated that the rent would be $750.00; (2)(b) going to change the announced authority they had to sublet the space; (2)(c) omitting their intention to increase the rent, and (2)(d) going to ask Plaintiffs to move out, to put them under duress, if Plaintiffs resisted the condition of rent increase.

174. As a co-conspirator with TSI / NYSC, Starwood helped arrange an extortion disguised as a rent-increase penalty to TSI / NYSC, that TSI / NYSC would be passing to Plaintiffs. However, even if they could demonstrate that this was their intention, they could not do that either. The Connecticut Supreme Court has ruled illegal to levy penalties in contracts: "The law is well established in this jurisdiction, as well as elsewhere, that a term in a contract calling for the imposition of a penalty for the breach of the contract is contrary to public policy and invalid." American Car

Rental, Inc. v. Commissioner of Consumer..., 273 Conn. 296 (2005) 869 A.2d 1198.

Therefore, even their pretext to levy the penalty was illegal and unenforceable.

### 3. The Evidence Attached and Other Expected Show that Defendants Uttered the False Statements to Induce Plaintiff to Act Towards Defendants' Rent Increase.

175. These statements, (1)(a), (1)(b), (1)(c), and (1)(d) are fraudulent for inducing with falsehood, material to the business, to sign a lease that they were going to change once Plaintiffs moved into the premises. Plaintiffs had no reasons to suspect that Defendants (3)(a) wanted another rent increase after increasing it twice, (3)(b) would sign false statements about the rent in the contract, and (3)(c) would change something so fundamental as whether they had the right to sublet, in disregard to its truth. Exhibit #3; Billington v. Billington; Maturo v. Gerard; Aldi v. Wells Fargo Bank, NA; Tatum v. Oberg, 650 F.Supp.2d 185, 191 (Conn. D. Ct. 2009).

176. Statements (1) (a-d) were produced by Brisvely Garcia, TSI / NYSC West Hartford's general manager, at the time of signing the contract on February 15, 2018, at 65 Memorial Dr. in West Hartford, and on several occasions during our February conversations leading to the lease signing.

177. If Plaintiffs knew that Defendants were not truthful in statements (1) (a-d), which implies a lease different from the signed one, Plaintiffs would not have signed the lease, and much less moved into TSI / NYSC's premises, at own risks and costs. They produced those false statements to (3)(d) induce Plaintiffs to act in a direction that advanced their plans to raise the rent, and, (3)(e) put Plaintiffs under pressure by asking Plaintiffs to move out after moving in.

178. Garcia's statement that "[her] Director" wanted $1,000.00 and that she was the one who convinced the Director to keep it at $750.00 was not a statement of satisfaction with the lease, but an *indicium* of what they were planning to do. Pl.'s Aff. ¶¶ 15-16.

179. Only because Defendants' false and inducing statements portrayed a precision that gave Plaintiffs a false sensation of security, did Plaintiffs sign and move into the premises. To convince Plaintiffs fully that the contract terms were definitive, Defendants traded other good and valuable consideration with Plaintiffs: Defendants asked for and accepted being the co-beneficiary of a $2,000,000.00 insurance policy to cover a set of eventualities; manufactured and gave Plaintiffs a key to access the premises at all times; allowed Plaintiffs to move in early, although work would start on March first, 2018, when a class was scheduled to begin, and even promised that the office was going to be cleaned before Plaintiffs moved in that weekend. Therefore, Defendants' statements were to induce Plaintiffs to act. Pl.'s Aff. ¶ 14.

4. The Evidence Presented Show that Plaintiffs Relied on the Defendants' Statements, Acting Accordingly, to Plaintiffs' Injury.

180. Connecticut Supreme Court has held that contributory negligence by the plaintiff is not a defense against a claim of fraudulent representation, Kramer v. Petisi, 285 Conn. 674 (2008) 940 A.2d 800, however, it is important to state that Superb Score saw a possible confrontation with Defendants and started to look for a different place. It was only because Starwood Corporation / Starwood Retail Partners and TSI / NYSC acted in concert to entrap Plaintiffs that Plaintiffs returned to the course of renting those premises: After Plaintiffs visited a space managed by Starwood Corporation that could have been rented, the Landlord dropped Plaintiffs as a

potential client by not answering Plaintiffs' emails, while TSI / NYSC sprang into action to finish up what was left to arrange the lease signature. Pl.'s Aff. ¶¶ 10-13. In the new situation created by Starwood and TSI's concerted actions, Defendants induced Plaintiffs, and injury resulted.

## CONCLUSION

181. The facts and the laws of this issue show that Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corporation and their agents made false representations as statements of fact. These facts and laws also show that Defendants knew the representations were false at the time they were uttered. Furthermore, the evidence show that the Defendants uttered the false statements to induce Plaintiff to act towards Defendants' rent increase goals. Plaintiffs relied on the Defendants' statements, acting accordingly, to Plaintiffs' injury. For these causes, Defendants should be found liable of contract fraud by inducement and be subject to "disgorgement of profits, treble and punitive damages, and injunctive relief."

E. TSI / NYSC, STARWOOD RETAIL PARTNERS / STARWOOD CORP., AND AGENTS, SHOULD BE FOUND LIABLE OF FRAUDULENT OVERCHARGES BECAUSE THEY OVERCHARGED PLAINTIFF'S CREDIT CARD MULTIPLE TIMES; WHEN PLAINTIFF CLAIMED HIS MONEY BACK, THEY ACTED TO INTIMIDATE, AND WHEN PLAINTIFF REPLACED HIS CARD, AFTER MEMBERSHIP CANCELLATION, DEFENDANTS THREATENED TO SEND HIS NAME TO A COLLECTION AGENCY.

182. Defendants, TSI / NYSC, Starwood Retail Partners, and their agents, should be found liable of fraudulent overcharge because Defendants charged Plaintiff's credit card multiple times without authorization. When Plaintiff claimed his money back, Defendants acted to intimidate Plaintiff, and after his membership was wrongfully cancelled and Plaintiff replaced his card to avoid new unauthorized charges, Defendants threatened to send his name to a collection agency. Exhibits #14 and #15.

183. A company that sets up a promotion or scheme to attract customers promising to give them a discount off the merchandize acquisition price or the services contracted costs, and, after a person becomes a customer, the company intentionally fails to honor the promise, or overcharges that person through a concealed or open scheme, commits fraud and is subject to "disgorgement of profits, treble and punitive damages, and injunctive relief" for the damages caused in so acting. Neufeld v. Cigna Health and Life Insurance Company, WL 4158377 (D. Conn. Aug. 30, 2018); Zito v. United Technologies Corporation, Not Reported in Fed. Supp. (2016) WL 2946157 Civil No. 3:15-cv-744 (AWT); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); Negron v. Cigna Health and Life Ins., 300 F. Supp. 3d 341 - Dist. Court, D. Connecticut 2018.

184. In <u>Neufeld</u>, this Court determined that the Defendant, Cigna

> [Had] engaged in a scheme to defraud patients by overcharging for the cost of medically necessary services and products. Patients, including Plaintiffs and the Class and Subclass, paid undisclosed excess charges in exchange for receiving these products and services. Unbeknownst to the Class and Subclass members, Cigna misrepresented the purported costs of these products and services in the form of invoices for increased charges to patients. <u>Neufeld v. Cigna Health and Life Insurance Company</u> at 2.

185. The Court found that the essence of the scheme was requiring from patients a copayment through which Cigna unnoticeably inserted its overcharges. Cigna executed the fraud by (1) developing a fraudulent billing scheme through its Plans; (2) requiring the managers to charge patients excessive and unlawful copayments, and dictating that these copayments would not be discounted, waived, or excused; and, (3) contracting with providers not to disclose costs or the existence of "spread."

186. Copayment was used to receive money for a particular test for plaintiff Aubrey Srednicki. The test was billed for $17,362.66 to patients with insurance, but Cigna was going to "discount" $14,572.66 to its insureds, and the patient only had to pay the deductible of $2,787.00 for that service. <u>Neufeld v. Cigna Health and Life Insurance Company</u> at 2.

187. The patient was convinced that she had received a discount because another company, purportedly doing the blood test, billed the $17,362.66 and Cigna paid the $2,787.00 to that company and saved the patient the difference.

188. However, when trained eyes looked under the piles of papers, found that Cigna was using a fraudulent technique called "spread." It consists of creating several companies, some that provided the services and others that did the billing. Cigna contracted with those that did the billing. They billed the services the other companies

provided, and Cigna "spread" the payments among them. These companies have names like Laboratory Corporation of America Holdings, with the nickname LabCorp, HLTH DIAG LAB, where there is no trace of Cigna's ownership, but they belonged to Cigna. Id. at 1.

189. In this particular case, LabCorp did the job but HLTH DIAG LAB billed the patient. Although LabCorp did the work for $449.00, the company billing the patient was HLTH DIAG LAB, and HLTH DIAG LAB billed the patient for $17,362.66. At the end the patient paid $2,787.00, not its cost of $449.00. Id. at 2.

190. Something similar to this happened to insured patient Jeffrey Neufeld who paid almost 350% the price that an uninsured would pay if that uninsured purchased a disposable CPAP filter. While the filter cost only $7.50 without insurance, with insurance Neufeld had to pay $25.68. Id. at 1.

191. This Court concluded that "even if defendants' claims procedures could provide a spread reimbursement, plaintiffs and the Class and Subclass [that have been injured by this scheme] are entitled to more, including disgorgement of profits, treble and punitive damages, and injunctive relief." Id. at 1.

192. In assessing this and other cases, the Connecticut District Court defines the level of particularity with which fraudulent overcharges must be pled this way: "A claim for unfair and deceptive trade practices [...], which incorporates the same allegations as that for fraudulent overcharges [...], is essentially an action sounding in fraud and must meet the provisions of Rule 9(b)." .... But, "[a] general interest in self-enrichment [is] insufficient to satisfy Rule 9(b)'s requirement ..." Zito v. United Technologies

Corporation, Not Reported in Fed. Supp. (2016) WL 2946157 Civil No. 3:15-cv-744 (AWT).

193. In establishing the valid requisites to establish fraud, the Second Circuit says: "[A] requisite [of a] 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

194. And the Conn. App. Ct. in Southington Savings Bank v. Rodgers, 40 Conn. App. Court 1995, punctuates:

> An act or practice is deceptive if three conditions are met. "'First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material— that is, likely to affect consumer decisions or conduct.'" relying on Caldor, Inc. v. Heslin, 215 Conn. 590, 597, 577 A.2d 1009 (1990).

195. In Neufeld, the District Court adopted plaintiffs' conclusion that the defendant "created a mechanism through which Cigna could obtain additional monies beyond what plaintiffs should have paid under their plan". And that the defendant "designed and entered into the Claw-back scheme with the intent to defraud insureds who paid for excessive…costs."

196. These concepts combined with the concepts of fraud work as the framework to plead the fraudulent overcharges by TSI / NYSC.

A PRIMA FACIE CASE FOR OVERCHARGE

197. To form a prima facie case that Defendants committed fraudulent overcharges, the
Plaintiffs have to show that a reasonable jury could consider the evidence attached
and other expected, and plead with particularity each element of the violation which
are: (1) Defendants developed a fraudulent built-in billing passageway to
overcharge; (2) the fraudulent passageway required the managers to charge
customers excessive and unlawful payments that are never returned; (3) Defendants
created a mechanism to camouflage the fraudulent built-in billing device and shield it
from plain viewers, as the following details show. Neufeld v. Cigna Health and Life
Insurance Company; Zito v. United Technologies Corporation; Shields v. Citytrust
Bancorp, Inc; Caldor, Inc. v. Heslin, 215 Conn. 590, 597, 577 A.2d 1009 (1990). The
Plaintiffs meet and surpass this standard, as shown below:

>     1. The Evidence Attached and Other Expected Show that
>        Defendants Developed a Fraudulent Built-in Billing
>        Passageway Through Which They Overcharged.

198. When Plaintiff decided to join a gym, he looked at several websites, and decided to
register as a member of New York Sports Clubs in West Hartford attracted by the
promotion on their website stating that with $5.00 a person could register and be
exempted of charges the next two months. Exhibit #25. Plaintiffs registered on
December 20, 2017 with the promised $5.00, but on January 2, 2018 his credit card
was charged $31.89. Exhibit #4 pages 1 and 2; Pl.'s Aff. ¶ 4.

199. Although Plaintiffs was credited in paper, that credit went to foot another charge
undisclosed in the promotion, $74.43, for what they call "annual fee," and which
remaining amount, $42.54, was charged on 1/16/2018. Although the promotion did

not say anything about annual fee, and clearly stated two months free of charge, on 02/01/2018 the Plaintiffs' card was charged again $31.89, and so was on March 2, 2018. Exhibit #4 pages 1-5.

200. In charging the credit card in such a fashion, TSI / NYSC helped us satisfy the "requisite" necessary to "establish" a "'strong inference' of fraud," as the Second Circuit required in Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994), above.

201. In the two and a half months Plaintiff was a member of TSI / NYSC, Defendants charged him a total of $175.42. Deducting the $5.32 due at the beginning of the membership and the $31.89 they returned after cancelling the membership, Plaintiffs was overcharged $138.21, which was never returned. Exhibit #4, 1-6.

202. Being so deliberate in applying their "claw-back scheme," TSI / NYSC give us a textbook case of "deceptive practice," as the Conn. App. Ct. defines it in Southington Savings Bank v. Rodgers, because (1) there was a "representation" of charges that did "mislead" Plaintiff as what they portrayed in the promotion was not what they charged; (2) it is reasonable for consumer to interpret as true the promotion on a website because it was confirmed by the attendant at the front desk in Plaintiff's case; (3) such representation is material because otherwise Plaintiff might have made a different decision with respect to where to join or whether to join at all. We can reasonably conclude that the Defendants engaged in "deceptive practice."

203. If the unauthorized charges are projected to the full year, the proportional overcharges would have been $138.21 multiplied by 4.8, or $663.41. (If the 12 months in a year are divided by the 2.5 months Plaintiff was in the Clubs, the factor obtained

is 4.8. Presuming that Defendants would not overcharge more throughout the year, the total overcharges in a year would have been $138.21 multiplied by factor 4.8.)

204. According to TSI's website, they had 587,000 members by the end of 2017. Exhibit #3. Should Defendants apply to other members the same pattern of overcharges they applied to Plaintiff, and no more, we can estimate TSI's overcharges in one year. Multiplying the overcharges projection for one year to the number of members: 587,000 X $662.92 = 389,134,040. This pattern of overcharge projects 389.13 million dollars a year, that the public may be losing to TSI / NYSC's fraud.

205. If we take into account that TSI has been around since 1973 and that Plaintiff's membership number was #8,985,649, the fraud against the public has the possibility of being staggering. Exhibit #24.

206. TSI / NYSC's statement on their website is admissible as evidence under (Fed. R. E. 801(d)(2)). Plaintiff's membership card is also admissible under (Fed. R. E. 801(d)(2)).

207. The inferred data is not presented as a conclusion or to prove that Defendants have overcharged all the members of TSI / NYSC equally, but (a) "to show that defendants had both motive and opportunity to commit fraud," and that they committed (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

208. The improper deductions from which we inferred the yearly data show that Defendants have built a charging mechanism through which all the members have to pass to attend the Clubs. (All members have to give a credit card or a bank account

number, and this credit card or bank account can be charged at any time. When a member gives a card number, as Plaintiff did, the moment on which the card is charged only depends on TSI / NYSC's will. As soon as the account in possession of NYSC cannot be charged, the Defendants are notified, and Defendants request a new financial means). If the mechanism was applied to Plaintiff, it can be applied to anybody.

2. The Evidence Attached and Other Expected Show Defendants' Built-in Billing Passageway Required "Managers to Charge Customers Excessive and Unlawful Payments that Are Never Returned."

209. As stated, Plaintiffs registered on December 20, 2017 with the promised $5.00, but on January 2, 2018 his credit card was charged $31.89. When he notified the mistake, instead of reconciling the difference over the phone, Defendants requested that Plaintiff had an appointment with Tanya Hussain, the manager in charge of finance. She received Plaintiff at the front desk with two or three other people. At the beginning Plaintiff could not understand the presence of three people (maybe four) in a small space, where only one was actually performing a task, but the others had the kind of alertness of soldiers protecting a person in danger of an attack. Given the environment, Plaintiff simply told Hussain that the charges were probably a mistake because Plaintiff registered with the promotion they were running of $5.00 and two months free. Pl.'s Aff. ¶¶ 7-8.

210. "I just want the money to be returned to my card," Plaintiff told Hussain and the other people at the desk. Hussain responded that the money would not be returned, but "if my Director approves, you will be credited." By the emotion displayed, Hussain seemed to imply that Plaintiff was doing something wrong by claiming the

overcharged money: "Well, the Director has no option. It's my money" Pl.'s Aff. ¶ 8. The Director involvement from Massachusetts in this issue shows that the business as a whole adopted the policy of overcharge. And just like Cigna, no money was to be returned once charged. Neufeld at 2.

211. Plaintiffs' Affidavits and Small Court Claims Pleadings are admissible at trial under (Fed. R. E. 613 (a) and 801 (d) (1)).

212. Plaintiffs' membership was wrongfully cancelled on March 8, 2018, and the March charge was returned. But on April 2nd, after Ramon Moreno-Cuevas was not a member, his card was charged again $31.89. Exhibit #4, page 6. At the same time, NYSC's Director had forbidden Plaintiff to talk to any of their employees or to go to NYSC. To avoid new unauthorized charges, the only option Plaintiff had was to replace his card at the bank. And yet, when NYSC's management noticed that the card had been replaced, they called and sent email threatening Plaintiffs with sending his name to a collection agency, if he did not provide a new card. Never mind that he was not a member of the club anymore and that he could not talk to anybody there. Exhibit #14 and #15. As in Neufeld v. Cigna, Defendants ordered managers not to return overcharged money. But worse than in Neufeld v. Cigna, Defendants threatened to defame Plaintiff if he did not accept giving them more money through his card.

> 3. The Evidence Attached and Other Expected Show that the Defendants Created Mechanisms to Camouflage the Fraudulent Built-in Billing Device to Shield it from Plain Viewers.

213. Two mechanisms camouflaged the fraudulent built-in billing device to shield the device from plain viewers: (1) The offering of discount through promotions that give

members the sensation of confidence and security because they were receiving incentives, and, (2) The use of direct or implied threats to complaining victims to imply that the victim (not the company) is misbehaving, when a customer complains about overcharges.

214. Both mechanisms are aimed at the same purpose: To prop up a "deception practiced in order to induce another to part with property or surrender some legal right." Billington v. Billington. When some doubtful person poses inquiries, the company's harsher features come out. An angry person talks in self-righteous stand, who does not return money, and sanctions credit only "if my Director approves." It is aimed at sending a chilling message that induces people to wonder "who is going to argue for this little money?" and leaves the claim unfinished.

## CONCLUSION

215. The facts and the laws of this issue show that Defendants, TSI / NYSC, formed a scheme to defraud in a pattern similar to the one depicted in Neufeld v. Cigna Health and Life Insurance Company, which includes: (1) promise of a discount; (2) failure to provide that discount in real terms, or overcharges to service-receivers, and (3) a mechanism to conceal the fraud. Therefore, and for these reasons, Defendants should be found liable of fraudulent overcharges and be subject to the penalties of that behavior, including "disgorgement of profits, treble and punitive damages, and injunctive relief."

F. DEFENDANTS TSI / NYSC, STARWOOD MANAGEMENT PARTNERS / STARWOOD CORPORATION, AND AGENTS SHOULD BE FOUND LIABLE OF RECKLESS MISREPRESENTATION BECAUSE THEY ADMIT SUBLETTING PREMISES WITHOUT KNOWING IF THEY HAD THE RIGHT TO DO SO, IN DISREGARD TO THE DAMAGES THIS BEHAVIOR COULD CAUSE PLAINTIFFS.

216. Defendants, TSI / NYSC, Starwood Retail Partners and their agents, should be found liable of recklessness or reckless misrepresentation because they admit they signed a sublease with Plaintiffs without knowing whether they had the right to do so, in disregard for the truth and to the damages this act could cause Plaintiffs. In doing so, besides recklessness, Defendants were making a false representation because Defendants had said to have a right they did not know if they had.

217. Although in **Point D** we showed that the Defendants made a deliberate false statement when signing the lease with a particular price written, Defendants have counter-argued that they did not know if they had the right to sublet the premises and Starwood Retail Partners / Starwood Corp. stated that TSI / NYSC did not have the right to sublet. Exhibit #5. According to TSI, the Landlord told TSI / NYSC that they did not have that right, and therefore the Landlord was going to charge an extra fee, which TSI / NYSC, in turn, were passing to Plaintiffs. As Plaintiffs did not accept the extra fee, they "cancelled" the lease.

218. A person who in the course of forming a contract or business agreement with a second person makes reckless misrepresentations about the business in disregard to the truth, to induce the second person to act in a certain way that advances the inducer's business plans, causing injury to the second person, is liable for reckless misrepresentation and subject to "disgorgement of profits, treble and punitive

damages, and injunctive relief" for the damages caused to the second person. Maturo v. Gerard, 196 A.2d 494, 584 (Conn. S.Ct. 1985); Aldi v. Wells Fargo Bank, NA, Not Reported in F.Supp.3d (Conn. D. Ct. 2015) WL 3650297; Neufeld v. Cigna Health and Life Insurance Company, WL 4158377 (D. Conn. Aug. 30, 2018). If the first person commits these acts through an agent who promotes the scheme in disregard to the truth, the agent is personally liable for reckless misrepresentation and for treble the damages caused to plaintiff. Maturo v. Gerard; Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. Partnership, 309 Conn. 342 (2013) 71 A.3d 480.

By the Connecticut Supreme Court definition,

219. "Recklessness involves a subjective realization of [a] risk and a conscious decision to ignore it.... It does not involve intentional conduct because one who acts recklessly does not have a conscious objective to cause a particular result." State v. Jones, 289 Conn. 742, 756, 961 A.2d 322 (2008). That "[r]ecklessness or w[a]nton behavior implies a conscious disregard of a high risk, such as embarking upon a particularly dangerous course of action after actual warning." Williams v. Housing Authority of the City of Bridgeport, 327 Conn. 338 (2017) 174 A.3d 137.

A PRIMA FACIE CASE FOR RECKLESSNESS

220. Therefore, besides making false statements when saying that they had the right to sublet, now Defendants engaged in, either signing a lease they did not have the right to sign or increasing the rent by pretending they did not have a right they actually had.

1. The Evidence Attached and Other Expected Show Defendants Did Not Know Whether They Had the Right to Sublet; Therefore, They Acted Falsely and Recklessly.

221. Defendants said they did not know whether they had the right to sublet the premises after signing it, and because they did not have that right, the Landlord is charging a fee to permit them to sublet. Defendants decided to pass that "fee" to Plaintiffs, but Plaintiffs refused the "fee." As Plaintiffs refused, Defendants decided to "rescind" the lease.

222. When a person makes a statement about a business agreement or signs it in a contract without making sure the statement is true, that person utters a reckless statement in disregard to the truth and to the damages the statement may cause to those who rely on it. Such statement carries the same penalties as the one produced by somebody who knows that the representation is not true, if they result in injury when the second person relies on it to change position. Maturo v. Gerard; Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. Partnership. See evidence in **Point D**.

2. The Evidence Attached and Other Expected Show that Defendants Had Little Regard for Whether the Representation Was True.

223. Defendants signed a lease with Plaintiffs, but Defendants admit that they did not know whether they had the right to sublet the premises. Therefore, Defendants induced Plaintiffs to make business calculations and take different business risks without Defendants knowing whether Plaintiff would be able to stay in the premises. This resulted in injury when Plaintiff was forced out of the premises. A person who in disregard for the truth makes such a reckless business act is subject to "disgorgement of profits, treble and punitive damages, and injunctive relief." Maturo

v. Gerard; Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd. Partnership. See the

evidence in **Point D.**

### 3. The Reckless Misrepresentations Were Uttered to Induce Plaintiffs to Act in Ways that Advanced Defendants' Business End.

224. Without knowing whether they had the right to sublet the premises and whether the

statements produced in the contract were true, Defendants induced Plaintiffs to sign

such contract and move into the premises under their control. To induce Plaintiff into

action in a certain direction, Defendants also asked for and received an insurance to

cover eventualities for $2,000,000.00 in which Defendants were co-beneficiary,

manufactured a key and acted with all the characteristic of a person who has the

right to sublet and is willing to sublet the premises. Only if they were aiming at

Plaintiffs' business itself or at Plaintiffs' property, does this conduct make sense.

225. Defendants' actions caused injury to Plaintiffs. A person who recklessly and in

disregard for the truth induces another to change position relying on that statement

is subject to "disgorgement of profits, treble and punitive damages, and injunctive

relief." Maturo v. Gerard; Coppola Const. Co., Inc. v. Hoffman Enterprises Ltd.

Partnership. See the evidence in **Point D.**

### 4. The Plaintiffs Relied on the Defendants' Reckless Misrepresentations, Acted Accordingly and Injury Resulted.

226. As an agreement binds both persons to comply with certain conditions of the

agreement, Plaintiffs had to adjust their position to the agreement requirements. If

there had been no agreement, Plaintiffs had the opportunity to rent an office

elsewhere, but with the agreement Plaintiff had to comply, therefore injury was unavoidable.

227. Defendants' inducement cause: destruction of accumulated capital, almost two years and counting without exercising Plaintiffs' business, loss of market, project loss, and others.

## CONCLUSION

228. The facts and the laws of this issue show that Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corporation and their agents made false representations as statements of fact. These facts and laws also show that Defendants did not know whether they had the right to sublet; therefore, they acted falsely and recklessly. Furthermore, the evidence show that the Defendants had little regard for whether the representation was true.  The reckless misrepresentations were uttered to induce Plaintiffs to act in ways that advanced Defendants' business end.  The Plaintiffs relied on the Defendants' reckless misrepresentations, acted accordingly and injury resulted.

229. For the reasons expressed above, Defendants should be found liable of reckless misrepresentation, as Defendants' subletting premises to Plaintiffs without knowing whether they had the right to sublet, in disregard of the damages they could cause and be subject to "disgorgement of profits, treble and punitive damages, and injunctive relief.

G. DEFENDANTS, TSI / NYSC, STARWOOD RETAIL PARTNERS / STARWOOD CORP., SHOULD BE FOUND LIABLE FOR BREACH OF CONTRACT BECAUSE, AFTER SIGNING A LEASE, TRADING CONSIDERATIONS, AND INDUCING PLAINTIFFS TO MOVE INTO THE PREMISES, DEFENDANTS DENIED "THE VALIDITY OF THEIR PROMISE" UNLESS PLAINTIFFS ACCEPTED A RENT INCREASE.

230. States or its agents should not interfere in shaping the provisions of a contract between private parties. To prevent that from happening, the Founding Fathers included a clause in the First Article of the U.S. Constitution by which the states should not interfere in contracts between private parties but, instead, should recognize and enforce what those private parties did in their agreements: "No State shall […] pass any Bill […] or Law impairing the Obligation of Contracts." Art. I, § 10, U.S. Const.; Guy v. City of Baltimore, 1 Ky.L.Rptr. 205 (1879) 100 U.S. 434, 10 Otto 434, 25 L.Ed. 743; Cairo & F.R. Co. v. Hecht, 95 U.S. 168 (1877) 5 Otto 168, 24 L.Ed. 423. But see Stone v. State of Mississippi, 1 Ky.L.Rptr. 146 (1879) 101 U.S. 814, 11 Otto 814, 25 L.Ed. 1079.

231. However, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and agents believe they can skirt what the Constitution says, skip their obligations under the contract, and burden Plaintiffs with non-assented, non-discussed obligations, using the Police (local agents of the State) to threaten Plaintiff with arrest, if Plaintiffs do not accept a rent increase, after agreeing with Plaintiffs to move into the office and asking them to move out if they did not accept that increase. Pl.'s Aff. ¶¶ 25.

232. A person who forms a business agreement with a second person, and have the second person perform the second person's part of the agreement, breach the agreement with the second person by not performing the first person's part of the agreement, causing damages to the second person, is liable for breach of contract.

Meyers v. LIVINGSTON, ADLER, PULDA, 87 A. 3d 534 – Conn. Supreme Court 2014; Maloney v. Connecticut Orthopedics, PC, 47 F. Supp. 2d 244 - Dist. Court, D. Connecticut 1999; D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206 – Conn. Supreme Court 1987.

233. If two parties form an agreement in which one of the parties performs his corresponding part, the second party fails to perform, breaching the agreement, which results in damage to the first party, the first party has a cause of action in breach of contract.  Therefore, "[a]n action in [breach of] contract is for the breach of a duty arising out of a contract..." Meyers v. Livingston, Adler, Pulda.

234. In Claude v. Wells Fargo, Civ. Action No. 3:13-cv-00535(VLB), 2015WL 5797007 (D. Conn. Sept. 30, 2015), this District Court states that to form a valid contract, enforceable by Connecticut laws, the parties' agreement should occur through "an offer and acceptance based on a mutual understanding by the parties," expressed as a "mutual assent between the parties." Steinberg v. Reding, 24 Conn. App. 212, 214 (1991). To define the characteristics of an enforceable contract, this Court stipulates that the contract must be "definite and certain as to its terms and requirements, and must be supported by valid consideration." L & R Realty v. Connecticut Nat'l Bank, 53 Conn. App. 524, 534 (1999). Then, it defines "consideration" this way: "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Harley v. Indian Spring Land Co., 123 Conn. App. 800, 819 (2010). And it states the indispensable conditions to modify a contract so formed: "While parties to a written contract 'retain the power to alter or vary or discharge any of its provisions by a subsequent

agreement,' New England Petroleum Corp. v. Groppo, 214 Conn. 444, 450 (1990),

there must be new consideration as well as mutual assent to the meaning and

conditions of a modification in order for it to be enforceable. See Coniglio v. White,

72 Conn. App. 236, 243 n. 5 (2002)."

235. Explaining the principles upon which trial courts should rely to adjudicate breach of

contract cases in this State, the Conn. Supreme Court sustains that:

> "To constitute a breach of [the implied covenant of good faith and
> fair dealing], the acts by which a defendant allegedly impedes the
> plaintiff's right to receive benefits that he or she reasonably
> expected to receive under the contract must have been taken in bad
> faith." [...] "Bad faith in general implies both actual or constructive
> fraud, or a design to mislead or deceive another, or a neglect or
> refusal to fulfill some duty or some contractual obligation, not
> prompted by an honest mistake as to one's rights or duties, but by
> some interested or sinister motive . . .. Bad faith means more than
> mere negligence; it involves a dishonest purpose." (Citation
> omitted; internal quotation marks omitted.)
> De La Concha of Hartford, Inc. v. Aetna Life Insurance Company,
> 269 Conn. 424 - Conn: Supreme Court 2004.

## A PRIMA FACIE CASE FOR BREACH OF CONTRACT

236. To form a prima facie case that Defendants committed breach of contract, the

Plaintiffs only have to show that a reasonable jury could consider the evidence

attached and other expected, and plead with particularity each element of the

violation which are: (1) Defendants formed a business agreement with Plaintiffs; (2)

Plaintiffs complied with their part of the agreement; (3) Defendants defaulted by not

complying with their part of the agreement, (4) which resulted in damages to the

Plaintiffs. The Plaintiffs meet and surpass this standard, as shown below:

237. By the Connecticut District Court, the agreement between TSI / NYSC and Superb

Score LLC is a "binding and enforceable" contract because there was "an offer" by

Plaintiffs, when Plaintiffs asked to rent the day-care space, and NYSC responded with a counteroffer of the space described in Exhibit #1. See Plaintiffs' Small Claims Writ, p. 2 et seq., Pl.'s Aff. ¶ 6. There was also "an acceptance," because Plaintiffs accepted NYSC's counteroffer. Id. There was "mutual understanding by the parties" manifested as "mutual assent between the parties" when Superb Score decided to accept the counter-offered space in exchange for the promise to pay Defendants through a credit card they had on file, and when the parties decided to sign, and signed, a written contract. Id. The contract was "definite and certain as to its terms" and there is no dispute as to the terms used. A "manifestation" of the "definite[ness] and certain[ty] as to the contract terms" is the fact that when the Defendants tried to increase the rent, they did it resorting to external reasons, instead of claiming an alternative interpretation of one term or another in the contract, whether "term" is construed as "language," or "term," is construed as "condition." Id. There was mutual "consideration," as both parties offered and both parties promised, in seeking "the benefit" offered by the counterpart. Plaintiffs wanted a space where to conduct their business. Defendants, an amount of money equivalent to having 25 new members registered each month: $750.00 per month. Id. By the definition adopted by the District Court of how a "binding and enforceable contract" is formed, NYSC and Superb Score formed "a binding and enforceable contract."

238. The Defendants, TSI / NYSC unnecessarily violated these terms (Plaintiff told them that in six months "we can review the lease to increase the rent, if it's fair."). As to signing the lease, (1) Defendants do not deny signing the lease, but TSI / NYSC have said, in the email by which they breached the contract that because no money

has been charged there was no contract. Exhibit #5. Paying the rent does not include hand-cuffing Defendants and forcing them to click the button on their computer screen corresponding to Plaintiff's credit card. They had been charging that card before the parties signed the lease and continued charging it after Plaintiff's membership was cancelled. If they refrained from doing so for the rent, it is only because that was part of the "design to mislead or deceive" Plaintiffs, and eluding charging the rent was "not prompted by an honest mistake […], but by some interested or sinister motive…". De La Concha of Hartford, Inc. Moreover, (2) Plaintiffs complied with their part by authorizing the charges, contracting insurance for $2,000,000.00, in which Defendants were co-beneficiaries, Exhibit #2, and more. (3) Defendants do not deny breaching the lease, when they should have performed their part, but they call it "a rescission of the lease," as if calling the violation by a different name changes its nature. To this effect, the Connecticut Supreme Court points out in State v. Gooch that: "Putting a [legal] tag on an [illegal action] will no more change its essential character than calling a bull a cow will change its gender." State v. Gooch, 186 Conn. 17 - Conn: Supreme Court 1982.

239. Defendants, Starwood Retail Partners and Agents, also call it "rescind" the lease, as if a lease could be rescinded by one of the parties alone. As a result of Defendants' violations, (4) Plaintiffs have sustained damages for millions of dollars, as the evidence attached to these pleadings and others expected will show.

## CONCLUSION

240. The facts and the laws of this issue show that Defendants, TSI / NYSC, and their agents formed an agreement with Plaintiffs as a lease. These facts and laws also show that Plaintiffs complied with his end of the agreement by providing a credit card number (as they demand) from which TSI / NYSC could charge the monthly rent and other considerations to the Defendants. Despite that, Defendants did not comply with their part by permitting Plaintiffs to teach a class there, as agreed.  Furthermore, the evidence show that the Defendants breached the lease by asking for a higher rent after the lease was signed, use a security guard to intimidate Plaintiff and the West Hartford Police to announce the breach, then asked Plaintiffs to move out, changed the promises lock, locking Plaintiffs out and the chattel in. Starwood Retail Partner was instrumental in this breach, by sending the security guard, the police, and pretending they did not know TSI was subletting the premises.

241. For the reasons expressed above, Defendants should be found liable of breach of contract and be subject to the penalties this violation entails, and be made apply the remedies to the violation.

H. DEFENDANTS, TSI / NYSC AND AGENTS, SHOULD BE FOUND LIABLE OF A SECOND BREACH OF CONTRACT BECAUSE DEFENDANTS ACCEPTED PLAINTIFF'S MEMBERSHIP IN THE CLUBS, CHARGED FOR THE MEMBERSHIP, AND AFTER DEFENDANTS VIOLATED THE LEASE WITH PLAINTIFFS, THEY ALSO VIOLATED THE MEMBERSHIP CONTRACT.

242. Defendants, TSI / NYSC should be found liable of a second breach of contract because, after signing a lease, trading considerations, and inducing Plaintiffs to move into the premises, Defendants denied "the validity of their promise," Finlay v. Swirsky, unless Plaintiffs accepted a rent increase, in violation to the contract. Pl.'s Aff. ¶¶ 21-25. Then, without giving a reason, Defendants breached Plaintiff's membership contract.

243. The rule proposed in **Point G.** and its principles and explanations are applicable here because this new set of facts of a second contract violation is governed by the same rules and principles as that in the written contract. The structure of the violations is the same for **Point G.** as for **Point H.** Plaintiffs further rely on other concepts developed by the Second Circuit, dealing with cases when no written contract between the parties signals the agreement.

244. If two persons reach a business agreement, but the agreement is not reduced to a written document, "partial performance by one party and the acceptance of such performance by another can satisfy this requirement" of a written contract. "Partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." Kimm v. Kyu Sung Cho, 706 Fed. Nos. 16-1372-cv, 16-1560-cv August 23, 2017. When the partial performance executed by one party is accepted by the other party in a transaction, an enforceable contract is established

between the parties. Kimm v. Kyu Sung Cho; See also Yong Kui Chen v. Wai Yin Chan, 615 Fed.Approx. 10 (2015); Moore v. T-Mobile USA Inc. 548 Fed.Appx. 686 13-240-cv Dec. 18 (2013). But see Beautiful Jewellers Private Ltd. v. Tiffany & Co. 438 Fed.Appx. 20 No. 10-3039-cv Sept. 16, 2011.

245. Not even a partial modification of provisions of a contract can be effected without the agreement of the other party. In ruling on the question of whether one of the rates in a gas distribution contract can be changed, the Supreme Court answered:

> [T]here is nothing in the structure or purpose of the Act from which we can infer the right, not otherwise possessed and nowhere expressly given by the Act, of natural gas companies unilaterally to change their contracts.
> Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act.
> United Gas Co. v. Mobile Gas Corp., 350 US 332 S. Ct. 1956.

246. The Court uses a similar language with respect to other contract modification attempts: "'The District Court's finding that the proposed contract change related to 'rates of pay, rules, or working conditions,' and was thus a bargainable issue under the Railway Labor Act, is clearly erroneous.'" Order of R. R. Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330 (1960); 80 S. Ct. 761, 45 L.R.R.M. (BNA) 3104, 4 L.Ed.2d 774, 39 Lab. Cas. P 66,415. Therefore, we find that at all levels of the judicial system, contracts cannot be unilaterally changed, and Defendants are in violation of that rule.

## A PRIMA FACIE CASE FOR AN UNWRITTEN CONTRACT

247. To form a prima facie case that Defendants breached an unwritten contract, the Plaintiffs only have to show that a reasonable jury could consider the evidence attached and other expected, and plead with particularity each element of the

violation which are: (1) Defendants reached an agreement with Plaintiff as a Clubs' member; (2) Plaintiff complied with his part of the agreement by supplying a credit card number to be charged; (3) Defendants defaulted by cancelling Plaintiff's membership, although they charged (4) the default resulted in damages to the Plaintiffs.

248. The payment of an annual fee by the Plaintiff entitles the Plaintiff to a membership of at least one year while in good financial and behavioral standing with the Clubs. Defendants, TSI / NYSC cannot sell their cake and eat it, too. If TSI / NYSC charged an annual fee, unless Plaintiff committed an outrageous act that justified lopping him off the membership. Otherwise, the act is forbidden by the agreement and common custom. At a minimum, Defendants should have returned the money of the annual fee when they cancelled the membership because the cancellation was an unprovoked, non-assented, and unjustified act.

249. A contract cannot be modified by one of the parties without the other party's consent, unless the other party committed a violation of the contract. Plaintiff did not commit any violation, and Defendants have not alleged so. Therefore, Defendants could not have cancelled the contract, the ultimate modification, without Plaintiff's consent. The law of contracts does not accept the notion that one or the other party can retain the power to, by oneself, modify or nullify the contract. That's why in Claude, the District Court makes clear that

> While parties to a written contract "retain the power to alter or vary or discharge any of its provisions by a subsequent agreement," New England Petroleum Corp. v. Groppo, 214 Conn. 444, 450 (1990), there must be new consideration as well as mutual assent to the meaning and conditions of a modification in order for it to be

enforceable. See Coniglio v. White, 72 Conn. App. 236, 243 n. 5 (2002).

## CONCLUSION

250. The facts and the laws of this issue show that Defendants, TSI / NYSC, and their agents formed an agreement with Plaintiffs as a membership contract. These facts and laws also show that Plaintiff complied with his end of the agreement by providing a credit card number (as they demand) from which TSI / NYSC charged (and sometimes overcharged) a monthly fee for the membership in the clubs. Without a justifiable motive, Defendants breached the contract of the membership and did not returned the money they have charged in excess.  Furthermore, the evidence show that the Defendants breached this contract in connection with Plaintiffs' property locked in the premises, which was in connection with an unacceptable rent increase of the lease signed between the parties, which makes it a graver violation because it shows that Defendants were using Plaintiff's membership as a leverage to put Plaintiff under duress.

251. For the reasons expressed above, Defendants should be found liable of breach of contract and be subject to the penalties this violation entails, and make them to comply with the remedies to the violation.

I. THE DEFENDANTS, TSI / NYSC, STARWOOD RETAIL PARTNERS / STARWOOD CORP. AND AGENTS SHOULD BE FOUND LIABLE OF VIOLATING THE GOOD FAITH AND FAIR DEALING DUTY IMPOSED ON EACH PARTY TO A CONTRACT UNDER THE UCC BECAUSE, AFTER SIGNING A LEASE, DEFENDANTS WITHHELD THEIR COMPLIANCE UNLESS PLAINTIFFS PAID A HIGHER RENT.

252. The Defendants, TSI / NYSC and Starwood Retail Partners / Starwood Corporation and their agents, should be found liable of violating the good faith and fair dealing duty imposed on each party to a contract under the Uniform Commercial Code because, after signing a lease and trading considerations with Plaintiffs, Defendants withheld their compliance unless Plaintiffs accepted a rent increase not included in the contract, and after accepting Plaintiff as a member of the Clubs and charging for it, Defendants cancelled Plaintiff's membership, without returning some of the money paid for the membership, so committing larceny.

253. The Conn. S. Ct. recognizes a self-standing cause of action in torts stemming from the common law duty of good faith. The court states that the assumption that when parties are in a contractual relationship, one of the parties could not sue the other based on bad faith alone because "the only cause of action available to the plaintiff is a cause of action based on the violation of the [contract]" is erroneous. The court states that an "implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships." Buckman v. People Express, Inc., 205 Conn. 166, 171, 530 A.2d 596 (1987) at 170. Therefore, good faith and fair dealing is a legitimate cause of action on its own.

254. If a person forms a business agreement with a second person, have the second person comply with the second person's part of the agreement, and then the first

person refuses to fulfill the first person's contractual obligations, not because the first person thought it was the person's right not to fulfill that action, or because of an honest mistake, but because of some interested or sinister motive, then the first person is acting in bad faith and is liable for violation of the covenant of good faith and fair dealing implied in every contractual agreement in Connecticut. Buckman v. People Express, Inc., 205 Conn. 166, 171, 530 A.2d 596 (1987); Habetz v. Condon, 224 Conn. 231 - Conn: Supreme Court 1992; Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157 - Dist. Court, D. Connecticut 2014; D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206 - Conn: Supreme Court 1987; Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620 - Conn: Supreme Court 2002; Warner v. Konover, 210 Conn. 150 - Conn: Supreme Court 1989; CAPSTONE BLDG. v. American Motorists Ins., 67 A. 3d 961 - Conn: Supreme Court 2013; Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1 - Conn: Supreme Court 1995.

255.  "Refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake […], but by some interested or sinister motive" defines bad faith. Buckman v. People Express, Inc. The plaintiff in Buckman was a terminated employee who, by statute, had the right to keep his insurance. He wrote his former employer to get a notice to the insurance and keep that benefit the law accords him. The employer did not respond. Then Buckman had a lawyer write another letter asking for the same prerogative. Still, the employer did not answer. Buckman sued and the trial court awarded him the found damages of $1,595.84 and $50,000.00 in punitive damages for the bad faith with which the employer acted. Id. at 171.

256. The trial court said that "[g]ood faith and fair dealing mean an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking [it] means faithful to one's duty or obligation ... an honest intention not to take an unconscientious [sic] advantage of another....". (Observations in the original). The court affirmed, conditioned to a remittitur to $35,000.00 for punitive damages, which still was more than 21 times the compensatory damages found by the trial court. Id. at 171.

257. Furthermore, committing some wrong against the other party in a contract and then hide behind that wrong to justify the lack of performance of the wrongdoer's obligations under the contract, contravenes the principle of good faith and fair dealing expected in every contract. In Habetz v. Condon, Peter Habetz contracted with Condon Contracting LLC, owned by Ken Condon, some construction at his home for $103,000.00. After the construction started, the homeowner asked the contractor to include some extras that were written in two unsigned pages describing what to add. It was agreed that the additions cost was extra $6,244.00. The homeowner never signed the two pages, although the contractor asked repeatedly to do so. Habetz v. Condon, 224 Conn. 231 – Conn. Supreme Court 1992.

258. The contract "outlined the work to be performed and set forth a time schedule for payments based on designated stages of construction." The homeowner paid $93,000.00 on the original contract and nothing on the extra. Id. at 234.

259. As the homeowner was unsatisfied with the work, he sued for (a) breach of contract; (b) breach of the statutory requirements of the homeowner improvement act, (c) violation of CUTPA; and (d) negligence resulting in emotional distress and

financial loss. The contractor responded plaintiff and filed a counterclaim for: (a)

plaintiff's failure to pay $10,000.00 owed under the written, signed contract; and (b)

plaintiff's failure to pay $6,244.00 for the extras the homeowner requested. The

plaintiff alleged the special defenses that modifications and extra work had to be

stated in writing and signed by both parties, per General Statutes § 20-429. Id. at

235.

260. The trial court found for the homeowner's first count and awarded him $16,542.50.

But also found for the contractor's two counts, and awarded him $10,000.00 for the

first count and $6,244.00 for the second count. The trial court concluded that the

contractor incurred violations of the § 20-429 (a) (6), but the court also found that

"bad faith on the part of the [homeowner] caused it to conclude further that 'the

minor noncompliance by the defendant with § 20-429 (a) [did] not bar a recovery

under the first and second counts of the counterclaim.'" Id. at 235.

261. On appeal by the homeowner, the Conn. S. Ct. found that "to allow the homeowner

who acted in bad faith to repudiate the contract and hide behind the [Home

Improvement Act] would be to allow him to benefit from his own wrong, and indeed

encourage him to act thusly."

262. "Every contract imposes upon each party a duty of good faith and fair dealing in its

performance and its enforcement." Belz v. Peerless Ins. Co., 46 F. Supp. 3d 157 -

Dist. Court, D. Connecticut 2014. Relying on Warner v. Konover, 210 Conn. 150,

154, 553 A.2d 1138 (1989). Hiding behind their own wrongs to take advantage of

them effected "[a] breached of the implied covenant of good faith and fair dealing

[that] involves a defendant acting in bad faith to impede the plaintiff's right to receive

his or her reasonably expected benefits under the contract." <u>Belz v. Peerless Ins.</u>
<u>Co.</u>, at 165.

## A PRIMA FACIE CASE FOR GOOD FAITH AND FAIR DEALING

263. To form a prima facie case that Defendants violated the good faith and fair dealing
imposed on every contract in Connecticut, the Plaintiffs only have to show that a
reasonable jury could consider the evidence attached and other expected, and plead
with particularity each element of the violation which are: (1) A person forms a
business agreement with a second person; (2) the second person complies with the
second person's part of the agreement; (3) the first person refuses to fulfill the first
person's contractual obligations; (4) the first person's incompliance is due to some
interested or sinister motive; (5) the first person is liable for violation of the covenant
of good faith and fair dealing.

264. For a long time now, TSI / NYSC have been acting "thusly." They contracted with
Plaintiffs, had Plaintiffs comply with their part of the agreement, and when the
Defendants were supposed to comply with their part, they withheld the compliance
unless Plaintiffs paid a higher rent disguised as a fee to TSI / NYSC imposed by
their Landlord, Starwood, for a purported overlook of the Defendants. To permit this
is to do as the Conn. S. Ct. advises not to do: To let wrongdoers hide behind their
own wrong actions to take advantage of them, even if that wrong action was
performed between the companies responsible for the fraud.

265. "Every contract imposes upon each party a duty of good faith and fair dealing in its
performance and its enforcement." <u>Belz v. Peerless Ins. Co.</u>, 46 F. Supp. 3d 157 -

Dist. Court, D. Connecticut 2014. Relying on Warner v. Konover, 210 Conn. 150,

154, 553 A.2d 1138 (1989). TSI / NYSC had the credit card to charge for the rent,

but they did not. They had their own lease with Starwood to see if they had the right

to sublet, but they did not look at their lease. And then they raised their own

inactions as their reasons to increase the rent to Plaintiffs, and to breach the

sublease. Hiding behind their own wrongs to take advantage of them effected "[a]

breached of the implied covenant of good faith and fair dealing [that] involves a

defendant acting in bad faith to impede the plaintiff's right to receive his or her

reasonably expected benefits under the contract." Belz v. Peerless Ins. Co., at 165.

266. The second group of Defendants, Starwood Retail Partners / Starwood

Corporation and their agents, gave a tour to Plaintiff to rent one of their spaces,

arranged with their locksmith to make a key to the door that gave Plaintiffs access to

the subleased facility, "received" complaints from a garage employee about Plaintiff

"being homeless," saw, through their monitoring cameras in the building, Plaintiff

entering and leaving the premises with the key they authorized for the entrance they

knew did not have a key before, however, they allege that they did not know the

premises were being sublet. If the garage employee did not see a relationship

between Plaintiff and the premises, there is no justification for that employee to

convey complaints to the Landlord. Moreover, when Carlson toured Plaintiff he

learned that Plaintiff was trying to rent a space. Then, knowing that the key was for

Plaintiffs was equivalent to knowing that the space was being sublet. So Starwood

and agents Rifkin and Carlson consciously participated in the breach of contract,

and their contribution to that breach was alleging that they did not know about it and

its supposed consequences. That is to act in "bad faith," as this Court defines it:

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Id. at 165.

267. Of course, Starwood, Rifkin, and Carlson will adduce that they could not have acted in bad faith because they did not have a contract with Plaintiffs, and therefore there was no covenant to comply with. But they did have a covenant with TSI / NYSC and, therefore, that covenant is implied with subtenants they authorize. By manufacturing a key or giving permission to manufacture a key for the Plaintiffs, Starwood adopted the covenant existing between TSI / NYSC and Superb Score, LLC. Falkner v. Samperi, 190 Conn. 412, 419, 461 A.2d 410*410 681 (1983); Courtney v. Courtney, 542 P.2d 164, 166 (Alaska 1975). The text that Carlson sent to Plaintiff shows that he was aware and in control of what was happening between Plaintiffs and TSI / NYSC. In different scenarios, the Conn. S. Ct. has ruled in cases with similarities to this one in favor of the plaintiff. See Warner v. Konover, 210 Conn. 150 – Conn. Supreme Court 1989; Gateway Co. v. DiNoia, 232 Conn. 223 – Conn. Supreme Court 1995.

## CONCLUSION

268. The laws of this case show that the Conn. S. Ct. recognizes a self-standing cause of action in torts stemming from the common law duty of good faith. That not fulfilling one's contractual obligations because of some interested or sinister motive is to act in bad faith, and that a party acting that way is liable for violation of the covenant of good faith and fair dealing implied in every contractual agreement in Connecticut. The law also states that "[g]ood faith and fair dealing mean an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking [it] means faithful to one's duty or obligation."

269. Defendants violated the good faith and fair dealing covenant that they adopted when they: (1) signed a contract with Plaintiffs; (2) in which Plaintiffs complied with their part of the agreement; (3) Defendants refused to comply with the part of their contractual obligations; (4) they did so in order to obtain an extra advantage in the agreement, which is a sinister motive; (5) for that reason, Defendants are liable for violation of the covenant of good faith and fair dealing.

270. For the reasons stated above, the Defendants should be found liable of violating the duty of good faith and fair dealing implied in every contract and be subject to punitive damages, as the law states.

J.  THE DEFENDANTS, TSI / NYSC, STARWOOD, AND THEIR AGENTS, SHOULD BE FOUND LIABLE OF CONSPIRACY BECAUSE DEFENDANTS ENTERED A COMBINATION TO DEFRAUD PLAINTIFFS, CONVERTED THEIR PROPERTY, OVERCHARGED THEIR CREDIT CARD, AND USED THE POLICE AND A SECURITY GUARD TO BREACH TWO CONTRACTS, PUT UNDER DURESS, INTIMIDATE, AND RAISE THE RENT TO PLAINTIFFS.

271. When two or more persons enter into a combination to do a criminal or unlawful act or a lawful act by criminal or unlawful means against other persons, that association is called a conspiracy. In a conspiracy the acts done by the conspirators in furtherance of their objective, constitute the damage caused by the conspiracy to the plaintiff. A civil action for conspiracy is based on the conspirators' material acts done in furtherance of the schemed goal. The execution of such scheme to reach the goal results in damages to the plaintiff. Williams v. Maislen, 165 A. 455 (Conn. 1933); Marshak v. Marshak, 226 Conn. 652 - Conn: Supreme Court 1993; Kilduff v. Adams, Inc., 219 Conn. 314, 317-19, 593 A.2d 478 (1991); Maturo v. Gerard, 196 A.2d 494, 584 (Conn. S. Ct. 1985); Bernbach v. Timex Corp., 989 F. Supp. 403 - Dist. Court, D. Connecticut 1996.

272. The elements of a civil action for conspiracy are: (1) a combination between two or more individuals, (2) to commit an unlawful act or a lawful act by unlawful means, (3) in which the act of one or more of the conspirators pursuant to the scheme and in furtherance of the objective, (4) results in damage to the plaintiff. Williams v. Maislen, 116 Conn. 433, 437, 165 A. 455 (1933);

273. "If [a] conspiracy [is] proved, one party might have one function and one another in carrying it out," but all the co-conspirators, having more or less knowledge of the conspiracy, are responsible for the conspiracy. Williams v. Maislen, 116 Conn. 433,

437, 165 A. 455 (1933). However, "conspiracy alone […] does not constitute a viable predicate for a civil conspiracy claim; unlawful acts must actually be committed pursuant to the conspiracy. Bernbach v. Timex Corp., 989 F. Supp. 403 - Dist. Court, D. Connecticut 1996.

274. In Williams, the defendants, Maislen, Bonasso, and Hoffson formed a conspiracy to cheat and deceive people, and deprive them of their properties, using a circular scheme in which the victims never caught up with their property as it passed from hand to hand. Miss Williams was one of those victims.

275. In response to an advertisement, she called Maislen's office. Maislen told Williams that he knew a wealthy man, Bonasso, who could buy the three lots she had in Bloomfield. A few days later, Bonasso went to see Williams and the day after they went to see the three lots. After seeing the lots, Williams and Bonasso went to Maislen's office, where there was another person: Hoffson.

276. Maislen, Bonasso, and Williams discussed the sales terms in Hoffson's presence and reached the agreement to execute a deed the next day. The same day, Hoffson and Maislen went with Williams to a lawyer's office in Hartford and instructed him to prepare a warranty deed and a note for the balance. The following day, Bonasso took Williams to the attorney's office and there she executed the deed to Bonasso in exchange for $50.00 and a payable-in-six-months note for $450.00.

277. A week later, Bonasso exchanged the lots for a property on Euclid Avenue, and right after, gave Hoffson a mortgage on that property. When the note was not paid, six months later, Williams went to Maislen, who told her to attach the Euclid Avenue property, which she did. But the property was so encumbered that her attachment

was worth nothing. When The Maison Company, a corporation owned by Hoffson and his wife, who happened to be Maislen's sister, foreclosed the property, there was nothing left for Williams.

278. Williams brought charges of (1) fraudulent representation, and (2) conspiracy. The Superior Court found for the plaintiff for both charges and found that defendants had the same substantial knowledge of the scheme and that they simply played different roles in the conspiracy.

279. On appeal, the Conn. S. Ct. affirmed all the charges, except for the first on Hoffson, which was reversed. In its opinion the Conn S. Ct. said that the trial court explained to the jury that "where three persons are charged with conspiracy, the jury might find that only two participated, and were liable therefor; that if only one schemed and did acts in furtherance thereof, it would not be a conspiracy and an action of conspiracy would not lie, but liability might be found against that one on the first count of the complaint on the ground of fraudulent representation; and that, if the conspiracy was proved, one party might have one function and one another in carrying it out." Williams v. Maislen, 116 Conn. 433, 437, 165 A. 455 (1933).

280. However, "[w]ithout an independent basis for finding illegality in the defendant's action," a plaintiff does not have an actionable cause for conspiracy against a group of people who acts in combination. Marshak v. Marshak, 226 Conn. 652 - Conn: Supreme Court 1993. This case arises from the controversy that followed when a wife, Karel, told her husband, Sheldon Marshak, that she wanted a divorce. Husband and wife engaged in a heated discussion that ended up with the husband asking the marriage's four children to enter his car and leaving the house with them.

281. He stopped at a friend's house and asked the friend, James Ambadjes, to take them to the airport. On their way to the airport, they stopped at Stamford, where James signed an affidavit confirming that Sheldon was the children's father to get their passports. After getting the passports, Sheldon and the children took a plane.

282. Two and a half months later, Sheldon called Karel and told her that if she did not withdraw the marriage dissolution she had filed, she would not see the children again. Karel asked Sheldon's friend, James, several times about her children and husband to which James answered that he did not know their where about. Karel also called Sheldon's mother, Sylvia, and asked where her children and husband were. Sylvia answered the same way as James. Later, James admitted that he talked to Sheldon on a weekly basis for the first six weeks after he left. When Karel discovered that children and father were in Israel, she travelled there three times, had a trial for custody, won the children custody, and when she was ready to fly back home with her children, Sheldon picked them up from school and disappeared with them.

283. Karel located Sheldon in Sao Paolo, Brazil, got him arrested, but the police released him from custody before she got the children. He picked up the children and disappeared again, this time not to be located by Karel. This battle spanned from 1985 to 1992 until Sheldon and their children went into the dark for Karel. She allegedly had spent close to a million dollars chasing her children and ex-husband.

284. Finally, she decided to sue the people who had allegedly helped her ex-husband abduct her children. Among them, she named her ex-husband's mother, Sylvia, his sisters, Evelyn and Jaqueline, and his friend James.

285. Karel documented her losses and her allegations, and the trial court found that for

aiding and abetting in the conspiracy to commit abduction, the four defendants were

"jointly and severally liable to the plaintiff for […] the loss of her children's

companionship, loss of parental rights, emotional distress, and her economic loss,"

which amounted to $886,499.00. Marshak v. Marshak, 226 Conn. 652 – Conn.

Supreme Court 1993.

286. On appeal the Conn. S. Ct. analyzed the case in detail and found that while James

helped Sheldon get passports for the children and took them to the airport, at that

time both parents had joint legal custody of the children, therefore, under statutes §§

53a-97 and 53a-98 of the penal code, he was not committing a crime condemned by

those statutes. After the sixth week James did not have any contact with Sheldon,

and at that time Sheldon had not lost custody of the children, yet.

287. The most important feature of the case from the legal standpoint is that the Conn.

S. Ct. found in its ruling that

> "[T]here is no such thing as a civil action for conspiracy. The action
> is for damages caused by acts committed pursuant to a formed
> conspiracy rather than by the conspiracy itself." Cole v. Associated
> Construction Co., 141 Conn. 49, 54, 103 A.2d 529 (1954). That the
> plaintiff has made an "allegation as to conspiracy brings no strength
> to the declaration, for it shows no additional cause of action." Id.
> Marshak v. Marshak, 226 Conn. 652 - Conn: Supreme Court 1993.

288. The importance of Marshak stems from having the Conn. Supreme Court forced to

clarify that the court did not have the intention to overrule Williams in Marshak when

defendants rely on misinterpretations of Marshak. The court just wanted to state that

unlawful acts or lawful acts by unlawful means must actually be committed to assert

a cause of action for conspiracy. The combination of people to commit those acts

does not produce a cause of action for conspiracy, unless the conspirators commit the acts themselves. The unlawful acts committed by the combination is what makes a cause of action to arise.

289. In Bernbach v. Timex, defendants, Timex Corporation and Middlebury Office Park Limited Partnership (MOP) appealed from a case in which the Plaintiffs, residents and owners who lived next to Timex asserted, eighteen counts against the defendants.

290. Timex had a long-time manufacturing facility where the company disposed of hazardous chemical materials and contaminants. Through routine checks, Timex discovered in 1989 that the underground water was contaminated. The company did not notify the authorities, but retained Roy F. Weston, Inc., an environmental consulting firm, to assess the site and develop a remediation plan. In 1990 Timex informed the EPA and the DEP Weston's advice, their concern, and their plans.

291. Although Timex stopped using well water for their own consumption, the company did not test the groundwater of the adjoining residential neighborhoods until 1992. The wells of the plaintiffs were found to be contaminated. When the damages became public, two tiers of plaintiffs filed a civil law suit against Timex, MOP, and Weston. One of those counts was conspiracy. In their response, Timex and Weston relied on Marshak, particularly on the block quote from above, stating that "there is no such thing as a civil action for conspiracy…".

292. In its ruling, the Conn. D. Ct. clarified that "[t]he language quoted above merely states that conspiracy alone (i.e., combination to do unlawful acts or lawful acts by unlawful means) does not constitute a viable predicate for a civil conspiracy claim;

unlawful acts must actually be committed pursuant to the conspiracy." <u>Bernbach v.</u>

<u>Timex Corp</u>., 989 F. Supp. 403 - Dist. Court, D. Connecticut 1996. In another case

the D. Court summarizes the interaction between the conspirators and the law:

> The purpose of a civil conspiracy claim is to impose liability on all
> those who agreed to join the conspiracy. By joining, the members
> become legally responsible for the tortious acts taken in furtherance
> of the object of the conspiracy, including actions taken by co-
> conspirators. See id. at 636, 894 A.2d 240; see also Noll v. Hartford
> Roman Catholic Diocesan Corp., No. X04CV024000582S, 2005
> WL 2130212, at 2 (Conn. Super. Ct. July 29, 2005) ("[T]he benefit
> of ... civil conspiracy to a plaintiff is not that it creates liability where
> otherwise none might exist, but rather it expands the universe of
> those potentially liable for the harm."). To say that individuals "join"
> a conspiracy, thereby exposing them to liability, is to say that they
> agree to participate, in some manner, in the object of the
> conspiracy. See Macomber, 277 Conn. at 636, 894 A.2d 240.
> <u>Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC</u>, 739 F. Supp.
> 2d 109 - Dist. Court, D. Connecticut 2010.

293. Therefore, in the present case, the Plaintiffs must show that not only the

Defendants, NYSC, Starwood Retail Partners / Starwood Corp., and their agents

formed a combination between two or more persons "to do unlawful acts," but also

that those unlawful acts were actually committed in furtherance of the conspiracy by

the conspirators, and that damages to Plaintiffs resulted from those acts.

<u>A PRIMA FACIE CASE FOR CONSPIRACY</u>

294. To form a prima facie case that Defendants committed unlawful acts as the

furtherance of a conspiracy, the Plaintiffs only have to show that a reasonable jury

could consider the evidence attached and other expected, and plead with

particularity each element of the violation which are: (1) a combination between two

or more individuals, (2) to commit an unlawful act or a lawful act by unlawful means,

(3) in which the acts of one or more of the conspirators pursuant to the scheme and in furtherance of the objective, (4) results in damage to the plaintiff. Williams v. Maislen, 116 Conn. 433, 437, 165 A. 455 (1933); Marshak v. Marshak, 226 Conn. 652 - Conn: Supreme Court 1993; Bernbach v. Timex Corp., 989 F. Supp. 403 - Dist. Court, D. Connecticut 1996. The Plaintiffs meet and surpass this standard.

295. **Point D**, particularly ¶¶ 160-180, shows that a conspiracy was formed between TSI / NYSC and their landlord, Starwood Retail Partners / Starwood Corporation and agents to commit fraud against Plaintiffs. Specifically, to illegally get more money for the rent than what the lease stipulated. For that, Defendants planned actions around the intermediate step of Plaintiffs' early moving into the subleased premises. With this, the conspirators assured that, should Plaintiffs rebuff the demand to increase the rent, Defendants would lock in Plaintiffs' chattel, used the West Hartford Police, manipulated through Starwood Retail Partners, to separate Plaintiffs from their property, by banning Plaintiff from going to the building.

296. That action put Plaintiffs under duress because without their working tools, Plaintiffs could not have an income, even if they rented another place. Defendants provoked incidents after Plaintiffs moved into the premises, like the "altercation" with the security guard, and when Plaintiff avoided them by acting cautiously, Defendants referred to them as if the incidents had actually happened.

297. To cover up the purpose of these actions, they had the police ban Plaintiff not only from 65 Memorial Dr. but also from other places that were not connected to the property. (Pl.'s Aff. ¶ 25).

298. Let us retake the elements of the conspiracy as presented in <u>Williams</u>: (1) a combination between two or more individuals, (2) to commit an unlawful act or a lawful act by unlawful means, (3) in which the act of one or more of the conspirators pursuant to the scheme and in furtherance of the objective, (4) results in damage to the plaintiff. <u>Williams v. Maislen</u>, 116 Conn. 433, 437, 165 A. 455 (1933).

    1. <u>The Evidence Attached and Other Expected Show Defendants TSI / NYSC, Starwood Retail Partners / Starwood Corporation and Their Agents Formed a Combination to Act in Furtherance of their Unlawful Goals.</u>

299. The first element of the conspiracy is (1) the combination between two or more persons. TSI / NYSC's manager, Brisvely Garcia, helps us establish the existence of that combination between her company and her Landlord company when she talked about "an altercation between [Plaintiff] and... ah, it was the security guard." To gain awareness of that combination, Plaintiffs please ask the Court to notice that the security guard approached Plaintiff on Sunday Feb. 18, 2018, at about 9:45 at night in the middle of a holiday weekend that extended until Monday night and said that "the owner told me to escort you out of the building." And that Garcia approached Plaintiff a few hours later, still during the holiday weekend, on Monday the 19th at 1:00 p.m. or earlier, and told Plaintiff that "the landlord had received several complaints about you," including the "altercation" that had allegedly happened just a few hours before. Pl.'s Aff. ¶¶ 20-1.

300. To show the inconsistencies, Plaintiffs asked the Court please to notice that managers in the real estate business are not first respondents, who work Sunday night and all day Monday of the President's Day weekend. In fact, the office at

Starwood Retail Partners was closed from Friday afternoon to Tuesday morning that weekend.

301. Another detail is that the security guard was working the night shift. If he was going to work the next day, he would have started not earlier than 3:00 pm. Garcia approached Plaintiff to inform him about "the complaints the Landlord had received about you," hours before the security guard could relay the information in a normal business schedule, never mind that the office was closed. Therefore, she did not have occasion to have received information about "the altercation" that the security guard had not had time to convey to Carlson, unless everything was set up ahead of time, which is what the evidence points out to.

302. Additionally, the announcement that a lease is going to be "rescinded" is not a police duty. It is a private issue. Not even in the most authoritarian regimes police officers do that, much less in the first country in which it was banned in the Constitution for agents of the states to interfere in private contracts.

303. However, it is a police officer's task to get somebody out of a building, if "the owner" does not want that person there for considering that the person is trespassing. But Carlson and Garcia used the police officer for the inappropriate task of announcing the lease cancellation, but did not send the police "to escort you out of the building," as security guard Persa said, although it would have been appropriate, if the appropriate causes were raised.

304. There is only one possible explanation for this particular discrepancy: When the conspiracy sent the police officer to announce the lease cancellation, the conspiracy wanted to intimidate Plaintiff and soften his will against a rent increase. A security

guard is not vested with the legal power to cause the chilling effects needed to shock Plaintiff. However, claiming that there was an "altercation" with a police officer is difficult to swallow because it could be a crime, and the police would have to follow up with an indictment against Plaintiff. At that point Defendants were interested in business, in increasing the rent. ("This is a matter of business," as Garcia said). The prospect of an indictment would be against their business interest. Therefore, inventing an altercation with a police officer was out of the question. The security guard filled their needs of certain authority, but not one that created a crime by an altercation they needed to invent. And that explains why they sent the security guard instead of the police officer. There is no other explanation for sending a security guard when a police officer was more appropriate and vice versa. What they did not take into account is that the security guard filled their needs but not their legality.

305. Assuming no collusion between the Landlord and the security guard, if something a little out of the ordinary happens involving the security guard with a tenant on a Sunday night, the security guard does not risk his job by bothering the Landlord with a call that can wait. The normal behavior and the channel that follows a uniformed man is to inform his superior in Secure-America what happened, who is the one who knows the phones to call. The other alternative for the security guard is simply to call the police. That is what security guards are instructed to do. Persa did not call…

306. The facts of Sunday 18th and Monday 19th, February of 2018 beg for the only possible explanation of the security guard's behavior: that he was specifically instructed to do exactly what he did, and among his instructions was to call "the owner of the building," Carlson, after he completed his mission of asking Plaintiff to

get out of the building, which, by the way, is a public building with restaurants, medical offices, Amazon lockers, UCONN Health and dentist offices, crossing to one of the public garages, and seats for the public that use the building.

307. Although Plaintiffs have not had opportunity to show Defendants' communication channels, their communication is as fluid as electricity: one cannot see it, but one can feel its effects. To gauge the existence of a combination and the communication between the members of the combination, conspiring on behalf of their respective companies, Plaintiff wrote the following text to Carlson:

308. "Tim, people don't ambush other people to ask for nothing. But I still don't know what you and Briz want. So, before I move out, I decided to ask. If what you are looking for is reasonable, we may have a conversation about it. If you find time in your busy schedule between now and Tuesday, I will be as pleased to converse with you as you will with me. Please let me know."

Carlson's answer was:

309. "The lease has been rescinded by NYSC. The space in subject is not available for subletting. As for spaces that are at Blue Back, the one space that we looked at was the old GNC space and is now being readied for lease to an electronics sales and repair shop. The only other offering I can think of in West Hartford is Regus on Brace Rd. They rent office and/or conference room by the day, month or year. Best of luck in your search and venture. Regards, Tim C." Exhibit #6.

310. The first thing that Carlson proves in his text is that he is being untruthful, about "not available for subletting" because Starwood authorized the locksmith to manufacture a key for the independent entrance in the premises; therefore, he knew

that the space was being sublet and he or Rifkin agreed with it. The second thing is that he says that "the space in subject (sic) is not available for subletting."

311. What Garcia said is that a fee was to be charged for the Landlord to permit subletting, which contradicts Carlson's words of absoluteness "not available for subletting", and later, although Garcia did not quite say it, she (almost) said that they do not have that right. Never Carlson's words "not available for subletting." Carlson is being untruthful twice trying to conceal the combination with NYSC to increase the rent. But the cloak is not big enough to cover the facts.

312. This proves the first element of the conspiracy, which is the formation of a combination between two or more persons. Other facts will be explained as they are needed.

### 2. The Evidence Attached and Other Expected Show that Defendants Conspired to Commit Unlawful Acts by Unlawful Means.

313. It has been shown that money is property, and that all courts recognize that to unlawfully deprive a person of money is to deprive that person of property, an illegal act. All courts in this state and country recognize that using violence, the implied or direct threat to use violence, is an illegal act. It is equally illegal the implied threat of arrest to commit a fraud, as it is the case of increasing the rent by trickery and then threaten the targeted victim with arrest if he somehow resists the fraud.

314. In their conspiracy TSI / NYSC and Starwood used all the mechanisms described in the previous paragraph to increase the rent on Plaintiffs or appropriate Plaintiffs' property. Therefore, the Defendants conspired not only to commit unlawful acts, but also to commit them by unlawful means, and committed those acts.

3.  The Evidence Attached and Other Expected Show that the
Conspirators Committed Acts Pursuant to the Conspiracy and in
Furtherance of the Scheme Goals.

315. The conspirators in this case specialized in different aspects of the conspiracy, by

their companies' characteristics and influence in town. As NYSC has a lot of muscle

men, they specialized in direct intimidation of the Plaintiff, in testing his will not "to

part with some rights." That is why, when Plaintiff claimed his money back for the

first overcharge, Defendants did not solve the small difference over the phone, but

gave Plaintiff an appointment, so that he would go to the club and feel what they

could do to him if he resisted. Likewise, when Plaintiff sent the small claims court's

papers, the manager coordinated with the front desk to surprise Plaintiff by walking

to the lockers room to cut the padlocks at the same time Plaintiff was entering the

gym, but as if by coincidence, asking with colorful language to take "your clothes out

of my lockers" while a muscle man or two displayed their hedge cutters.

316. On the other hand, TSI and Garcia do not have the clout to summon a police

officer to go tell somebody that the lease "is gonna be rescinded" and what parts of

town he cannot visit as a consequence. Besides that, when Plaintiff sent the small

claims court papers, and they wanted to solve the legal issue by arresting Plaintiff,

Garcia does not have cameras control in town to know when Plaintiff is in Barnes

and Noble and "coincide" with him there, and have him arrested if he talked to her.

That is a job for Rifkin and Carlson. So, the roles are well defined, but they are all "in

furtherance of the goals of the conspiracy," and the players all have knowledge of

what is going on, even if one of them does not have the power the other has to

implement certain actions.

4. <u>The Evidence Attached and Other Expected Show that
Defendants' Acts Resulted in Damages to the Plaintiff.</u>

317. The personal damages to Plaintiff and to his company cannot be easily evaluated as they go from defaming Plaintiff to taking his money, clothes, computers and everything valued as work tool. Their damage goes from harassing him to trying to convert him into a criminal that would be incarcerated as a result. They go from planning with the garage manager to perjure against him to having other gyms in the area act against him. Defendants have destroyed the intellectual capital accumulated by Plaintiffs in more than seven years by kidnapping his computers and having some computer resources expire. They have scattered the personnel with which Plaintiff was to work in his business as a result of not being hired at the time promised by the company, and placed Plaintiff in a situation in which his personal abilities and skills have been devalued.

**CONCLUSION**

318. The Plaintiffs have shown that although it is true that "[w]ithout an independent basis for finding illegality in the defendant's action," a plaintiff does not have an actionable cause for conspiracy against a group of people who acts in combination, in this case the group in combination has committed illegal acts by illegal means, and therefore there is an actionable cause for conspiracy. The distribution of tasks among the conspirators is irrelevant as a defense in this case, because they have acted in concert to the same illegal goals, and, therefore, they are all responsible for the actions of the conspiracy.

319. The Plaintiffs in this case have shown that (1) a combination was formed between agents of Starwood Retail Partners and agents of TSI / NYSC; (2) to unlawfully deprive the Plaintiffs of additional money for the rent after signing a sublease; (3) in which they had a division of tasks, but both had enough information about the conspiracy and its objectives; (4) the actions of that conspiracy resulted in damage to the Plaintiffs.

320. For that and the other reasons expressed above, Defendants should be found liable for conspiracy and be penalized with the measures stipulated by the law for those actions.

**K.** DEFENDANTS, STARWOOD RETAIL PARTNERS, SHOULD BE FOUND LIABLE OF UNLAWFUL INTERFERENCE WITH BUSINESS EXPECTANCY FOR INTERFERING WITH THE LEASE BETWEEN PLAINTIFFS AND TSI / NYSC; TSI / NYSC SHOULD BE FOUND LIABLE OF UNLAWFUL INTERFERENCE WITH BUSINESS EXPECTANCY BECAUSE THEY INTERFERED WITH SEVERAL OF PLAINTIFFS BUSINESS EXPECTANCIES.

321. When a person has a business relationship with a second person, or a business relationship will imminently form with a second person, and a third person who knows about that relationship, decides to interfere in the business relationship between those two persons, causing losses to the first person, the third person is liable of unlawful interference with business expectancy, and should be subject to the penalties the law accords against the defendant, including punitive damages.

322. Defendants, Starwood Retail Partners and agents, should be found liable of unlawful interference with business expectancy because they knew about Plaintiffs' business with TSI / NYSC and intentionally interfered with the relationship to breach the lease. TSI / NYSC should be found liable of unlawful interference with business expectancy because TSI / NYSC and agents knew about two businesses Superb Score would imminently develop with third parties when Plaintiffs moved into the premises. Defendants intentionally interfered with those businesses to put Plaintiffs under pressure to accept a rent increase.

323. The Conn. Supreme Court has established that the elements of an action for tortious interference with business expectancy are: (1) a business relationship between plaintiff and another party; (2) the defendant knows about that business relationship; (3) the defendant intentionally interferes with the relationship, and, (4) as a result of the interference, the plaintiff suffered actual losses. Hi-Ho Tower, Inc.

v. Com-Tronics, Inc., 255 Conn. 20 – Conn. Supreme Court 2000; Blake v. Levy, 191 Conn. 257 - Conn: Supreme Court 1983; Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co., 169 Conn. 407, 415, 363 A.2d 86 (1975); Fink v. Golenbock, 238 Conn. 183 - Conn: Supreme Court 1996.

324.  "[W]hen the court is convinced that damages have been incurred but the amount cannot be proved with reasonable certainty, it awards nominal damages." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20 – Conn. S. Ct. quoting W. Prosser, Torts, 4th Edition. In that case, the Conn. S. Ct. awarded $120,000 in punitive damages to the defendants, John Becker and Com-Tronics, Inc., although the court could not assess compensatory damages on which punitive damages were based.

325. John Becker operated a business selling, servicing, and installing two-way radio equipment, which he exerted through his company, Com-Tronics, Inc. In the early 1980s, Becker began to service communications equipment for D'Addario Industries. Two years later, orally Becker requested permission to install a community repeater at D'Addario's tower facility for use in Com-Tronics' business. D'Addario's Industries president at the time, F. Francis D'Addario, granted permission. In exchange, Becker paid a monthly usage fee of $25. By 1989, the parties entered into an oral agreement whereby the defendants would furnish technical assistance and service functions at D'Addario's tower.

326. From 1982 through 1992, Com-Tronics and Becker installed additional repeaters and antenna combiners on the plaintiff's tower for the defendants' use, licensed Com-Tronics' customers to use the repeaters and combiners, and collected license fees for that use. But in their counter-claim, Com-Tronics and Becker asserted

that they provided technical services for both the plaintiffs and their customers. These customers had equipment at plaintiffs' tower facility. This part of Com-Tronics' business formed the basis of its counterclaim for tortious interference.

327. By August, 1992, when D'Addario's Industries was contacted by the Federal Communications Commission, the business had a new president, David D'Addario. The commission contacted D'Addario in reference to interference with the area television and radio reception due to increased use of the tower facility. David D'Addario also asked Becker to compile a list of customers who were utilizing the tower communications facilities. The list prepared by Becker included Com-Tronics' equipment located at the tower. At the conclusion of the investigation, Osenkowsky, a consultant hired by D'Addario, determined that the list compiled by Becker accurately reflected all equipment located at the tower.

328. David D'Addario met with Becker and demanded that the defendants turned over all of Com-Tronics' equipment at the tower to David, and reimburse his business for revenues lost as a result of the Com-Tronics' alleged unauthorized use of the plaintiffs' tower facility, and two or three weeks later sent a letter to Becker's customers in the tower stating that the defendants no longer were associated with or had access to the tower.

329. Then the plaintiff brought an action against the defendants based on three theories: (1) breach of fiduciary duty; (2) breach of contract; and (3) common-law conversion and statutory theft. Com-Tronics, in addition to pleading special defenses, filed a four-count counterclaim alleging: (1) breach of agreement; (2) unjust enrichment; (3) tortious interference with existing and prospective business; and (4) violation of

CUTPA. In this case, although plaintiff brought the action against defendants, defendants counter-claimed, and the jury awarded $120,000.00 in punitive damages against plaintiff for plaintiff's unlawful interference with business claims.

## A PRIMA FACIE CASE FOR INTERFERING WITH BUSINESS

330. To form a prima facie case that Defendants and their agents unlawfully interfered with business expectancies, the Plaintiffs only have to show that a reasonable jury could consider the evidence attached and other expected, and plead each element of the violation which are: (1) a business relationship between plaintiff and another party; (2) the defendant knew about that business relationship; (3) the defendant intentionally interfered in the relationship, and, (4) as a result of the interference, the plaintiff suffered actual loss. Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20 – Conn. Supreme Court 2000; Blake v. Levy, 191 Conn. 257 - Conn: Supreme Court 1983; Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co., 169 Conn. 407, 415, 363 A.2d 86 (1975); Fink v. Golenbock, 238 Conn. 183 - Conn: Supreme Court 1996. The Plaintiffs meet and surpass this standard.

331. Along this pleading, it has been shown that although the Landlord-Defendant, Starwood Retail Partners / Starwood Corporation, did not have a contract with Plaintiffs, it has been a dominating player in the injuries inflicted on Plaintiffs. They guided, limited, and shaped what defendants TSI / NYSC did during the course of their relationship with Plaintiffs and were the essential help for the deceptions in the fraud part of the lease:

332. From sending one of its security guards to provoke an "altercation," and when that altercation did not happen, feigning one, to announcing in a text the demise of any

hope to solving this controversy in an amicable way. Their influence in town as managers of Blue Back Square makes them reluctant to recognize anybody's right, acting as if only their Grace is the town's law.

333. Although the Landlord's agent, Tim Carlson, had the opportunity to explain in the text sent to Plaintiff why Starwood did not rent to Plaintiffs the space they showed Plaintiff, he did not care to give that explanation, but instead spent 80% of the message space telling Plaintiff why he would not find any space to rent in West Hartford. However, in that text the Landlord's agent produced the false statement that the space TSI / NYSC rented to the Plaintiffs was not available for subletting, without saying why. As we saw above, the Landlord's statement is false. On producing that false statement, the Landlord and its agent confirm that they were interfering with Plaintiffs' lease and business expectancy, and now were producing false statements to cover up that interference.

334. That interference by itself should make the Landlord responsible for the damages sustained by the Plaintiffs. The statements in the Landlord's text are the best evidence, not just that they knew from the very beginning about the rental, but also that they were fundamental in breaching the lease and executing the other violations committed in the relationship.

335. As Defendants, TSI / NYSC, allege that there is no contract because they did not charge the rent, Starwood and agents may allege that they could not have interfered with business expectancies because if there was no contract, there is no contract to interfere with. The Connecticut Supreme Court has answered that kind of reasoning

in their determination in <u>Harry A. Finman & Son, Inc.</u> that estops Defendants from a possible averment in that direction:

336. The court states that an "agreement need not […] be enforceable by the plaintiff as a contract .... The law […] does not object to the voluntary performance of agreements merely because it will not enforce them, and it indulges in the assumption that even unenforceable promises will be carried out if no third person interferes." <u>Harry A. Finman & Son, Inc.</u>, quoting Prosser, Torts (4th Ed.) § 129, p. 932.

337. The court continues to say that "[a]ccordingly, the law not only does not restrict its protection to rights resting on enforceable contractual relationships, 'but it also forbids *unjustifiable interference with any [one's] right to pursue [one's] lawful business or occupation and to secure to [oneself] the earnings of [one's] industry.*' <u>Skene v.Carayanis</u>, 103 Conn. 708, 714, 131 A. 497. Thus, it is not essential to the cause of action that the tort has resulted in an actual breach of contract. <u>Goldman v. Feinberg</u>, 130 Conn. 671, 674, 37 A.2d 355." (Emphasis added).

338. The other group of Defendants, TSI / NYSC and its agents, had a conversation with Plaintiff in which Plaintiff told Garcia that Plaintiff has written a book for one of the tests he teaches, that the book had new features that solves some of the problems students confront in the test, and, therefore, it should produce enough money to pay for the other locations we were planning to rent from them (In fact, Plaintiffs were assuring $1.92 million in book sale with the website built). By doing so Plaintiffs were assuring NYSC that, if they decided to rent those other locations they were assured payment, regardless of how many students registered in this class.

339. Because TSI / NYSC's postponements, Superb Score did not have enough time to announce the classes. Given the short time the public had to assimilate the information and decide to register, the first few classes might not have as many students as expected. So, Plaintiff told this trade secret to TSI / NYSC's manager, after signing the lease, to boost her confidence in the business Plaintiffs were installing and to make sure she did not give a negative report when we applied for rent in the other one hundred locations they had. Plaintiffs might have boosted too much their confidence because they ended up wanting more than what the space is worth and more than what it was legally possible to ask for. They interfered with the imminent businesses we were to implement when they appropriated our work tools.

340. The other business they were aware of was the classes that were going to start on March 1, 2018. They interfered with that business, too. When Plaintiffs were sure that the contract was going to be signed, Plaintiffs contacted several students and a class was scheduled for March first. Although the first class was going to start with about half of our goal, it was surely going to start on March 1, 2018. They were equally aware that we were planning to have additional space somewhere nearby, as we told them.

341. On inventing the irrelevant situation to raise the rent, Defendants TSI / NYSC interfered with our March 1, 2018 class, with our next step to rent another location nearby with four classrooms, that were going to be used to execute some of the plans we had submitted to the State.

342. In their allegations to Plaintiffs and in small claims court, Defendants TSI / NYSC and agents have said that because they did not charge for the rent (although they

had the credit card number from which to charge) there was no contract and therefore there was no breach of contract. Extending that, they may equally say that, therefore, there was no interference with other businesses.

343. However, in Herman v. Endriss, the Connecticut Supreme Court objects to that kind of allegations, that "[a] plaintiff may recover damages for tortious interference with a contract not only where the contract is [...] not performed [...] but also where the interference causes the performance "to be more expensive or burdensome...." Herman v. Endriss, 187 Conn. 374 - Conn: Supreme Court 1982 at 377. Therefore, just by how expensive and burdensome our activities have turned because of Defendants and their agents' interference, the cause of action is justified, and Plaintiffs should be able to recover from the damages caused by such interference.

**CONCLUSION**

344. The facts and the laws of this issue show that Defendants, Starwood Retail Partners, TSI / NYSC, and their agents interfered in at least two types of business relations and expectancy, when they, knowing that Plaintiff had a business relation or a business relation was imminent to form (1) with another party, (2) a relation that they knew for certain, (3) interfered in the relationship: (a) Starwood interfered with the relationship with TSI, and (b) TSI / NYSC interfered with the relationship with Plaintiffs direct customers, and, (4) the Plaintiff suffered actual losses.

345. For the reasons stated, Defendants should be found liable of unlawful interference with business expectancy and business contracts and be subject to the penalties the law accords for these violations.

L. THE DEFENDANTS SHOULD BE FOUND LIABLE OF WRONGFUL DETENTION AND CONVERSION BECAUSE, AFTER TAKING CONTROL OVER PLAINTIFFS' PROPERTY, DEFENDANTS EXERCISED THE KIND OF UNAUTHORIZED POWER OVER THE PROPERTY THAT DEFINES CONVERSION.

346. Defendants should be found liable of wrongful detention and conversion because Defendants signed a lease with Plaintiffs, agreed to have Plaintiffs move into the premises, breached the lease, and asked Plaintiffs for a rent increase. Following the law, Plaintiffs rejected the increase. Defendants asked Plaintiffs to move out of the premises to put Plaintiffs under duress. When Plaintiffs prepared their departure by recovering the moving-in-and-out costs, Defendants locked Plaintiffs out of the office without returning, or offering to return, Plaintiffs' property, exercising an unauthorized dominion, exclusive of the owner.

347. Although Defendants told Plaintiffs in their email breaching the lease to get "all your belongings" out of the office, when Plaintiffs tried through the courts the means to do exactly that, Defendants changed the office lock, obstructing Plaintiffs from moving out and parting them from their property. Then, the director sent an email forbidding Plaintiff from talking to her employees, suspending his membership from the Clubs, banning him from the premises, and stating that if Plaintiffs wanted to get their property, Ramon Moreno had to ask for and obtain an appointment with her in Massachusetts, which contradicted their statement asking Plaintiffs to get "all your belongings" out of NYSC's space and obstructed its execution. Exhibits #5 and #12.

348. Where there is a landlord, and its tenant subleases a smaller space to a subtenant, one of two possible conversions that may arise is the wrongful-from-the-start conversion. In this, the tenant did not originally have control over the subtenant's

chattel. If a controversy arises between the tenant and the subtenant, and the tenant locks out the subtenant, the tenant exercises some of the dominions over the property exclusive of the owner, incurring in detention and conversion. In an action stemming from this scenario, the tenant becomes the defendant and the subtenant becomes the plaintiff. Luciani v. Stop & Shop Cos.,15 Conn. App. 407 - Conn: Appellate Court 1988; Epstein v. Automatic Enterprises, 6 Conn. App. 484 - Conn: Appellate Court 1986; Falker v. Samperi, 190 Conn. 412, 419, 461 A.2d 410*410 681 (1983); Coleman v. Francis, 102 Conn. 612, 129 A. 718 (1925).

349. To prove wrongful detention and conversion, where the defendant had no previous control over plaintiff's chattel in the premises, a court in Connecticut tests the following elements: (1) the defendant did not have previous control over plaintiff's chattel; (2) the defendant took control of the subspace where the chattel is housed; (3) by taking control of the subspace, the defendant took de facto control over the chattel, and did not return or offered to return the chattel, and (4) the wrongful detention by the defendant results in wrongful possession and conversion.

350. But "[i]f the defendant never had actual or constructive possession of the property of another, that ends the matter […] constructive possession is defined as [c]ontrol or dominion over a property without actual possession or custody of it." Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018). Relying on Maroun v. Tarro, 35 Conn. App. 391 (1994) (12209), this District Court sets the bar that "[d]efendant must be alleged to have wrongfully possessed the property to be the proper defendant in a conversion action."

351. The Connecticut Supreme Court has defined conversion as "some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." Falker v. Samperi, 190 Conn. 412, 419, 461 A.2d 410*410 681 (1983), relying on Pollock's Law of Torts, p. 290.' Gilbert v. Walker, 64 Conn. 390, 394, 30 A. 132 [1894]; Bruneau v. W. & W. Transportation Co., 138 Conn. 179, 182, 82 A.2d 923. [1951]." VanDerlip v. VanDerlip, 149 Conn. 285, 288-89, 179 A.2d 619 (1962).

352. In Falkner v. Samperi, the plaintiff, David Falkner, claimed that the defendants, Anthony Samperi and Pasquale Puglio converted some 20,000 cubic yards of material from his property, which had a southerly boundary with Samperi's property, in violation of an agreement between Falkner and the defendants to use the material for Falkner's property. Plaintiff took the case to court in Newtown, where the properties are located.

353. The complaint alleges that defendant Samperi was operating a mining business to sell gravel and other construction materials, and he directly or through his agent Puglio appropriated the material from Falkner's land. The complaint also alleges that as a result of defendants' activities, the plaintiff's land has depreciated in value. The plaintiff sued for damages.

354. However, during trial the defendants maneuvered to keep out of court evidence in favor of the plaintiff. Specifically, defendants kept out of court maps and other survey evidence that showed where the border of the two properties was. The defendants

alleged those maps were inaccurate; including maps made on the defendants'

behalf.

355. With all that evidence ruled inadmissible, the court found that the plaintiff could not

prove where the southerly border of his property was, and therefore could not

determine whether the material in dispute was the plaintiff's. Consequently, the trial

court had to dismiss the case.

356. On appeal, the Connecticut Supreme Court used a mechanism that is both fair and

pleasurable for its logic. It took the case of Courtney v. Courtney, 542 P.2d 164, 166

(Alaska 1975), in which the husband in a divorce dispute for assets settlement,

appealed from the trial court division of assets because the court used an out-of-

court document, and, therefore, defendant labeled it a hearsay. The evidence was a

financial document prepared by an accounting firm for the couple to use in a bank

loan two months before the couple's separation.

357. The Connecticut Supreme Court then said that:

> In finding an adoptive admission of the statement by the husband,
> the Courtney court opined that his claim that it was inadmissible
> because it was based on hearsay information would have merit
> "were it not for the fact that it was used by Mr. and Mrs. Courtney
> for the purpose of obtaining a loan."
> Falkner v. Samperi, 190 Conn. 412, 419, 461 A.2d 410*410 681
> (1983).

358. The defendants had used the maps ruled inadmissible by the trial court to apply at

the Newtown Zoning Division for the mining license necessary for the business

operation defendants were engaged in. The Conn. S. Ct. reasoned that, like the

husband in Courtney v. Courtney, Samperi had adopted the statement that the map

represented, and if that statement was accurate to get a mining license, it was also

accurate to determine where the border of the two properties was. And the court remanded the case for a new trial in which the evidence would be admitted.

## A PRIMA FACIE CASE FOR CONVERSION

359. To form a prima facie case that Defendants committed wrongful detention and conversion, where the defendants had no previous control over plaintiff's chattel in the premises, the Plaintiffs only have to show that a reasonable jury could consider the evidence attached and other expected, and plead each element of the violation which are:  a court in Connecticut tests the following elements: (1) the defendant did not have previous control over plaintiffs' chattel; (2) the defendant took control of the subspace where the chattel is housed; (3) by taking control of the subspace, the defendant took de facto control over the chattel, and did not return or offered to return the chattel, and (4) the wrongful detention by the defendants results in wrongful possession and conversion. Luciani v. Stop & Shop Cos.,15 Conn. App. 407 - Conn: Appellate Court 1988; Epstein v. Automatic Enterprises, 6 Conn. App. 484 - Conn: Appellate Court 1986; Falker v. Samperi, 190 Conn. 412, 419, 461 A.2d 410*410 681 (1983); Coleman v. Francis, 102 Conn. 612, 129 A. 718 (1925).

360. The Defendants in this case are using a defense not equal, but quite similar to the defendants in Falkner v. Samperi. These Defendants said in their email breaching the contract that the lease is "invalid and seeing as monies was never exchanged between us." Exhibit #5. Or, in a more understandable language, that because no money was charged for the rent there is no contract; that they rescinded that lease before any charges were accrued. We say, following the Conn. S. Ct. in Falkner v. Samperi, that if the lease signed by the Defendants was valid to ask for a

$2,000,000.00 insurance policy and to induce and agree with Plaintiffs to move into the premises, it is also good to be presented as a valid contract for Plaintiffs' rights of tenancy.

361. This is especially so because considerations were traded between the parties. Besides, Defendants conveniently ignores that "[a]t the option of the defrauded party, where there has been fraud in the inducement of the contract, the contract […] subjects the defrauding party to a suit for damages." Kavarco v. TJE, INC., 2 Conn. App. 294 - Conn: Appellate Court 1984.

362. Plaintiffs proffer these concepts through the elements below:

1. The Evidence Attached and Other Expected Show that Defendants Did Not Gain Control of Plaintiffs' Property When Plaintiffs Moved In.

363. When Defendants and Plaintiffs signed the sublease that gave the Plaintiffs rights to move into the premises, nothing in that lease or other documents said that TSI / NYSC would have any control over Plaintiffs' property, neither the Defendants claimed in the small claims "trial" or in the email breaching the lease that they were entitled to control Plaintiffs' property in the sublet office. The understanding was that the two companies would continue to be independent entities, with just the relationship created by the sublease. Therefore, the Defendants did not acquire legal control of Plaintiffs' property when Plaintiffs moved into the premises after the parties signed the lease. Exhibits #1 and #5.

2.  The Evidence Attached and Other Expected Show that
    Defendants Gained Forcible Control of the Subspace that
    Housed Plaintiffs' Property.

364. When the Defendants changed the lock that gives access to the subleased space,

and took possession of it, knowing that Plaintiffs' property was there, they gained

forcible control of the subspace that housed Plaintiffs' property. They also maneuver

to have the Police to forbid access to Plaintiffs' office. Pl.'s Aff. ¶ 25; Small Claims

Pleadings. And Defendants banned Plaintiff from going to the premises, even to

retrieve the property, and also blocked the possibility of an indirect retrieval by

forbidding Plaintiff to talk to the employees. Exhibit #12. Defendants made a phone

call followed by an email in which they conditioned the Plaintiffs' access to the

property to soliciting and obtaining an appointment in Massachusetts with the

Director and signer of the email. Exhibit #12.

3.  The Evidence Attached and Other Expected Show that
    Defendants Took de Facto Control of Plaintiffs' Property When
    They Took Control of the Rented Subspace, Without Offering to
    Return the Property.

365. One of the side agreements between Defendants and Plaintiffs was to give Ramon

Moreno-Cuevas the use of several lockers in the gym area, so that Plaintiff would

not have to go home to change from gym clothes to teaching attires. Before sending

the small claims court papers to recuperate expenses, Plaintiff rented those lockers,

authorizing card charges. On being served the small claims papers, Defendants'

general manager threatened to "throw your f***ing clothes in the dumpster, if you

don't get them out of my lockers," and proceeded to detain Plaintiffs' property by first

demanding Plaintiffs' office's key, which Plaintiff refused, then changing the office

lock, locking Plaintiffs out and Plaintiffs' property in. Pl.'s Aff. ¶ 25. By denying

Plaintiffs entrance to the subspace Plaintiffs had rented, and conditioning Plaintiffs'

access to their property, the Defendants took de facto control of Plaintiffs' property,

dealing with the "property rights of [the plaintiff] …in a manner adverse to him,

inconsistent with his right of dominion and to his harm." Vossbrinck v. Eckert

Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018).

> ### 4. The Evidence Attached and Other Expected Show that the Wrongful Detention Led to Intentional and Wrongful Possession of the Property, for Which the Defendants Are Liable of Conversion.

366. By Connecticut Supreme Court's definition, that "[c]onversion occurs when one,

without authorization, assumes and exercises the right of ownership over property

belonging to another, to the exclusion of the owner's rights," Plaintiffs show that the

Defendants have committed conversion. Luciani v. Stop & Shop Cos.,15 Conn. App.

407 - Conn: Appellate Court 1988; Hi–Ho Tower, Inc. v. Com–Tronics, Inc., 255

Conn. 20, 43, 761 A.2d 1268 (2000).

367. When Defendants changed the lock to Plaintiffs' office and denied access, the

Plaintiffs tried to amend the situation filling out a lock-out form at the Housing Court,

where the small claim was pending. As one of the steps in getting the lockout solved

is to go to the corresponding police department, Plaintiffs filed the complaint with the

West Hartford Police Department. The Defendants told the police that the lockout

was due to a rescission of contract, and the police did not want to find out that the

law does not allow one of the parties in a contract to rescind it unless the other

agrees. Exhibit #13. Maneuvering that way, the Defendants not only detained

Plaintiffs' property, but came into its wrongful possession by denying Plaintiffs access, and keeping Plaintiffs' property indefinitely.

368. For the reasons proffered above and the evidence attached that Defendants came into the wrongful possession of Plaintiff's property, the Defendants should be found liable for detention and conversion of Plaintiffs' property.

## CONCLUSION

369. The facts and the laws of this issue show that Defendants, did not gain control of Plaintiffs' Property when Plaintiffs moved in, and it was not stipulated in the contract either; the evidence attached also show that Defendants gained forcible control of the subspace that housed Plaintiffs' property; the evidence attached show that Defendants took de facto control of Plaintiffs' property when they took control of the rented subspace, without offering to return the property; the evidence attached and other expected show that the wrongful detention led to intentional and wrongful possession of the property, for which the Defendants are liable of conversion.

370. For the reasons stated above, Defendants TSI / NYSC and Defendants Starwood Retail Partners and their agents should be found liable of conversion.

**M.** DEFENDANTS, TSI / NYSC SHOULD BE FOUND LIABLE OF TWO COUNTS OF LARCENY BECAUSE THEY INTENTIONALLY APPROPRIATED MONEY AND, AFTER CONVERTING PLAINTIFFS' PROPERTY, WITHHELD IT FOR INDEFINITE TIME, WITH THE INTENT TO PERMANENTLY DEPRIVE PLAINTIFFS OF IT, AS THEY DID.

371. The Defendants should be found liable of two counts of larceny or civil theft because they appropriated money and, after converting Plaintiffs' property, withheld it for indefinite time with the intent to deprive Plaintiffs of that property. The intent to permanently deprive Plaintiffs of their property is evidenced by Defendants arranging with a magistrate to legalize its permanent possession, although the magistrate lacked jurisdiction or authority to do that.

372. Under Connecticut law concerning larceny, a person "commits larceny when, with intent to deprive another of property […] withholds such property from an owner. Larceny includes, but is not limited to: (2) Obtaining property by false pretenses, and (3) Obtaining property by false promise." Conn. Gen. Stat. Sec. 53a-119.

373. The District Court has said that "[i]n Connecticut, civil theft makes a person liable for treble damages. And that '[a]ny person who steals any property of another, or knowingly receives and conceals stolen property is liable for civil theft. (Conn. Gen. Stat. § 52-564), Civil theft is synonymous with larceny as defined by Conn. Gen. Stat. § 53a-119; Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 44, 761 A.2d 1268 (2000).'" Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018).

374. Likewise, the Conn. S. Ct has stated that "[s]tatutory theft […] requires an element over and above what is necessary to prove conversion, namely, that the defendant intentionally deprived the complaining party of his or her property." Suarez-Negrete

v. Trotta, 47 Conn. App. 517, 521, 705 A.2d 215 (1998); Mystic Color Lab v.

Auctions Worldwide, 934 A. 2d 227 - Conn: Supreme Court 2007.

375. In general, the offense of civil theft or larceny differs from that of conversion in that

civil theft or larceny has the additional element of *intent.* Therefore, a plaintiff trying

to recover from larceny has to demonstrate that the defendant had or at some point

acquired the *intent* to permanently deprive the plaintiff of the property. And to do

that, the plaintiff confronts several uphill demonstrations: 1) "Although statutory theft

does not require a heightened pleading standard, Milo v. Galante, No. 3:09cv1389

(JBA), 2011 WL 1214769 (D. Conn. Mar. 28, 2011), plaintiff must allege facts

tending to show defendant's intent to permanently deprive plaintiff of the property."

2) "If in order to sustain a claim for statutory theft, when coupled with a claim for

conversion arising out of the same facts, a plaintiff must prove `the additional

element of intent over and above what he or she must demonstrate to prove

conversion,' it necessarily follows that a plaintiff who cannot prove conversion also

cannot prove statutory theft."

376. The concept of *intent* in criminal law is the *mens rea* of a person acting with the

knowledge that he or she is doing something that the law forbids. But the concept of

*intent* is not simple. It has been the subject of many U.S. Supreme Court and Conn.

Supreme Court's opinions, like the interesting one the latter had in State v. Newton,

330 Conn. 344 (2018) 194 A.3d 272, at 360, in the context of an appeal for a

campaign finance indictment.

377. The court found that, in proving guilt, some statutes require the state to prove that

in committing an offense the defendant's *mens rea* was that of "knowingly and

willingly," while other statutes require the state of mind to be only "willingly," and others simply "knowingly" or "having the knowledge of," depending mainly on the gravity of the offense. The court also found that there are three levels of "willingly" *mens rea* and that they apply to the person's different states of mind and situations, even if the offense is for violating the same statute. State v. Newton, 330 Conn. 344 (2018) 194 A.3d 272, at 362.

378. The present case does not require those nuances because the statute controlling the conduct from which larceny arises states that "'[a]ny person who steals any property of another, or *knowingly* …" (Conn. Gen. Stat. § 52-564), (emphasis added). As the statute only mentions "knowingly," which does not split into levels of "guilty mind," and "knowingly" is the lowest level of *mens rea,* the plaintiff has only to show *intent* in a relatively straightforward demonstration to recover from the offense of larceny.

379. In defining the *mens rea* "knowingly," Conn. S. Ct. states: "A defendant acts 'knowingly' when […] '[the defendant] is aware that [the] conduct is of such nature or that such circumstances exist. An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident.'" State v. Newton, 330 Conn. 344 (2018) 194 A.3d 272, at 361.

A PRIMA FACIE CASE FOR LARCENY

380. To form a prima facie case that Defendants committed larceny or statutory theft, the Plaintiffs only have to show that a reasonable jury could consider the evidence attached and other expected, and plead with particularity the element of *intent* in Defendants' depriving Plaintiffs of the property located in the premises Plaintiffs

rented from Defendants, and Defendants forcibly seized from Plaintiffs, in violation of the lease, after the Plaintiffs moved into the premises their working tools. Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521, 705 A.2d 215 (1998); Mystic Color Lab v. Auctions Worldwide, 934 A. 2d 227 - Conn: Supreme Court 2007; State v. Newton, 330 Conn. 344 (2018) 194 A.3d 272; Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018). The Plaintiffs meet and surpass this standard, as shown below:

381. For the sake of argument, let us suppose that Defendants never formed the *intent* to detain, convert, and appropriate Plaintiffs' property. And that they always had the intention to return it to Plaintiffs, if no agreement was reached about the rent. Therefore, in Defendants' conduct there should be some manifestation of that lack of intent to appropriate Plaintiffs' chattel, even if the property accidentally fell into their hands.

382. When math people analyze curves, they come across what they call *inflection point*. That is, a point in which the curve changes direction with respect to one or more axes. If, for example, the curve is going up with respect to the horizontal axis and then starts going down, there must be a point on the curve that marks the place where the curve changes direction. That point is what math people call *inflection point*.

383. In practical terms, if a person drives on I-91 South and minutes later finds herself driving on I-91 North, at some moment during her course, the driver must have gotten out at an exit, turned around, and re-entered I-91, if necessary, in the reverse

direction or North. That exiting and reversing direction is an inflection point. The driver inflects or changes direction.

384. Something similar happens on the imaginary line traced by people's conduct with respect to the bright lines traced by laws and statutes.

385. When Defendants seized the premises rented by Plaintiffs, they found themselves controlling Plaintiffs' property by virtue of being the sole possessors of the subspace where Plaintiffs' chattel was. Admittedly, that could have happened, as the Conn. S. Ct. says, by "mistake, inadvertence or accident," or, by acting carelessly, not necessarily with intent:  They wanted their subspace back and the subspace happened to contain the subtenant's property, which, carelessly, the Defendants did not let them take out before they changed the lock. But if the Defendants had the intention not to detain, not to convert, and not to deprive Plaintiffs of their property, at some moment there should have been some inflection point on the line of their conduct reversing the accident of possessing Plaintiffs' chattel. There should have been some manifestation signaling the effort, the intention, and the determination to reverse that accidental event. That is, the inflection point should brighten out.

386. Defendants, although they did not have the legal right to do so, said in the email in which they breached the lease: "Please remove all belonging (sick) from the New York Sports Club (sick) space and (sick) return of the space is expected." But when Plaintiffs legally procured the means to do just that, TSI / NYSC changed the office lock, acting contrary to what could have been their inflection point. It is as if a person driving I-91 South (to continue with the image), thinks that is being followed by

somebody with bad intention, takes an exit to lose the chaser, and right after take the entrance to continue on I-91 South.

387. Instead of telling Plaintiffs that they could take their property, Defendants suspended Plaintiff's membership and banned him from going to the Clubs, talking to any employee, or even going to the building after business hours, as announced through the police. After that, Defendants had not offered Plaintiffs' property to the owners. Instead, arranged with a magistrate, who does not have the authority or jurisdiction over the property to have TSI / NYSC keep the property as their own, while setting up Plaintiff for arrest.

388. Although the magistrate did not have jurisdiction over the property, if he had the intention to actually authorize Plaintiffs to recoup their property, the magistrate would have lifted the police ban not to go to the Clubs and not to talk to Defendants' employees, so that he would not be arrested for those infractions.

389. Likewise, defendant Hoover answered with measures that obstructed all possibilities of Plaintiffs rescuing their property: When Plaintiff proposed a meeting that included other members of the company to see if reasoning in group the parties could reach an agreement, Hoover answered with a phone call and an email forbidding Plaintiff to talk to any of her employees, cancelling Plaintiff's membership without a motive, reiterating not to go to the Clubs, and conditioning Plaintiff's access to his property on soliciting and obtaining an appointment with her, in violation to Plaintiffs' right to their property, as Connecticut's and federal statutes, and state and federal courts have ruled. Exhibit #12, Conn. Gen. Stat. § 53a-119, Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521, 705 A.2d 215 (1998); Mystic

Color Lab v. Auctions Worldwide, 934 A. 2d 227 - Conn: Supreme Court 2007; Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 44, 761 A.2d 1268 (2000); Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018).

390. Moreover, if Hoover was interested in not converting the property when she called and read her decrees to Plaintiff, she could have arranged the appointment during that call, or she could have simply asked for a day when she would create the conditions to get the property out. But during her call, Hoover did not do either. Exhibit #12.

391. Therefore, even if we interpret that the initial property seizure was accidental and their intention was only to get back their subspace, there is no inflection point changing the direction of their conduct towards detaining, withholding, converting, and possessing the property that signals a reverse of that conduct. All the manifestations in this respect are of "knowingly and willingly" withholding the property. Exhibit #12.

392. Nobody cuts another person's membership in a club, if that person is in compliance and is not posing a threat to any other person or has not done anything to merit such deprivation, except if the purpose is to have that person "part with property or surrender some legal right, [...] which accomplishes the [deceiver's] end designed," Billington v. Billington, 220 A.2d. 212, 594 (Conn. S.Ct. 1991), especially, while at the same time keeping on charging the person's credit card, and fighting for it when Plaintiff decided to change his credit card with the bank to avoid the unauthorized charges. Exhibits #14, #15, and #4, p. 6.

393. After the change, Defendants called Plaintiff to ask him for another credit card number. Defendants could have done exactly that if they wanted to release the property. But they did not do that. Therefore, there is not the slightest *indicium* that Defendants wanted to release the appropriated chattel. Exhibits #14 and #15.

394. Furthermore, Defendants clearly manifested their *intent* to deprive Plaintiffs of their property in two ways:

      1) Obtaining property by false promises, and

      2) Obtaining property by false pretense.

395. As the statute defines it, "[a] person obtains property by false promise when, pursuant to a scheme to defraud, [the person] obtains property of another by means of a representation, express or implied, that [the person] or a third person will in the future engage in particular conduct, and when [the person] does not intend to engage in such conduct…" (Conn. Gen. Stat. § 53a-119 (3)).

396. Defendants attracted Plaintiff to register as a member of TSI / NYSC with the scheme that with an initial payment of $5.00, Plaintiff would obtain two months free of charge. They did not disclose any other charges at the registration time or in any of the emails they sent Plaintiff. After Plaintiff was a member, the promise was broken, and Plaintiff was overcharged not only during the time he was a member, but even after his membership ceased. (Exhibit #4 pages 1 through 6). The money was never returned, despite Plaintiff asking for it. On the contrary, Defendants tried to intimidate Plaintiff when he asked for the money back.

397. The Connecticut Supreme Court has expressed that "[m]oney can clearly be subject to conversion. See Devitt v. Manulik, 176 Conn. 657, 662–63,410 A.2d 465

(1979) (explaining that recovery of money wrongfully taken from joint survivorship bank account is recovery of property); Dunham v. Cox, 81 Conn. 268, 270–71, 70 A. 1033 (1908) (explaining the legality of recovery of a sum of money entrusted to the defendant for payment to a third person); Shelby Mutual Ins. Co. v. Della Ghelfa, 3 Conn. App. 432, 445, 489 A.2d 398 (1985), aff'd, 200 Conn. 630, 513 A.2d 52 (1986) ("detailing the recovery by insurer from insured's attorney pursuant to General Statutes [Rev. to 1979] § 38–325 [b]) ..." Vacco v. Microsoft Corp., 260 Conn. 59 (2002) 793 A.2d 1048, 2002-1 Trade Cases P 73,632.

398. Moreover, the U.S. Supreme Court found that "by being led to pay more than the worth […] [a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U. S. 390 (1906).

399. Therefore, if money can be subject to conversion and recovery, and a person loses property when loses money, then money, when taken with the *intent* to deprive the owner of its possession, can be the subject of larceny or statutory theft. Consequently, when Defendants engaged in unauthorized charges of Plaintiff's credit card, they committed statutory theft or larceny, in violation of Conn. Gen. Stat. § 52-564 and Conn. Gen. Stat. § 53a-119.

400. In doing so, Defendants also violated Conn. Gen. Stats. § 53a-128e (a) and § 53a-128i (a) because Defendants' taking of Plaintiff's monetary property was by credit card fraud, and credit card fraud violates those statutes. Admittedly, a company having a person's credit card number might charge the person's credit card by mistake, once, but not consistently, and not after the person asks for the money

back. Especially, the company does not respond with implied threats upon denying the monetary property to be returned, and does not condition accrediting the amount on whether a director approves it or not. That type of action is coordinated not just "knowingly," but also "willingly." Therefore, there was the highest level of *intent* in Defendants' obtaining Plaintiffs' property with false promise. For that reason, TSI / NYSC should be found liable of larceny or statutory theft and be subject to "disgorgement of profits, treble and punitive damages, and injunctive relief."

401. (2) Now, the statute says that "[a] person obtains property by false pretenses when, by any false token, pretense or device, [a person] obtains from another any property, with intent to defraud [another] or any other person." Conn. Gen. Stat. Sec. 53a-119 (2).

402. When Defendants performed the sleight of hand of signing the lease, asking for an insurance policy, agreeing that Plaintiffs would move into the premises, staging a controversy with one of the security guards, and based on the latter, breaching the lease by asking for a higher rent, they were looking for the appropriation of one of two properties: additional money from the rent or the property they would lock in until Plaintiffs accepted a rent increase. If the rent were not increased, they would permanently lock in the property. As they did not appropriate the additional money, they opted for the property they had locked in, and kidnapped to ask for the ransom in the form of a rent increase.

403. Even if their original intention was not to appropriate Plaintiffs' chattel, but Plaintiffs' extra money, that, as we have seen, is also property appropriation, and, therefore, larceny.

404. Defendants may try to use the counter-argument that increasing the rent is not larceny, but simply a negotiation. But that argument fails because they were trying to effect that increase by illegal means, not in a pre-signature negotiation.

405. The District Court has said that "[i]n Connecticut, civil theft makes a person liable for treble damages. And that '[a]ny person who steals any property of another, or knowingly receives and conceals stolen property is liable for civil theft. (Conn. Gen. Stat. § 52-564), Civil theft is synonymous with larceny as defined by Conn. Gen. Stat. § 53a-119; Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 44, 761 A.2d 1268 (2000)." Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC, 301 F.Supp.3d 381 (2018). Therefore, Defendants have committed larceny.

## CONCLUSION

406. Plaintiffs have shown that under Connecticut law (1) a person "commits larceny when, with intent to deprive another of property […] withholds such property from an owner," and that the Defendants in this case have done so. Plaintiffs have also shown that larceny includes, but is not limited to: (2) "Obtaining property by false pretenses," which Defendants have done, and (3) "Obtaining property by false promise," which Defendants have also done. Conn. Gen. Stat. Sec. 53a-119.

407. Therefore, showing that Defendants had ample opportunity to reverse their possession of Plaintiffs' property and did not do so, means that Defendants always had the intent to possess either that property or the money of its ransom. Therefore, they should be found liable of two larceny counts or statutory thefts, and be subject to "disgorgement of profits, treble and punitive damages, and injunctive relief."

N. THE DEFENDANTS, TSI / NYSC, SHOULD BE FOUND LIABLE OF UNJUST ENRICHMENT AND SUBJECT TO A CONSTRUCTIVE TRUST BECAUSE DEFENDANTS DEFRAUDED PLAINTIFFS, DETAINED AND CONVERTED THEIR PROPERTY, AND CHARGED PLAINTIFF'S CREDIT CARD WITHOUT AUTHORIZATION, ENRICHING THEMSELVES AT PLAINTIFFS' EXPENSE.

408. When two persons or entities enter into a business transaction, and one of the persons or entities receives benefits that are inappropriate and at the expense of the other, the first person or entity has unjustly enriched itself. If there are no adequate remedies through actions contemplated in the contract to restore plaintiff in the measure in which defendant has unjustly enriched itself, the action for unjust enrichment is an adequate remedy to restore plaintiff in the measure in which defendant has enriched itself at others' expense.

409. The Connecticut Supreme Court states in Franks v. Lockwood, that the doctrine of unjust enrichment "is based upon the principle that one should not be permitted unjustly to enrich [oneself] at the expense of another but should be required to make restitution of or for property received, retained or appropriated." The court understands that "a right of recovery under the doctrine is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to [that person] at the expense of another." Franks v. Lockwood, 146 Conn. 273 - Conn: Supreme Court 1959, relying on Schleicher v. Schleicher.

410. Additionally, to address the issue of unjust enrichment when an implied or express contract governs the relationship between the parties, the court adopts concepts from different sources: "When an express contract does not fully address a subject,

a court of equity may impose a remedy to further the ends of justice." And specifies that "the existence of a contract, in itself, does not preclude equitable *relief which is not inconsistent with the contract*" [emphasis in the original]. Moreover, the court guides in sorting out situations that should be distinguished: "While it is stated that an action for unjust enrichment cannot lie in the face of an express contract, a contract does not preclude restitution if it does not address the specific benefit at issue". The court elucidates the more subtle point that ("[a]lthough there can be no implied contract on a point fully covered by an express contract and in direct conflict therewith, there may be an implied contract on a point not covered by an express contract"), then, to dissipate all doubts about an unjust enrichment action where there is a contract, the Conn. S. Ct. finally states that ("[s]ome of quasicontract's most important work is done in cases in which there was an express contract between the parties"). (Internal quotations omitted.) Town of New Hartford v. CT. RESOURCES RECOVERY AUTH., 970 A. 2d 592 – Conn. Supreme Court 2009 at 612.

411. To make a clear distinction between the sources of damages and restitution, the court defines: "Damages are 'intended to provide a victim with monetary compensation for an injury to his person, property or reputation'; whereas restitution aims *to deprive a defendant of unjustly obtained benefits*. 'The restitution claim stands in flat contrast to the damages action.... The damages recovery is to compensate the plaintiff, and it pays him ... for his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the

defendant to disgorge benefits that it would be unjust for him to keep.'" (Internal quotation omitted, emphasis added). Id. at 614.

412. So, restitution for the unjustly enrichment of the defendant is to make defendant disgorge the benefit obtained that does not belong to the defendant and should be taken away from that party independently of any action for damages separated from the action for restitution. Damages and restitution are different actions. That is why even when a plaintiff cannot recover under a theory of damages, that same plaintiff could recover under a theory of restitution, as in the following case.

413. In Town of New Hartford v. CT. RESOURCES RECOVERY AUTH., 970 A. 2d 592 - Conn: Supreme Court 2009, the Conn. S. Ct. illustrates a classic situation of unjust enrichment. In 1973 the Connecticut Legislature voted into law the Solid Waste Management Services Act, and created the Connecticut Resources Recovery Authority (The Recovery Authority or The Authority). The municipalities of central and northwestern CT that were plaintiffs in that case entered into agreements with the Recovery Authority, which became the defendant in the case. The Recovery Authority "is a quasi-public entity established […] to implement Connecticut's solid waste management plan and to assist Connecticut municipalities in managing, recycling and disposing of their solid waste" in a facility in the South Meadow region of Hartford. The law is described in C.G.S., Chapter 446e (2009).

414. In relevant part of its opinion the court states that "[w]hen the project was formed in the early 1980s, a processing facility was constructed [and] financed through the issuance of $309 million of tax-exempt bonds. […] [E]ach plaintiff, in or around 1985,

entered into a contract with the defendant that will not terminate until 2012, [to

process all its waste at the facility until the project ended] as it currently exists...."

415. The agreement between the central-northwestern Connecticut municipalities, the

private haulers, and the Recovery Authority stipulated that the municipalities and the

private haulers were to pay a *tipping fee* for dumping their solid waste in The

Authority's facility to cover the operating expenses of the facility. *Tipping fee* is the

fee that a person with privileges pays for the tonnage of solid waste dumped into a

solid waste processing station. The private hauler were not plaintiffs in the action

against The Recovery Authority.

416. The relevant points of the contract between the municipalities, the private haulers

and the Recovery Authority can be summarized as follows:

"a. The [municipalities and private haulers (plaintiffs)] are obligated
to process all of their [waste] at project facilities and guarantee
delivery of certain minimum amounts of [waste] each year.
"b. The [plaintiffs] are required to pay the project's `net cost of
operation' — i.e., that portion of the project's annual operating
expenses (including principal and interest on the project's bonds)
that is not covered by [the Recovery Authority's (defendant's)] sales
of steam or electricity or other sources of revenue. [The defendant]
is obligated to use all revenues received by the project to defray the
project's expenses and must include those revenues in the
calculation of the project's net cost of operation. The contracts
define `revenues' as proceeds received from the sale or other
disposition of recovered products and receipts from other than [the
plaintiffs]. [*Recovered products*] are defined as materials or
substances including energy which result from the processing of
solid waste in the system.
"c. [The defendant] is required to establish an annual budget for the
project each year, based on anticipated expenses and revenues.
[The defendant] is required to annually adjust the rate per ton of
garbage processed (i.e., the tip fee) paid by the [plaintiffs] so that
the [plaintiffs'] aggregate payments — referred to in their contracts
as `service payments' — will be sufficient to pay the project's net
cost of operation.

"d. [The defendant] is obligated to reconcile each year's projected budget against actual operating results and to credit any surplus (or debit any deficit) to succeeding years' budgets. The projected budgets must, under the contracts, be announced for an upcoming fiscal year (beginning July 1) by March 1 of the prior fiscal year. Thus, any surplus/deficit reconciliation at fiscal year-end must, as a practical matter, be applied to the budget two years out.

"e. [The defendant] and the [plaintiffs] are required to comply with all applicable laws.

"f. The [plaintiffs] pledge their full faith and credit to secure their payment obligations under the contract[s] and are required to use their taxing power, if necessary, to make any payments owing under the contracts.

"g. Both [the defendant] and each [plaintiff] have the right to sue to enforce the contract. The contracts contain a provision prohibiting the [plaintiffs'] right to recover damages from [the defendant], but do not otherwise limit the [plaintiffs'] right to legal and equitable remedies.

"h. The [plaintiffs] shall not acquire any vested or ownership rights in the system by reason of [the] contract[s]; provided, however, that in the event of a disposition of public property, [each plaintiff] shall receive a payment or payments as determined by [the defendant] consistent with [that plaintiff's] interest therein, if any."

Town of New Hartford v. CT. RESOURCES RECOVERY AUTH., 970 A. 2d 592 - Conn: Supreme Court 2009 at footnote 10.

417. Because "the tip fee [was] determined by dividing the project's net cost of operation by the total cumulative tonnage of waste processed at the facility […] the net cost of operation must be computed prior to the commencement of a given fiscal year," and therefore it is an estimated figure. In subsequent fiscal years, after the first, if the estimate was too high and produced a surplus, that surplus was applied to the two following years on March 1, when the budget for the next fiscal year that started on July 1 is submitted. The same if the estimate led to a deficit.

418. The Recovery Authority "entered a long-term energy purchase agreement with Connecticut Light and Power (power company)" to "purchase, at above market rates,

electricity-generating steam produced by the burning of solid waste at the South

Meadows facility, […] lowering substantially the net cost of operation and,

accordingly, the tip fee paid by the plaintiffs," because of how the tipping fee was

calculated. Town of New Hartford v. CT. RESOURCES RECOVERY AUTH., 970 A.

2d 592 - Conn: Supreme Court 2009.

419. The project was operating efficiently by the mid-1990s, "leading to […] multimillion

dollar operating surpluses. The defendant, however, failed to credit those surpluses

to the budget in subsequent years as required by the parties' contracts." Between

1997 and 2004, the Recovery Authority "improperly failed to credit approximately

$25,600,000 in project operating surpluses, making tip fees higher than they

otherwise would have been," which was against the law that started the project. Id.

at 603.

420. The defendant's agreement to sell electricity to the power company "had become

very lucrative due to a low market price for steam, producing over $20 million

annually for the project in above market rate revenues." However, in 1998, the

General Assembly enacted the Electric Restructuring Act, […] which required the

power company to make good faith efforts to divest itself of above market contracts

such as the energy purchase agreement with the defendant and provided subsidized

loans for that purpose. The defendant accepted $280 million from the power

company, referred to as a buy down, to release the power company from the energy

purchase agreement," one of the best deal that the Authority made during the project

life. Id. at 604.

421. Although the contracts with the municipalities and the law did not allow defendants to invest the buy-down proceeds, "defendant wanted to find a use for the buy down proceeds." [...] "Because those proceeds represented an advance payment of what otherwise would have been future project revenues, the only proper use for them was in connection with the project," if the Authority were to comply with the law.

422. However, defendants did use the money according to the law. Instead:

> Despite the [legal] restrictions on the use of the buy down proceeds, the defendant, in March or April of 2001, used $220 million of those proceeds to make what it since has admitted was an illegal, ultra vires unsecured loan to Enron Power Marketing, Inc., a subsidiary of Enron Corporation (collectively Enron). Contemporaneous with the loan transaction, two law firms, Murtha Cullina, LLP (Murtha), and Hawkins Delafield and Wood, LLP (Hawkins), advised the defendant that it was legal and not violative of the defendant's bonding agreements. [...]
> When the defendant received and disbursed the buy down proceeds, the project's debt service on the remaining construction bonds was approximately $26 million annually. The defendant, at that time, could have used $202,724,437 of the buy down proceeds to defease all of the remaining bond obligations and to eliminate that annual expense for the life of the project.
> Pursuant to the terms of the illegal loan, Enron was to make fixed monthly payments to the defendant of $2,375 million per month for eleven and one-half years. Of each payment, $175,000 was to be diverted to the nonproject ventures account. Enron made eight of the required monthly payments, from April, 2001, through November, 2001, then ceased making any further payments to the defendant. In December, 2001, Enron filed for bankruptcy. The loss of payments from Enron caused the project to sustain an annual revenue loss of $28.5 million, bringing it to the brink of financial ruin. Town of New Hartford at 605.

423. The Recovery Authority could not cover its operations costs and comply with its bond holders' financial duties after losing the 28.5 million annual revenue it received from the Enron transaction. To cover that gap, the defendant resorted to increasing

the tipping fee and to using some of the resources they had in reserve. The total

amount overcharged during the period between 2002 and 2007 was 64.185 million,

of which the municipalities paid $28,883,250. The reserves and surpluses of 38

million were dissipated and the defendant had to borrow 20 million authorized by the

legislature. In total the defendant lost 201 million in the Enron transaction. Id. at 605.

424. Through litigation and energy sale, the defendant was able to recoup a sizable part

of the losses after 2005. The defendant used the revenue obtained to defease part

of the bonds that financed the operation and to pay the loan from the state, but did

not use any part of that recovery to reimburse the plaintiffs for the increased tipping

fee plaintiffs had paid as a result of the Enron transaction, although the cost of

defendant's mistake has been financially suffered by the plaintiffs.

425. Plaintiffs filed an action to recover the increased tipping fee, on January 23, 2004.

Hearings were scheduled between November, 2006 and January 2007. "The

defendant in its answer denied each count and raised a number of special defenses,

among them that a limitation of remedies provision in the parties' contracts barred

the plaintiffs from recovering monetary relief for their claims." Town of New Hartford

at 607. But on June 19, 2007, through a comprehensive memorandum of decision,

the trial court ruled for the plaintiffs awarding them more than 35 million in a

constructive trust. Id. at 607.

A PRIMA FACIE CASE FOR UNJUST ENRICHMENT

426. To form a prima facie case that Defendants unjustly enriched themselves, the

Plaintiffs only have to show that a reasonable jury could consider the evidence

attached and other expected, and plead with particularity each element of the

violation which are: (1) that the defendants were benefited from overcharging Plaintiffs and from appropriating their property; (2) that the defendants unjustly did not return Plaintiffs the monetary benefits or the property inappropriately taken; and, (3) that the failure of payment and return of property was to the plaintiffs' detriment." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83, 649 A.2d 518 (1994); Town of New Hartford v. CT. RESOURCES RECOVERY AUTH., 970 A. 2d 592 - Conn: Supreme Court 2009 at footnote 10; Franks v. Lockwood, 146 Conn. 273 - Conn: Supreme Court 1959.

427. Because the contract with Plaintiffs was not as elaborate as the one in Town of New Hartford, there was more territory left to the court's interpretation than there was in our model case. The Defendants in the case in point did not limit the rights to sue of the Plaintiffs and therefore was open to all the recoveries the law permits.

      1. The Evidence Attached and Other Expected Show that Defendants Benefitted from Overcharging Plaintiffs and Others from Appropriating Their Property.

428. The Defendants in this case, TSI / NYSC, benefitted overcharging money from Plaintiff's card that they did not have the right or the authorization from Plaintiffs to charge. Defendants also benefitted from property that they were not supposed to appropriate, when they took computers, copy machine, fax machine, books, furniture, bookcases, writing boards, and even clothes that they never offered to return to the Plaintiffs. They also appropriated something more valuable than all that, which is Plaintiffs' data contained in the computers, the product of three years of work to apply to teaching standardized tests. As seen below, that software is valued

at millions of dollar, based on the software resources-generation potential, and to above one million the cost of production.

429. Although a measure of intentionality is not necessary, it is important to notice that Defendants committed these acts intentionally, as shown above, not by mistake or carelessness. Defendants decision to overcharge Plaintiffs had no other way of being executed multiple times other than intentionally because they were repeated acts that Plaintiffs opposed, opposition that Defendants ignored, except when they needed these acts to intimidate Plaintiffs.

2. The Evidence Attached and Other Expected Show that Defendants Unjustly Did Not Return Plaintiffs the Monetary Benefits or the Property Inappropriately Taken.

430. As we have seen in **Point M**, when Plaintiff tried to recoup the money from the inappropriate charges, Defendants denied Plaintiff his right to recoup, and, on the contrary, they stated that Plaintiff had to wait for the Director's approval for an overcharge to be credited to the account. Likewise, instead of returning Plaintiffs' property, Defendants zigzagged their way to a magistrate to exert an undue influence over this authority.

431. By Conn. Practice Book, by the Supreme Court's rulings and by the Conn. Dist. Court, a small claims magistrate is out of all jurisdiction when it comes to disposing of property cases nor does he has the authority to appropriate property, particularly when neither Plaintiffs nor Defendants have brought that property in front of the court, and the property was not in dispute. Conn. Practice Book § 24-2, 2017. In that section, the law plainly expresses that "[i]n no case shall the damages claimed exceed the jurisdictional monetary limit fixed by statute, including attorney's fees and

other costs of collection, but exclusive of interest and costs." That monetary limit has

been fixed in $5,000.00. But the property cost is in the millions. Even if we exclude

the software in the computers, the property value is more than $5,000.00. Therefore,

it was not within the small claims court's authority to rule about that property.

> 3. <u>The Evidence Attached and Other Expected Show that
> Defendants' Failure to Return to the Plaintiffs Excess Charges
> and Property Was to the Plaintiffs' Detriment Beyond Its Value</u>.

432. The attached credit card charges and the emails by the Defendants showed that

the Defendants overcharged Plaintiff and appropriated their property. Those actions

resulted in detriment to the Plaintiffs beyond the value of the charges and the value

of the property. Losing their property did not only cause the loss itself, but also

caused the loss of future income because Plaintiffs could not exercise his *"right to*

*pursue his lawful business or occupation and to secure to himself the earnings of his*

*industry.*" <u>Skene v.Carayanis</u>, 103 Conn. 708, 714, 131 A. 497(emphasis added).

## CONCLUSION

433. In conclusion, the evidence attached show that Defendants benefitted from

overcharging Plaintiffs and others, and from appropriating their property. The

evidence attached show that Defendants unjustly did not return Plaintiffs the

monetary benefits and the property inappropriately taken. The evidence also shows

that Defendants' failure to return to the Plaintiffs excess charges and property was to

the Plaintiffs' detriment.

434. For these reasons, Defendants should be found liable of unjust enrichment, and be

subject to a constructive trust for the money they have defrauded the public.

**O.** DEFENDANTS SHOULD BE SUBJECT TO A CONSTRUCTIVE TRUST FOR BEING LIABLE OF UNJUST ENRICHMENT, CUPTA AND RICO VIOLATIONS, CONSPIRACY, 15 U.S.C. § 1692 VIOLATION, FRAUD, LARCENY, AND OTHERS MERITTING A CONSTRUCTIVE TRUST AND SENDING A MESSAGE TO SIMILAR OFFENDERS.

Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp. and their agents, should be subject to a constructive trust for being liable of unjust enrichment, CUPTA and RICO violations, conspiracy, 15 U.S.C. § 1692 violation, fraud, larceny, and others meriting a constructive trust, to send a strong message to similar offenders.

The Defendants TSI / NYSC established themselves as a company in 1973. Until December 20, 2017, New York Sport Clubs has assigned 8,985,649 ID card numbers to enter the Clubs. Therefore, it is fair to assume that they have registered around 9 million persons in their business since established. Plaintiff registered with the number 8,985,649 for the lowest membership price. Exhibit #24. Other members spend hundreds of dollars in multistate memberships and trainers. With more expensive memberships and more activities to be separately charged, there are more opportunities to commit fraud because more charges occur more frequently, making it less likely that inserted overcharges will be noticed by busy members.

However, Plaintiffs will assume that TSI / NYSC overcharged the same to other members as they overcharged Plaintiff. If that were the case and those registered stayed for only two and a half months, like Plaintiff, the overcharges for 9 million people would be 9,000,000 X $138.21 = $1,243,980,000.00, or $1.24 billion. If we project that membership to last for one year, the overcharges would be 4.8 X $138.21 = $663.41. As said before, the 4.8 comes from dividing the 12 months in a year by the 2.5 months

of Plaintiff's membership. Therefore, the overcharges, assuming people membership would last just one year, would be 9,000,000 X $663.41 = $5.97 billion. For that reason, if the 587,000 members TSI / NYSC claims to have were overcharged with the projection for one year, the total would be 587,000 X $663.41 = $389,421,670.00 or $389.4 million in one year. By the previous numbers, that amount is not out of the possible fraud range.

Given these figures, and that Defendants have "[interfered] with the lawful employment [of Plaintiffs' livelihood]," causing Plaintiffs to be two years without exerting their "livelihood", Plaintiffs respectfully ask the Court to do justice in this case with a constructive trust of $389,421,670 X 2 = $778,843,340.00 or $778.8 million, the equivalent of two years of TSI / NYSC's potential fraud to the public, while Superb Score cannot make an income because their business tools have been converted by TSI and allies. Plaintiffs have decided to gift those funds to the public.

If the Court is persuaded to rule for the constructive trust and to send a strong message to similar offenders, we will employ the funds contributing to or executing projects in the areas of health, education, libraries, public radio and TV, and others of public interest and importance. Although the funds will be the property of the Plaintiffs (otherwise Plaintiffs would not have standing to gift them), the Court or the jury may select one of the members of the jury to be part of the committee that will recommend what particular projects are the best to invest in the money, judging by their benefits to the public and their efficiency in achieving that goal.

In Snepp v. United States, the Supreme Court imposed a constructive trust on a former CIA agent for violating the employment contract he had with the Agency and the

violation to the fiduciary duty he acquired when he signed that contract. The district court had imposed on Snepp a constructive trust by which all the gains of his book went to benefit the government. Snepp appealed to the Fourth Circuit Court, and, because the perception was that the defendant had not published classified information, punitive damages could be enough to sanction the former agent's violations.

"Judge Hoffman, sitting by designation, dissented from the refusal to find a constructive trust." The U.S. Supreme Court agreed with judge Hoffman in that "the proceeds of his breach are impressed with a constructive trust." Snepp v. United States, 444 US 507 - Supreme Court 1980 at 508.

A constructive trust is a form of restitution or restitutionary remedy "measured by the defendant's gains, not by the plaintiff's losses." 1 Dan B. Dobbs, Law of Remedies 4-5 (1993). The "restitutionary goal is to prevent unjust enrichment of the defendant by making him give up what he wrongfully obtained from the plaintiff."

Frank W. Snepp published a book about the CIA involvement in the Viet Nam war based on his experience in that war. The Court informs us that

> As an express condition of his employment with the CIA in 1968, however, Snepp had executed an agreement promising that he would "not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." App. to Pet. for Cert. in No. 78-1871, p. 59a. The promise was an integral part of Snepp's concurrent undertaking "not to disclose any classified information relating to the Agency without proper authorization." *Id.,* at 58a.
> Snepp v. United States, 444 US 507 - Supreme Court 1980 at 508.

Despite that, "the Government's concession [...] that Snepp's book divulged no classified intelligence" was motive for the Fourth Circuit to reverse the constructive trust that the district court had imposed on the defendant.

Based on its perception, the Fourth Circuit Court of Appeals "concluded that the record did not support imposition of a constructive trust." The Supreme Court reversed the court of appeals because a "constructive trust [...] is the natural and customary consequence of a breach of trust. It deals fairly with both parties by conforming relief to the dimensions of the wrong. [...] [T]he trusts remedy simply requires him to disgorge the benefits of his faithlessness. Since the remedy is swift and sure, it is tailored to deter those who [may breach a fiduciary duty]. And since the remedy reaches only funds attributable to the breach, it cannot saddle the [offender] with exemplary damages out of all proportion to his gain." Id. at 515-16.

The similarity of legal structure between Snepp and this case stems from the double offense of breach of contract and breach of fiduciary duty.

The breach of fiduciary duty in this case is the breach of the trust that the public and financial institutions deposit in a merchant when the public gives credit card numbers for the merchant to charge that credit card at certain times, on one hand, and, on the other, when financial institutions release funds belonging to the public and accept as good the charges that the merchant levy on those credit cards and put them in the merchant's account. The merchant has a double fiduciary duty of trust, in which both the public and the financial institution depend for their everyday transactions. Therefore, for the system to function, the public must trust the charges to a credit card will be only those authorized at the authorized times, even if the merchant has the card at all times. The

financial institutions, on its turn, must trust that the charges the merchant levies are acceptable, even if the merchant can charge as much money as the card can support. Violating these fiduciary duties with impunity would render the system ineffectual.

Although the government did not lose money when Snepp published his book about the Agency, Snepp did not published classified information, id. at 511, and Snepp had a free-speech right, as written in the Constitution, and therefore, a right to publish a book with no classified information, Id. at 511, the Supreme Court found that he was subject to a constructive trust in which all the gains of his book went to the government.

The reason for that is that he had signed an agreement stating that he would "not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." Therefore, he breached the fiduciary duty that he owed to his employer by violating the contract he had signed with them. According to the Supreme Court's opinion, there is no proximate cause of loss by the government because no classified information was published, but there is a proximate cause to the defendant's gain out of breaching the fiduciary duty he signed for, and a constructive trust is measured by the defendant's gains, not by the plaintiff's losses. The aim of the constructive trust was to make defendant give up what he has gained out of the wrong done and so to prevent unjust enrichment.

In the case in point, the merchant, TSI / NYSC, violated the double fiduciary duties to the public and to the financial institutions where Plaintiffs and Defendants had accounts because they charged amounts they were not authorized to charge (and sought other amounts through the rent using the same device), at times they were not authorized,

per their promise to give two free months to any person who registered in the Clubs. Therefore, they violated their fiduciary duty to both financial institutions because the charges released by one and received by another financial institution were conveyed as if they were legitimate charges. They also violated their fiduciary duty to the public and to Plaintiff in particular, who entrusted their credit card numbers to levy charges only when those charges were authorized.

Defendants' gains from the wrongs committed cannot be assessed by what Plaintiff lost; that is the pursuit of damages. But by what Defendants gained breaching their double fiduciary duty to the public and to financial institutions. To assess their gains, it is necessary to look at the general public, the people situated equally as Plaintiff, and, therefore, to all the gains they have obtained from that public to achieve one of the goals of the constructive trust:  to prevent unjust enrichment. Otherwise, we would be looking at a case of damages. Moreover, as the constructive trust only takes what the Defendants have inappropriately taken from others, the measure is fair to both Plaintiffs and Defendants.

For the reasons exposed, and given that the Defendants' proceeds in their illegal activities "are impressed with a constructive trust," Plaintiffs respectfully ask from this Court to impose a constructive trust of $778.8 million on Defendants for the unjust enrichment Defendants have committed in these two years, or the amount representing the "funds attributable to the breach of that fiduciary duty." As Defendants Starwood Retail Partners were part and parcel in executing the unjust enrichment, they should pay their share of liability, as well as the officers of both companies who participated in this scam. Plaintiff will publish how these funds are used in the projects stated above.

P. DEFENDANTS SHOULD BE SUBJECT TO PUNITIVE DAMAGES BECAUSE DEFENDANTS COMMITTED CONTRACT FRAUD, CREDIT CARD FRAUD, LARCENY, RICO AND CUTPA VIOLATIONS, VIOLATION OF 15 U.S.C. § 1692 AGAINST PLAINTIFFS, INFRINGING FEDERAL AND STATE STATUTES THAT CARRY PUNITIVE DAMAGES PENALTY IN EITHER JURISDICTION.

Defendants, TSI / NYSC, Starwood Retail Partners / Starwood Corp., and their agents, should be subject to punitive damages because Defendants intentionally engaged in breaching federal and state statutes controlling contract fraud, credit card fraud, larceny, RICO and CUPTA violations, violation of 15 U.S.C. § 1692 and others that carry punitive damages penalty in state or federal jurisdiction, and criminal offenses that carry long prison-term. After violating these statutes, Defendants continued to show contempt for the law by improperly influencing a magistrate to try to solve Plaintiffs' claim by coercion, and when that did not work, by having the magistrate "legalize" the larceny against Plaintiffs by giving to Defendants Plaintiffs' property, although that property was not in front of that court and was not in dispute between the parties. Exhibit #23; Pl.'s Aff. ¶ 42; Levesque's Aff. ¶¶ 3, 5-9.

In the last three decades, the Supreme Court has ruled on several landmark cases in which high awards in punitive damages have been levied against defendants and certiorari has been granted by the Court. One of those cases is BMW of North America, Inc. v. Gore, a case that stems from the purchase Ira Gore made of a new BMW. The car had been repainted in part, due to small post-factory imperfections suffered on the body. According to the distributor, the imperfections amounted to less than 3% of the car value. The repainting was undisclosed to the purchaser and plaintiff, Gore, who discovered it during a visit to a specialized car-detailing place in Alabama, where the

complainant lived. Upon discovering the repainting, Gore sued in state court. "The complaint prayed for $500,000 in compensatory and punitive damages, and costs." The jury found compensatory damages for $4,000 and punitive damages for $4,000,000. On appeal, Alabama Supreme Court remitted the award to $2,000,000 in punitive damages. The defendant received certiorari from the Supreme Court. BMW of North America, Inc. v. Gore, 517 US 559 - Supreme Court 1996.

The importance of the time at which BMW of North America, Inc. v. Gore landed at the Court is that by that time the Supreme Court had more than one and a half centuries ruling on punitive damages, therefore, an accumulation of data and legal theories that permitted ascertain what would be an excessive award on punitive damages and what would not. More importantly, enough concepts had been adopted to ascertain the severity with which a defendant should be punished.

In Gore, the Court stated, that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. Three guideposts […] lead us to the conclusion […] [of when an] award against [a defendant] is grossly excessive: [(1)] the degree of reprehensibility of the [conduct]; [(2)] the disparity between the harm or potential harm suffered by [the plaintiff] and the punitive damages award; and, [(3)] the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at 575.

The Court applied these three "guideposts" to Gore and found that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. […] This principle reflects the accepted view

that some wrongs are more blameworthy than others. Thus, we have said

that 'nonviolent crimes are less serious than crimes marked by violence or the threat of

violence.' […] Similarly, 'trickery and deceit,' […] are more reprehensible than

negligence." Id. at 576.

In continuing to layout the criteria to evaluate the severity of an award, the Court found

that the "second and perhaps most commonly cited indicium of an unreasonable or

excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.

[…] The principle that exemplary damages must bear a 'reasonable relationship' to

compensatory damages has a long pedigree. […] Our decisions in both *Haslip*

and *TXO* endorsed the proposition that a comparison between the compensatory award

and the punitive award is significant." Id. at 581. On these bases the Court states:

> In *Haslip* we concluded that even though a punitive damages award
> of "more than 4 times the amount of compensatory damages" might
> be "close to the line," it did not "cross the line into the area of
> constitutional impropriety." 499 U. S., at 23-24. *TXO,* following dicta
> in *Haslip,* refined this analysis by confirming that the proper inquiry
> is "'whether there is a reasonable relationship between the punitive
> damages award and *the harm likely to result* from the defendant's
> conduct as well as the harm that actually has occurred.'" *TXO*, 509
> U. S., at 460 (emphasis in original), quoting *Haslip*, 499 U. S., at 21.
> Thus, in upholding the $10 million award in *TXO,* we relied on the
> difference between that figure and the harm to the victim that would
> have ensued if the tortious plan had succeeded. That difference
> suggested that the relevant ratio was not more than 10 to 1.
> BMW of North America, Inc. v. Gore, 517 US 559 - Supreme Court
> 1996 at 581.

So, 10 to 1 seems to be one of the magic numbers of proportionality to follow in punitive

damages. In the present case, although the Defendants threatened to use violence

against the Plaintiffs, and used "trickery and deceit" in committing their offenses,

Plaintiffs are looking for punitive damages of 9 to 1, below the line the Court affirmed in Haslip and TXO, and below the line the Supreme Court got Gore remitted.

Referring to the third "guidepost" to evaluate punitive damages, the Court states that comparing "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness. As Justice O'Connor has correctly observed, a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' […] In Haslip, 499 U. S., at 23, the Court noted that although the exemplary award was 'much in excess of the fine that could be imposed,' imprisonment was also authorized in the criminal context." Id. at 583.

Applying these three "guideposts," the Court remanded the case to the supreme court of Alabama to be retried or remitted taking into account the Supreme Court's opinion. The supreme court of Alabama retook the case and remitted it to 12.5 times the compensatory damages. The U.S. Supreme Court based its opinion on several factors that arose by the application of the three "guideposts". If to each finding of the Court in Gore we add the Defendants' conduct in this case, we can distinguish in a point-by-point comparison this case from BMW of North America, Inc. v. Gore and use this comparison as a basis to pray for the proportion Plaintiffs is asking from the District Court on punitive damages. The numbers with a letter depicts Defendants' conduct in this case with respect to the preceding point the Supreme Court commented in Gore.

With respect to the reprehensibility of the conduct, the Supreme Court stated that

1) The defendant in <u>Gore</u> did not show indifference for the health or safety of
others;

1a) The Defendants, TSI / NYSC and its co-conspirators in this case, showed
indifference for Plaintiffs' livelihood by converting their chattel and refusing to comply
with the contract signed with Plaintiffs, and expressed "I don't care what other
people do to you…. This is about business. Pls.' Comp. ¶ 16; Pl.'s Aff. ¶ 22.

2) The harm inflicted on plaintiff in <u>Gore</u> was purely economic;

2a) The harm in this case encompasses economic, reputational, livelihood, safety
and freedom. Pl.'s Comp. ¶¶ 29-31.

3) The presale refinishing of the car in <u>Gore</u> had no effect on its performance;

3a) Plaintiffs' performance depends on their computerized system. Defendants
kidnapped Plaintiffs' computers with the data to be used. If Plaintiffs eventually get it
back, the data will be outdated, and the performance will be zero. Pl.'s Aff. ¶ 30.

4) The harm in <u>Gore</u> was not done intentionally through affirmative acts of
misconduct;

4a) In this case, the harm was done "knowingly and willingly" and on purpose to put
Plaintiffs under duress and gain more money than what the contract and the law
permitted them to gain. Pl.'s Aff. ¶¶ 29-31.

5) The act did not target financially vulnerable people in <u>Gore</u>, warranting
substantial penalty;

5a) Contrariwise, Defendants' perception of Plaintiffs' vulnerability ("you are homeless") prompted them to exploit that perceived vulnerability, locking in Plaintiffs tools, to cause financial shortness and emotional distress. Pl.'s Aff. ¶¶ 22-3 and 28.

6)  There is no evidence that BMW acted in bad faith when it sought to establish the appropriate line between presumptively minor damage and damage requiring disclosure to purchasers;

6a) In this case, Defendants went out of their way to apply their bad faith in the contract and in the relationship to Plaintiffs in general. Pl.'s Aff. ¶¶ 22-3 and 28-32.

7)  There is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful;

7a) In this case, although Plaintiff protested when he was overcharged, Defendants persisted in not returning Plaintiff's money and in continuing with indifference to overcharge Plaintiff and apply their policy of not returning money. On the contract side, Plaintiffs tried to solve the impasse by trying to agree on a revision of the lease in six months. Defendants illegally imposed their will. Pl.'s Aff. ¶¶ 7-9.

8)  The record in Gore discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive;

8a) The record in this case shows that TSI / NYSC and their co-conspirators not only produced deliberate false statements, but staged false statements, signed false statements, and then tried to cover them up with other false statements. They had acts of affirmative misconduct and threats. They concealed the conspiratorial relationship between Starwood and TSI / NYSC. Pls.' Compl. ¶¶ 184-205.

In the ratio to the actual harm inflicted on the plaintiff, the Court stated that

1) In <u>Haslip</u> we concluded that even though a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety";

1a) In this case it is almost impossible to "cross the line into the area of constitutional impropriety" with a big award for punitive damages because Defendants have committed so many criminal acts to intentionally appropriate Plaintiffs' money and other property that the area of "constitutional impropriety" seems out of reach with respect to the punitive measures. Pls.' Compl. ¶ 34.

2) The proper inquiry is "'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred' ";

2a) The harm Defendants have unnecessarily caused, places that proportion beyond what Plaintiff is planning to ask the Court as a proportion adequate to the harm. If prayer fails it would be for shortness in the proportionality, not for excessiveness.

3) In upholding the $10 million award in TXO, we [the Supreme Court] relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1;

3a) In this case we do not need to use the damages "that would have ensued" because the ones that Defendants have already inflicted are enough to sustain more than what the Plaintiffs is asking for. Plaintiff is suffering that harm every day, and

every day is bigger. And yet, Plaintiff is planning to stay below the proportional just line of 10 to 1 that the Supreme Court affirmed in TXO and other cases.

4)  The $2 million in punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury;

4a) BMW's repainting of Ira Gore's car cost some $600.00. The compensatory damages were $4,000 (including the treble damages), so the $2 million were effectively 500 times the compensatory damages. The Alabama Supreme Court remitted the punitive damages to 12.5 times the compensatory damages ($50,000.). Our prayers in this case are only 9 times the compensatory damages.

With respect to sanctions for comparable misconduct, the Court stated that

1)  The $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance;

1a) The federal and state statutory penalties Defendants may confront for their violations run from 30 years in prison to $1 million for each instance of the violation. Pls.' Compl. ¶ 34 et seq.

2)  The maximum civil penalty authorized by the Alabama Legislature for a violation of its Deceptive Trade Practices Act is $2,000; other States authorize more severe sanctions, with the maxima ranging from $5,000 to $10,000;

2a) The maxima violation is $1 million per violation plus 30 years in prison for the offenses Defendants have committed. If the District Court opt for sequential prison

terms for these violations, Defendants would need several lives to comply the prison terms. Pls.' Compl. ¶ 34.

3)  Significantly, some statutes draw a distinction between first offenders and recidivists; thus, in New York the penalty is $50 for a first offense and $250 for subsequent offenses;

3a) Even in just Plaintiff's case, Defendants are recidivists because they continued their violations after Plaintiff gave them notice of the violations. Pl.'s Aff. ¶¶ 7-8.

4)   None of these statutes would provide an out-of-state distributor with fair notice that the first violation—or, indeed the first 14 violations—of its provisions might subject an offender to a multimillion dollar penalty;

4a) In this case, Defendants have violated several federal statutes, therefore, this point of the Court's opinion does not apply, and if it does, the RICO violations consider fines of multimillion dollars even for two or three offenses if they are in a pattern. Defendants and agents incurred in more than three violations of these statutes. Pls.' Compl. ¶¶ 58-98.

5)  Moreover, at the time BMW's policy was first challenged, there does not appear to have been any judicial decision in Alabama or elsewhere indicating that application of that policy might give rise to such severe punishment;

5a) Contrary to that, there are many cases in Connecticut where these offenses have been ruled illegal. And examples in which both the District Court and the courts of general jurisdiction in the state have levied big punitive damages. Likewise, in

federal courts precedents have been formed to punish this conduct. Pls.' Compl. ¶¶ 58-98.

6)  The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal;

6a) Plaintiffs agree in this point, even if the case continues to sustain otherwise. That is why Plaintiffs are asking for only moderate measures of punitive damages (9 to 1), regardless that Defendants' conduct merits stronger ones.

7)  The fact that a multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers.

7a) Despite Defendants' outrageous conduct, Plaintiffs are with the Court because we should not descend to Roman circus times to adequately punish Defendants. Plaintiffs believe that a lesser deterrent than 500 to 1 may accomplish the goal Connecticut's consumers need as protection against this type of predators. That is why Plaintiff is asking for only 9 to 1 times the compensatory damages the jury finds. Besides that, like in the constructive trust, Plaintiffs have decided to gift the proceeds of the punitive damages to social causes in health, education, libraries, public radio and TV, and similar social endeavors. Plaintiffs will form a committee for the task.

In conclusion, given the facts and arguments presented, Plaintiffs ask the Court to award punitive damages in the amount of 9 times the compensatory damages that will be calculated in the next section.

Q. DEFENDANTS SHOULD BE SUBJECT TO TREBLE COMPENSATORY DAMAGES BECAUSE DEFENDANTS HAVE COMMITTED FRAUD, LARCENY, RICO AND CUTPA VIOLATIONS; THE FEDERAL AND STATE STATUTES SAY, AND THE COURTS HAVE FOUND, THAT EACH ONE OF THOSE VIOLATIONS CARRIES THE CIVIL PENALTY OF TREBLE COMPENSATORY DAMAGES.

435. Plaintiffs presented evidence and showed in **Points D, E,** and **F** that Defendants committed three counts of fraud, each of which carries a penalty of treble compensatory damages. Plaintiffs also presented evidence and demonstrated in **Points L** and **M** that Defendants committed a count of conversion and two counts of larceny and attempted a third count of larceny. Each count of larceny carries a penalty of treble compensatory damages. And in **Points A** and **B**, Plaintiffs presented evidence and showed that Defendants violated RICO and CUPTA statutes, that also carry treble damages. The counts in **D, E, F,** and **M** carry penalties of punitive damages as well.

436. Plaintiffs' attached documentation about projects' income and costs that should be the main base for an objective, rational, and equitable source to assess treble damages because it evaluates materially the injuries Defendants caused, using the proper evidence for the damages Defendants caused and continue to cause to the Plaintiffs.

437. Superb Score LLC is the successor in interest of The Tower Company LLC. Both companies are organized under Connecticut laws and under the same ownership, and are dedicated to the after-school improving student business, in AP Classes and standardized-tests taking.

438. The Tower Company operates in this field since 2007. In the year 2014, the company hired specialized professionals to build an educational system aimed at computerizing tasks for improving high-school students' performances in both areas.

439. The two projects should execute together using the same computerized system. But only the one to improve students' performance in AP Classes was submitted to the Department of Economic and Community Development (DECD) because that project solves innovatively public high-school students' problems in this area, at the same time that bound-to-college students save money in their future careers and reduce their risk of dropping out of college in up to twenty-five percent.

440. The computerized-task automatic system intertwines educational principles with self-correcting homework available on the internet that works as an engine to impel both projects.

441. The Tower Company hired two computer experts to build this system, but they could not attain the complex goal. Thence, Plaintiff decided to start from scratch learning how to execute the necessary computer tasks to build the system.

442. To have a real assessment of the cost to build the system and the income that it would be able to generate, we should define two basic concepts that serve as underpinnings of this assessment. The two concepts are *opportunity cost* and *project value*.

443. *Opportunity cost* is what a person forgoes gaining in an economic activity for not exercising that economic activity instead of the one the person is engaged in; or, as Samuelson and Nordhaus put it, "the *opportunity cost* of a decision consists of the things that are given up by taking that particular decision rather than taking an

alternative decision." Samuelson, Paul and Nordhaus, William D. Economics, p. 469, Twelfth Edition, 1985.

444. At the time when Plaintiff made the decision to work in the computer programming described, Plaintiff's income was around $92,000.00 a year, teaching standardized tests and high-school subjects 30 hours a week, as the tax return for that year shows. Exhibit #19.

445. Therefore, Plaintiff's opportunity cost to build the computerized system was $92,000.00 a year, if working 30 hours a week. But on building the computerized system, Plaintiff had to work three times the number of hours, some 98 hours a week, if Plaintiff wanted to finish within a reasonable time; therefore, the real cost per year was $276,000.00, three times his income. And as it took Plaintiff three years to build the program, the hourly component cost in those three years was $828,000.00.

446. The project for hiring University Faculty to teach AP Classes to High School Students, was researched and written in six months working at the same rate. Therefore, its assigned cost should be $138,000.00. The hourly cost for the two projects is $966,000.00.

447. To fund the activity and live, Plaintiff indebted himself for about $350,000.00, which raises the total opportunity cost to $1,316,000.00. Defendants are responsible for this initial damage of $1,316,000.00.

448. However, we must differentiate between the cost of a project and the value of a project. While the costs are all the costs of conceiving, planning, and executing the

project, the *value of a project* is the net income the project generates during its useful life.

449. For example, the project to teach AP Classes had a cost of $138,000.00, its value is what it would generate during the life span of the project. And in the first three years it would generate a net income equals to the sum of the net income it generates each one of those three years. As seen in the project, it is $413,052.00 + $1,163,182.00 + $1,597,447.00, which equals $3,173,681.00. In the first and second years, the AP Classes project should generate $1,576,234.00, which is what we are concerned with for now. Appendix C.

450. To spell out how much the standardized-test taking project would generate in the first year, using some of the resources as the AP Classes project, it is important to take into account that our standardized-test taking are 24-hour classes, distributed in 12 sections of two consecutive hours each, one day per week. To make classes efficient for students and teachers, we fit no more than 12 students per class. As the paid classes are Monday through Thursday, from 3:00 to 9:00 p.m., we can fit in that schedule 144 students, in one classroom in a quarter or the equivalent of 12 weeks. Given that the year has four quarters, we can fit 576 students in one classroom in one year.

451. By the number of qualified teachers and other personnel Superb Score had in the project, by the end of March, 2018, the Plaintiff would have been able to rent a four-classroom location in the vicinity of the one at TSI / NYSC, with the money generated by our first few classes. That was the plan, and that was confided to TSI / NYSC's manager, Brisvely Garcia, before they decided to kidnap the tools with

which we teach and the computers where some of the information and plans are contained, to demand a rent increase as a ransom, aware of the damages they were causing.

452. If the number of students that we would fit in one classroom were 576, in four classrooms we would be able to fit 576 X 4 = 2,304. Therefore, in the first year the standardized-test taking project should generate 2,304 X $1,200 = $2,764,800.00. If we have a cost of $200,000.00 in paying teachers and other expenses, when that is deducted, we obtain

$2,764,800.00 – $200,000.00 = $2,564,800.00

Now let us multiply by 2 for the years this should have been working:

$2,564,800.00 X 2 = $5,129,600.00

If now we add that to the AP Classes part of the project, the damages caused by Defendants for the first two years in that area alone are

$5,129,600.00 + $1,576,234.00 = $6,705,834.00.

Plaintiff told Defendants that the book we have written should generate a minimum of 1.92 million dollars, as we expressed above. Adding that, the damages for the two years are $8,625,834.00

453. Projecting the generation of income of $8,625,834.00 in the first two years, raises several questions, the first of which is whether Superb Score was going to be able to get 2,304 students to teach in the four quarters of each of the two years, given that Superb Score has not previously done that.

454. The Tower Company's tax return shows that the company had been increasing its business by 50% or more each year for the last three years in which it was active. Exhibits #19, #20, #21. The day-to-day experience of somebody who is a teacher, an economist, and an administrator shows that, to achieve the jump of getting 2,304 or more students in each year from the previous number, we just had to offer five advantages that our competitors are not offering and could not offer right away as a reaction to our promotion: (1) high quality and low prices in the classes offered, (2) solve problems students are confronting and neither the school system nor our competitors are solving, (3) individualized attention to each student's learning style and derived problems, without increasing the price, (4) save time to parents and bound-to-college students, and, (5)  communicate these advantages in a way that parents and students are willing to accept: Giving them the opportunity to try our system free of charge. That way they would assess the value of our offer.

455. (1) The high quality has been applied from the very beginning, as a matter of teaching policy. But we could not offer low prices and high quality together because we had to teach students individually in order to offer high quality. The advantage of the computerized system is that all the necessary tasks and a self-correcting mechanism with explanations permit a teacher to execute her program without glitches of interruptions to explain a point that most students know, but one or two students do not understand. The computerized system identifies the theme a particular student is struggling with and the issues in that theme crucial to overcome the weakness, then the system assigns tasks (homework) that strengthen the student's mastery of that point.

456. That way, the computerized system permits us to teach students in groups while paying individualized attention to each student, without delaying the other students or divulging which particular student has the problem, avoiding the discomfort attached to that divulging. By arranging the classes with that computerized help, the system solves the quality, the price, and the individualization issues simultaneously.

457. (2) (a) To solve problems that students, professionals, and the general population confronts these days and no institution seems to be solving: Due to the high quantity of written information, people have to read more just to keep abreast of the things they need to know. To solve that in the contest of middle- and high-school students, we are offering for free a three-week introductory speed-reading course. Two successive courses give students the techniques needed to master a faster reading with a better comprehension. Slow reading and low comprehension affect their performance in standardized tests, even if they take the best course to prepare for a particular test. (2) (b) An unintended consequence of calculators and computers to their young users is impairing their unaided calculating abilities. We are offering a three-week introductory course Calculating Without Machines, also for free, with two follow-up courses that help students master their calculating techniques, improve their reasoning and ability to solve tests, standardized or not.

458. (3) As the computerized system allows us to teach as many students as we can fit in a room, instead of one, we can lower the prices while having a better bottom line. So, we decided to cut the prices in half. At the same time, we have a more accurate picture of each student's needs. And that information can be seen by the

administrators without the teacher's filter, to solve students' problems before they

get too complicated, or to solve problems that are beyond the teacher's domain.

459. (4) Because the homework is done and corrected on the Internet, an athlete can

do her homework while travelling for a match to another school or sitting on the

bench in a game. Likewise, a student who has fever and did not attend our class that

day can still do his homework and ask through the computerized system what he

missed that day. All of which saves time to parents and students.

460. (5) By offering free classes in speed-reading and calculating without machines, we

acquaint parents and students with our teaching system. Because the school system

cannot solve in the short term the reading and math problems we are aiming to

solve, parents and students should be inclined to try for free such a solution. This

way of communicating our advantages through free practical samples should

facilitate recruiting students.

461. We were on our way to implementing these projects when TSI / NYSC locked us

out, locking in our teaching tools, for which we have not been able to implement

these projects or have an income since then.

462. Now, there are 39,550 public high-school students and 27,705 public middle-

school students in the Hartford County. Table I, compiled from *Patterson's American

Education*, pages 104-111, 2018, shows the students' distribution per school. These

numbers add up to 67,255 high-school and middle-school students.

463. To register 2,304 students, we only need 6% of the high-school students in the

county to become interested in one of our classes, or 3.4% of the combined number

of public high-school and middle-school students to have that same interest. The

advantages we are offering to those students and the way we are communicating those advantages makes it easy to attract those students.

464. Because we are relying on the whole county to get those students, a legitimate question that might be raised is about transportation. To which we answer that the town farthest from the rented location in West Hartford is Enfield, and it only takes 37 minutes to go from Enfield to West Hartford Center, according to Google Maps.

465. Therefore, with all the advantages we are offering to parents and students for our classes and the offering of free classes that solve problems that even intelligent and dedicated students confront, getting 6% of the public high-school population interested in solving their standardized-tests needs with us, should not be a difficult task, or, alternatively, getting 3.4% of the combined public middle-school and high-school students interested in one of our classes, should be even easier.

466. Moreover, as the year has 52 weeks and each free class will last three weeks, in one year we can assemble 17 one-hour classes on Saturday from 10:00 to 11:00 a.m. Therefore, working eight hours on Saturdays and eight on Sundays, we can assemble 16 X 17 = 272 classes. Having classes of a minimum of 12 students, we can give a first-hand experience of our material to 13,056 students a year, if we use only one classroom those days. To play safe in our calculations, we are only counting on the registration of 2,304 out of that pool, which means less than 18% of the students who have already tested our system for free and would decide to register.

467. Superb Score or its parent in interest, The Tower Company, had not previously done that only because the company was missing the tool that Ramon Moreno sat

down to build. As director and teacher, Plaintiff knew what was missing to hire new teachers and keep the quality of education at a level that has generated enthusiastic praises from parents and students, impressed by increases between 200 and 600 points in the SAT and improved performance in AP and regular classes in school.

468. For these reasons, the attached documentation about the projects, supports the amount of $8,625,834.00 to apply treble damages to for the two years that are about to pass. As Defendants committed more than four offenses that carry the penalty of treble damages, Plaintiffs multiply the basic amount of $8,625,834.00 by 9 to obtain the compensatory damages the law authorizes of $77,632,506.00 for the first two years.

To avoid arguments which we are not interested in proving at this time, like the value of the chattel in Defendants' premises, we have not included that and other damages Defendants have caused. We reserve the right to do so if it becomes necessary. Therefore, for now, what Plaintiffs submit to the Court as compensatory damages is the amount of $77,632,506.00.

469. In the previous section Plaintiffs laid the ground to calculate punitive damages. Despite the analysis of this case and the precedents that call for more, Plaintiffs want to limit their punitive damages to only nine (9) times the compensatory damages, a digit below the line the Supreme Court Seems to be comfortable with. That is, $$77,632,506.00 X 9 = $698,692,554. Just like the constructive trust, Plaintiffs have decided to gift the entire amount of punitive damages to support social projects in health, education, libraries, public radio and TV, either contributing to specific projects or financing complete projects in these areas. By punishing

to specific projects or financing complete projects in these areas. By punishing

Defendants with punitive damages we can deter their subsequent misbehavior and

the misbehavior of the others who are acting "thusly."


SIGNED UNDER PENALTY OF PERJURY

Ramon Moreno-Cuevas

Superb Score LLC

97 Newton St. 2nd Floor

Hartford, CT 06106

203-343-8505

morenocramon@gmail.com


On this the 26 day of October , 20 19 , before me, Ashley Carrasquillo the

undersigned officer, personally appeared Ramon Moreno- Cuevas ,

satisfactorily proven to be the person whose name is subscribed to the within instrument

and acknowledge that he executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.


Signature of Notary Public

Date Commission Expires: _9/30/2020_


Printed name of Notary Public

ASHLEY CARRASQUILLO
Notary Public, State of Connecticut
My Commission Expires Sept. 30, 2020